# Exhibit 5

# Transcript of

# **Debi Stafford**

September 19, 2017

## Linda Liano v. Computer Sciences Corporation

NJL Court Reporting & Video
Phone:800-426-7965
Fax:856-910-0037
Email:deps@njlone.com
Internet: www.njlone.com

Debi Stafford

---

**1**

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

LINDA LIANO,
            Plaintiff,
    vs.              NO. 2:16-CV-01080-hb
COMPUTER SCIENCES CORPORATION,
            Defendant.

VIDEOTAPE
DEPOSITION OF:    DEBI STAFFORD

DATE:          September 19, 2017

TIME:          1:58 p.m.

LOCATION:      A. William Roberts, Jr. &
               Associates
               234 Seven Farms Drive
               Charleston, SC
TAKEN BY:      Counsel for the Plaintiff
REPORTED BY:   Janice N. Shepherd,
               Registered Professional
               Reporter

---

**2**

 1   APPEARANCES OF COUNSEL:
 2       ATTORNEYS FOR THE PLAINTIFF
         LINDA LIANO:
 3
         CONSOLE MATTIACCI LAW
 4       BY:  RAHUL MUNSHI (via VTC)
             1525 Locust Street, 9th Floor
 5           Philadelphia, PA 19102
             (215) 545-7676
 6           munshi@consolelaw.com
 7       ATTORNEYS FOR THE DEFENDANT
         COMPUTER SCIENCES CORPORATION:
 8
         THE KULLMAN FIRM
 9       BY:  F. DANIEL WOOD
             600 University Park Place, Suite 340
10           Birmingham, AL 35209
             (205) 871-5858
11           fdw@kullmanfirm.com
12       JOSEPH R. WARD, III (via phone)
             1100 Poydras Street, #1600
13           New Orleans, LA 70163
             (504) 524-4162
14           jrw@kullmanlaw.com
15   ALSO PRESENT:
         CLINT THOMAS, LEGAL VIDEOGRAPHER
16
17
18
19
20
21
22
23
24
25       (INDEX AT REAR OF TRANSCRIPT)

---

**3**

 1       VIDEOGRAPHER:  Good afternoon.  We are
 2   now on the record.  Today's date is September 19th,
 3   2017, and the time on the monitor is approximately
 4   1:58 p.m.  This is the video deposition of Debi
 5   Stafford taken by counsel for the plaintiff.  The
 6   location is AWR's offices at 234 Seven Farms Drive
 7   in Charleston, South Carolina.  My name is Clint
 8   Thomas, legal videographer, representing A.
 9   William Roberts, Jr. & Associates and New Jersey
10   Legal.  I am familiar with the provisions of Rule
11   30(h) pertaining to videotape depositions.  This
12   deposition is taken in the matter of Linda Liano
13   versus Computer Sciences Corporation, Case Number
14   2:16-CV-01080-HB.  Counsel present, will you please
15   introduce yourselves for the record.
16       MR. MUNSHI:  Hi, this is Rahul Munshi
17   on behalf of the plaintiff, Linda Liano.
18       MR. WOOD:  Daniel Wood for Computer
19   Sciences Corporation.  And I believe my colleague,
20   Joe Ward, is also dialed in by remote, I think,
21   telephone.
22       MR. WARD:  That's correct, Daniel.  I'm
23   on the line.
24       VIDEOGRAPHER:  In accordance with Rule
25   30(h)(3), the witness has the right to be shown the

---

**4**

 1   videotape deposition unless waived by the witness
 2   and the parties.  Madam Court Reporter, will you
 3   please swear in the witness, and we may proceed.
 4       DEBI STAFFORD,
 5   being first duly sworn, was examined and testified
 6   as follows:
 7       MR. MUNSHI:  All ready to proceed?
 8       VIDEOGRAPHER:  Yes.
 9       EXAMINATION
10   BY MR. MUNSHI:
11       Q.  Okay.  Good afternoon, Ms. Stafford.
12       A.  How are you?
13       Q.  My name is -- good, good.  My name is
14   Rahul Munshi.  I'm an attorney at Console Mattiacci
15   Law up in Philadelphia, and I have the privilege of
16   representing Linda Liano in this matter that's
17   brought against CSC.  You're here today for your
18   deposition.  Do you understand that?
19       A.  I do.
20       Q.  Have you ever had your deposition taken
21   before?
22       A.  I have.
23       Q.  When was the last time?
24       A.  Four years ago.
25       Q.  Okay.  Before we get into everything,

---

1 (Pages 1 to 4)

Debi Stafford

5

1    let me go over some of the basic ground rules here.
2    You'll probably remember it from last time.
3    Basically I'm going to be asking you some questions
4    here today, and you're going to give me answers to
5    those questions.  If I ask you a question that you
6    don't understand or you want me to repeat, just let
7    me know.  I'll try to ask a better question.  Okay?
8        A.   Certainly.
9        Q.   You have a court reporter sitting next
10   to you.  She's taking everything we're saying down
11   so that a transcript can be created later.  As a
12   result, we have to be aware of a couple of things.
13   One is that we have to make sure that we do our
14   best to not talk over each other.  Otherwise the
15   transcript is not going to come out clean.  So I'll
16   ask you to try to wait until I'm done asking my
17   question, even if you know where I'm going with it,
18   and I'll try to do my best to wait until you're
19   done answering my question until I ask the next
20   one.  Okay?
21       A.   Okay.
22       Q.   Similar instructions for the purposes
23   of the transcript, we want to make sure we
24   verbalize all of our answers.  A head shake or head
25   not is not going to come out clean.  So from time

6

1    to time I may ask you to please verbalize your
2    actual answer.  Do you understand that?
3        A.   I do.
4        Q.   If you do want to take a break at any
5    point, just let us know.  As long as there is no
6    question pending at that time, we can go ahead and
7    do that.  All right?
8        A.   Okay.
9        Q.   And the last instruction I'll give you,
10   Ms. Stafford, is the most important one, and that
11   is, even though I'm in a conference room here and
12   you're in a conference room there and there's no
13   judge, there's no jury present, you did just take
14   an oath here to tell the truth.  And with that oath
15   comes the same responsibilities and potential
16   penalties of perjury if you do not tell the truth.
17   Do you understand that?
18       A.   I do.
19       Q.   Okay.  Now, you mentioned that you were
20   deposed around four years ago; is that right?
21       A.   That's correct.
22       Q.   Okay.  And were you employed by CSC at
23   that time?
24       A.   Yes, I was.
25       Q.   And was your deposition in connection

7

1    with a CSC matter?
2        A.   Yes, it was.
3        Q.   What was the nature of that case?
4        A.   It was an employee dispute upon
5    termination.
6        Q.   What was the name of the plaintiff in
7    that action?
8        A.   I don't recall.
9        Q.   Do you recall if it was a man or a
10   woman?
11       A.   No.
12       Q.   Did you understand that CSC was a
13   defendant in that action?
14       A.   I did.
15       Q.   And was that individual somebody who
16   was a former employee of CSC?
17       A.   Yes.
18       Q.   And did that person bring an action
19   basically challenging the stated reasons for the
20   termination?
21       A.   I don't recall that.
22       Q.   Okay.  Did you understand that it was
23   an employment-related matter though?
24       A.   I did.
25       Q.   Did you play any role in the decision

8

1    to terminate that person's employment?
2        A.   No.
3        Q.   Where was that person employed?
4        A.   I don't recall.
5        Q.   Did you personally know that person
6    prior to their termination?
7        A.   No.
8        Q.   Did you play any role whatsoever in the
9    decision to terminate that person's employment?
10       A.   No.
11       Q.   And do you know where that case was
12   filed, where that lawsuit was filed?
13       A.   I do not.
14       Q.   Did you testify at trial in that case?
15       A.   No.
16       Q.   Do you know if the case did go to
17   trial?
18       A.   I don't.
19       Q.   Do you know if the matter was resolved
20   prior to trial?
21       A.   I don't.
22       Q.   Okay.  Any other times during your
23   employment with CSC that you were deposed as a
24   representative of CSC?
25           MR. WOOD:  Object to the form.  You can

Debi Stafford

9

1    answer.
2         THE WITNESS:  Yes.
3    BY MR. MUNSHI:
4         Q.  How many other times?
5         A.  I don't recall exactly.
6         Q.  More than one other time?
7         A.  Yes.
8         Q.  When was the last time that you recall
9    prior to the one you just told me about?
10        A.  I don't remember.
11        Q.  Prior -- except for the one that you
12   already told me about, have you ever been deposed
13   in connection with an employment-related case --
14        A.  Yes.
15        Q.  -- that was filed against CSC?
16        A.  Yes.
17        Q.  Okay.  Are you aware of the name of the
18   individual who brought the action that was the one
19   preceding the deposition you just told me about?
20        A.  I don't recall.
21        Q.  Are you aware of any complaints,
22   lawsuit complaints, that were brought against CSC
23   during your tenure there where the individual
24   claimed to be discriminated against by CSC?
25        A.  Would you ask me that again?

11

1         Q.  What documents have you reviewed?
2         A.  Some org charts, some Power Point
3    presentations from the past.
4         MR. MUNSHI:  I'm sorry.  We're having a
5    little technical difficulty here.  Is there a
6    background noise on your end, or is it just on our
7    end?
8         THE WITNESS:  The air conditioner just
9    turned on.
10        VIDEOGRAPHER:  The air conditioner.
11        THE WITNESS:  Yeah, the air conditioner
12   just turned on.
13        MR. MUNSHI:  Oh, okay.  Can we just
14   take a moment and see if we can fix that, because I
15   can't hear.
16        VIDEOGRAPHER:  I can do that.  Give me
17   one moment.  Let's go off the record real quick so
18   I can do that, if you guys don't mind.  We'll now
19   go off the record.  The time on the monitor is
20   approximately 2:06 p.m.
21        (A recess transpired.)
22        VIDEOGRAPHER:  We'll now go back on the
23   record.  The time on the monitor is now 2:07 p.m.
24   BY MR. MUNSHI:
25        Q.  Ms. Stafford, I asked you if you had

10

1         Q.  Sure.  Are you aware of any employment
2    actions, lawsuits, that were brought in court where
3    the individual claimed to be discriminated against
4    by CSC?
5         A.  Yes.
6         Q.  Have you ever testified at trial for
7    any of those cases?
8         A.  No.
9         Q.  Are you aware of the names of any of
10   the individuals who brought claims that they said
11   they were discriminated against by CSC?
12        A.  I don't remember those names.
13        Q.  Okay.  You're here today because you
14   received a subpoena for your deposition; is that
15   correct?
16        A.  Yes.
17        Q.  And are you being represented by CSC's
18   counsel here today?
19        A.  I am.
20        Q.  Did you personally retain him, or was
21   it a connection through the company?
22        A.  A connection through the company.
23        Q.  Did you review any documents in
24   preparation for your deposition today?
25        A.  Yes.

12

1    reviewed any documents in preparation for your
2    deposition.  And I believe you starting answering,
3    but I didn't hear what you said.  Can you complete
4    your answer?
5         A.  I said, yes, I did.  I reviewed some
6    Power Point presentations, some org charts.  That's
7    it.
8         Q.  Describe the Power Point presentations
9    that you reviewed, please.
10        A.  They mostly covered our spans and
11   layers process that we went through at CSC.
12        Q.  Were those documents documents that you
13   had seen while you were employed at CSC during that
14   time period?
15        A.  I can't say they all were, no.
16        Q.  Okay.  And the org charts that you
17   reviewed, were those ones that you had previously
18   seen?
19        A.  Yes.
20        Q.  Did you create those org charts?
21        A.  No.
22        Q.  When did you first see those org
23   charts?
24        A.  At the time they were created, so 2012,
25   2013.

3 (Pages 9 to 12)

Debi Stafford

---

**13**

1    MR. MUNSHI:  I have a little background
2  noise -- okay.  I can only see you, by the way.  So
3  I can't see if there are other things going on back
4  there.
5  BY MR. MUNSHI:
6    Q.  So the org charts that you saw were org
7  charts that reflected the organizational structure
8  in the 2012, 2013 area; is that right?
9    A.  Yes.
10    Q.  Do you know who did create those org
11  charts?
12    A.  No.
13    Q.  Did you play any role in the
14  preparation of those org charts?
15    A.  Yes.
16    Q.  What role did you play?
17    A.  I would have been working with my HR
18  business partners on those.
19    Q.  What was the purpose of their creation?
20    A.  Can you ask me that a different way?
21    Q.  Why were those org charts created?
22    A.  To reflect the nature of the
23  organization.
24    Q.  Were they created in connection with
25  the reduction in force at CSC?

---

**14**

1    A.  Some of them may have been.
2    Q.  And what was the purpose of creating
3  them in connection with the reduction in force?
4    A.  To reflect the organization.
5    Q.  And were they created to reflect the
6  organization before the reduction in force, as well
7  as what it would look like after the reduction in
8  force?
9    MR. WOOD:  Objection to the form.
10    THE WITNESS:  Yes.
11  BY MR. MUNSHI:
12    Q.  In any of your organizational charts
13  that you reviewed, was Ms. Liano's name on there?
14    A.  Yes.
15    Q.  And was her name on any organizational
16  chart that was meant to reflect the organizational
17  structure in the year 2013?
18    MR. WOOD:  Object to the form.
19    THE WITNESS:  I don't believe so, no.
20  BY MR. MUNSHI:
21    Q.  Okay.  You mentioned HR business
22  partners with whom you worked.  Who were those
23  individuals?
24    A.  Different people that worked for me in
25  the organization, depending on the business units

---

**15**

1  or what I needed at the time.
2    Q.  Any specific individual that you
3  recall?
4    MR. WOOD:  Object to the form.
5    THE WITNESS:  Well, I had a fairly
6  large staff of business partners, so anybody that
7  would have been on my staff.
8  BY MR. MUNSHI:
9    Q.  Any other documents besides
10  organizational charts and Power Point presentations
11  that you reviewed prior to this deposition?
12    A.  No, sir.
13    Q.  When did you first learn that Ms. Liano
14  had brought this action against CSC?
15    A.  Probably a year and a half ago.
16    Q.  Okay.  And how did you learn that she
17  had brought this action?
18    A.  I received a call from Joe.
19    Q.  Joe Ward, the attorney for CSC?
20    A.  Yes, I'm sorry.
21    Q.  That's okay.  And putting aside any
22  conversations that you had with counsel for CSC,
23  have you communicated with anybody regarding
24  Ms. Liano's lawsuit?
25    A.  I have not.

---

**16**

1    Q.  Are you currently working at CSC?
2    A.  No, I'm not.
3    Q.  When did you leave CSC?
4    A.  I left voluntarily in August of 2014.
5    Q.  Are you still in communication with any
6  of your former co-workers at CSC?
7    A.  That are still employed at CSC?
8    Q.  Or with whom you used to work at CSC.
9    A.  Yes.
10    Q.  Have you communicated with any of those
11  individuals about Linda Liano?
12    A.  No.
13    Q.  Have you communicated with any of those
14  individuals about the lawsuit that she brought?
15    A.  No.  Could I just elaborate on that for
16  one second?
17    Q.  Go ahead.
18    A.  My boss today worked at CSC, and so I
19  communicated to him that I had this deposition
20  today in order to be off today.  No details, no
21  name.
22    Q.  Okay.  And who is your current boss?
23    A.  Ray August.
24    Q.  And did you work with Mr. August back
25  when you worked at CSC?

---

4 (Pages 13 to 16)

Debi Stafford

17

1    A.  I did.
2    Q.  Where do you currently work?
3    A.  Benefitfocus in Charleston, South
4  Carolina, spelled just like it sounds.
5    Q.  Ms. Stafford, what is your date of
6  birth?
7    A.  7/6/55.
8    Q.  Can you walk me through your education
9  background post high school?
10   A.  University of Texas, degree in
11  psychology.
12   Q.  And what year did you receive that
13  degree?
14   A.  I don't remember.  I took several years
15  off to have babies.
16   Q.  Sure.  Any other graduate degrees or
17  undergraduate degrees?
18   A.  No.
19   Q.  When did you join CSC?
20   A.  I was acquired by CSC, I think, in 1995
21  by a company called Continuum.  I was working for
22  Continuum.  They were acquired by CSC.
23   Q.  What kind of work were you doing for
24  Continuum?
25   A.  I was a vice president of human

18

1  resources.
2    Q.  And did you work continuously for CSC
3  from 1995 until 2014?
4    A.  No.  No.
5    Q.  Walk me through --
6    A.  I took seven months off to go chase dot
7  com riches just before the term of the year.
8    Q.  Okay.  And then you came back?
9    A.  Yes.
10   Q.  You didn't strike it rich, I take it?
11   A.  I didn't.  CSC made me a better offer.
12   Q.  What was your first position with CSC?
13   A.  Vice president of human resources.
14   Q.  Did your job title change at any point
15  during your tenure at CSC?
16   A.  No.
17   Q.  In other words, when you left CSC in
18  2014, you were still the VP of HR?
19   A.  Yes.
20   Q.  When you left CSC in 2014, who did you
21  report directly to?
22   A.  The HR -- the HR by -- the CHRO of
23  human resources, who was fairly new, and I cannot
24  recall her name.  Donna.  Donna Lesch, L-E-S-C-H.
25   Q.  And did any individuals report to you?

19

1    A.  Yes, I had a global staff.
2    Q.  Approximately how many people reported
3  to you right before you left CSC?
4    A.  Fifteen.
5    Q.  Why did you leave CSC?
6    A.  I retired.
7    Q.  When did you start working for Benefit
8  Focus?
9    A.  I started consulting with Benefit Focus
10  in February of 2016.
11   Q.  And your retirement from CSC was
12  voluntary?
13   A.  Yes.
14   Q.  Were you ever asked to resign?
15   A.  No.
16   Q.  Were you given a severance package in
17  connection with your leaving CSC?
18   A.  No, I was not.
19   Q.  Do you own any shares of stock of CSC?
20   A.  No, I do not.
21   Q.  Have you ever been terminated from any
22  job before --
23   A.  No.
24   Q.  -- involuntary?  Going back to your
25  professional background, when did you first start

20

1  working in human resources in any capacity at any
2  company?
3    A.  1980 for Progressive Insurance.
4    Q.  And are you currently working in human
5  resources?
6    A.  Yes.
7    Q.  Are you a member of any HR societies or
8  organizations?
9    A.  I'm not.
10   Q.  Do you have any certificates or
11  certifications or licenses in HR?
12   A.  No.
13   Q.  Back in 2012 at CSC, what were your
14  general job duties as VP of HR?
15   A.  I was reporting to the leader of the
16  global industries group, and I had general
17  responsibilities for HR strategy, workforce
18  planning, general employment issues, compensation.
19   Q.  What do you mean by workforce planning?
20   A.  Staffing, making sure we had proper
21  staff for the revenue projected.
22   Q.  Where were you based out of while you
23  were working for CSC?
24   A.  I lived in Austin, Texas.  But the last
25  three years with CSC, I was living -- commuting to

Debi Stafford

21

```
 1   Falls Church, Virginia, every week.
 2        Q.  Have you ever met Linda Liano in
 3   person?
 4        A.  I don't think so, no.
 5        Q.  As part of your job duties and
 6   responsibilities at CSC, did you have any
 7   responsibilities as it pertained to EEO issues,
 8   Equal Employment Opportunity issues?
 9        A.  Explain it -- explain more.
10        Q.  Sure.  Lots of people in HR do
11   different things.  Certain HR employees also work
12   with EEO issues, meaning complaints about
13   discrimination, complaints about retaliation, those
14   types of things.  Did any of those issues fall
15   within your jurisdiction?
16            MR. WOOD:  Object to the form.
17            THE WITNESS:  Yes, they did.
18   BY MR. MUNSHI:
19        Q.  What were your job responsibilities and
20   duties as it pertained to the EEO issues?
21            MR. WOOD:  Object to the form.  You can
22   answer.
23            THE WITNESS:  To conduct an
24   investigation and resolve the issues.
25   BY MR. MUNSHI:
```

22

```
 1        Q.  Have you taken any courses or any
 2   classes or any seminars on how to recognize
 3   discrimination in the workplace?
 4        A.  Yes.
 5        Q.  Taken any classes or seminars on
 6   employment law or civil rights law?
 7        A.  Yes.
 8        Q.  In your -- and you would agree with me
 9   that you are a human resources professional;
10   correct?
11        A.  Yes.
12        Q.  You won't be offended if I call you an
13   HR professional?
14        A.  No.
15        Q.  Within your capacity as an HR
16   professional, do you have any -- are you familiar
17   with the Age Discrimination in Employment Act?
18        A.  I am.
19        Q.  And within your capacity as an HR
20   professional, are you familiar with Title VII of
21   the Civil Rights Act?
22        A.  I am.
23        Q.  And as an HR professional, are you
24   familiar with the concept that we have certain
25   federal and state laws that protect individuals
```

23

```
 1   from discrimination in the workplace?
 2        A.  Yes.
 3        Q.  And as an HR professional, is it your
 4   understanding that, even though we have federal and
 5   state laws that protect against discrimination,
 6   that discrimination does still exist in the
 7   workplace?
 8            MR. WOOD:  Object to the form.  Lack of
 9   foundation.
10            THE WITNESS:  Yes.
11   BY MR. MUNSHI:
12        Q.  As an HR professional, are you familiar
13   with the concept of a protected characteristic?
14   Have you ever heard that phrase before?
15        A.  Not put that way, no.
16        Q.  Do you understand that there are
17   federal and state laws that protect against
18   discrimination because of somebody's age or because
19   of somebody's sex or gender?
20        A.  Absolutely.
21        Q.  And as an HR professional, do you
22   understand that even though those laws exist, age
23   discrimination and sex discrimination specifically
24   may still exist in the workplace?
25            MR. WOOD:  Object to the form.
```

24

```
 1            THE WITNESS:  Yes.
 2   BY MR. MUNSHI:
 3        Q.  Do you agree with me as an HR
 4   professional that there may be people who work at
 5   CSC who may have prejudices or biases against
 6   certain individuals?
 7            MR. WOOD:  Object to the form.  Lack of
 8   foundation.
 9            THE WITNESS:  I can't answer that.
10   BY MR. MUNSHI:
11        Q.  Well, is it your belief that there is
12   no individual who has ever worked at CSC who ever
13   had a bias or a prejudice?
14            MR. WOOD:  Object to the form and lack
15   of foundation.
16            THE WITNESS:  I can't answer that.
17   BY MR. MUNSHI:
18        Q.  Well, my point is this.  Isn't it true
19   that as an HR professional, you're trained to
20   understand that there are situations where people
21   come to work with hidden biases and prejudices?
22            MR. WOOD:  Object to the form.  Lack of
23   foundation and argumentative.
24            THE WITNESS:  Yes.
25   BY MR. MUNSHI:
```

Debi Stafford

25

1     Q.   And is it true that CSC has policies,
2  internal policies, against discrimination?
3     A.   Absolutely.
4     Q.   Does CSC also have a policy that states
5  that if an individual feels like he or she is being
6  discriminated against, they are encouraged to raise
7  a complaint?
8     A.   Yes, they do.
9     Q.   Do you agree with me as an HR
10  professional that the reason why those policies
11  exist at CSC is because there are going to be
12  situations where a manager, where a supervisor does
13  exhibit some form of discrimination against an
14  employee?
15     MR. WOOD:  Object to the form.  Lack of
16  foundation and argumentative.
17     THE WITNESS:  No.
18  BY MR. MUNSHI:
19     Q.   Well, why do these policies exist then?
20     MR. WOOD:  Object to the form.
21  Argumentative.
22     THE WITNESS:  Because I think it's good
23  prudent business practice.
24  BY MR. MUNSHI:
25     Q.   Why is that?

26

1     A.   Because certainly these situations are
2  well-known to exist, and I think good businesses
3  put in place policies that protect them and their
4  associates.
5     Q.   While the policies also exist, don't
6  you agree with me, to counter the potential biases
7  and prejudices of particular employees, that's why
8  they're there; right?
9     MR. WOOD:  Object to the form and
10  argumentative.
11     THE WITNESS:  I don't agree with that.
12  BY MR. MUNSHI:
13     Q.   Okay.  So why do the policies exist if
14  they're not meant to counter a particular forbidden
15  notion?
16     MR. WOOD:  Object to form.
17     THE WITNESS:  I think they're there to
18  protect both the company and the associate.
19  BY MR. MUNSHI:
20     Q.   How do those policies protect the
21  company?
22     A.   Well, it makes sure that if somebody
23  has a concern about the way they're being treated,
24  that they're instructed to take those concerns
25  forward.

27

1     Q.   And how does that protect the company?
2     A.   Well, I think it protects the company
3  because they're asking people to come forward and
4  tell a story about what's wrong with their
5  situation.
6     Q.   Is it part of an HR person's job to
7  potentially insulate a company from liability?
8     MR. WOOD:  Object to the form.
9     THE WITNESS:  I don't know what you
10  mean by insulate.
11  BY MR. MUNSHI:
12     Q.   Protect the company.
13     MR. WOOD:  Object to the form.
14  BY MR. MUNSHI:
15     Q.   Is what I mean by insulate.
16     A.   Yes, I do think it's part of our job to
17  do that.
18     Q.   Have you ever seen discrimination at
19  CSC before?
20     MR. WOOD:  Object to the form.
21     THE WITNESS:  No.
22  BY MR. MUNSHI:
23     Q.   Are you aware of any managers that have
24  discriminated against an employee at CSC?
25     MR. WOOD:  Object to the form.

28

1     THE WITNESS:  No.
2  BY MR. MUNSHI:
3     Q.   In total, you worked for CSC for nearly
4  20 years.  Is that right?
5     A.   Twenty-four years, actually.
6     Q.   Twenty-four years all in?
7     A.   (Witness moves head up and down.)
8     Q.   Okay.  And as an HR person with the
9  company for 24 years, did you ever receive an
10  internal complaint of discrimination at CSC?
11     MR. WOOD:  Object to the form.
12     THE WITNESS:  Against myself?
13  BY MR. MUNSHI:
14     Q.   No, receive a complaint within your
15  capacity as an HR person.
16     A.   Yes.
17     Q.   Approximately how many times did that
18  happen in 24 years?
19     A.   Too many to count.
20     Q.   More than ten?
21     A.   Yes.
22     Q.   More than 50?
23     A.   I'm not sure, but probably.
24     Q.   And was it one of your job duties and
25  responsibilities as an HR person, as the VP of HR

7 (Pages 25 to 28)

Debi Stafford

29

1   at CSC, to conduct investigations into those
2   complaints that you received?
3           MR. WOOD: Object --
4           THE WITNESS: Yes.
5           MR. WOOD: -- to the form.
6           THE WITNESS: Yes.
7   BY MR. MUNSHI:
8       Q.  Okay. And did you in fact ever conduct
9   an investigation into a claim of an employee that
10  he or she felt discriminated against?
11      A.  Yes.
12      Q.  Approximately how many times did you
13  conduct such investigation?
14      A.  It would be the same answer as before.
15      Q.  When you're conducting these
16  investigations into a complaint of discrimination,
17  is it part of your job duties and responsibilities
18  to ultimately reach a conclusion as to whether or
19  not discrimination did or did not exist in that
20  situation?
21      A.  Yes.
22      Q.  In all the investigations that you
23  conducted during your tenure with CSC, which you
24  estimated as may be more than 50, have you ever
25  found that in fact there was discrimination that

30

1   took place?
2       A.  No.
3       Q.  So every single time that any
4   individual at CSC complained to you that they felt
5   discriminated against, you ultimately concluded
6   that, no, that's not right. Is that correct?
7           MR. WOOD: Object to the form and
8   argumentative.
9           THE WITNESS: As I just said, yes.
10  BY MR. MUNSHI:
11      Q.  Were there any other HR folks at CSC
12  who were similarly tasked with conducting
13  investigations into complaints of discrimination?
14          MR. WOOD: Object to the form. Vague.
15          THE WITNESS: Yes.
16  BY MR. MUNSHI:
17      Q.  Are you aware those individuals were
18  also tasked with doing investigations and
19  ultimately reaching a conclusion as to whether or
20  not discrimination existed?
21      A.  I don't know that.
22      Q.  Are you aware of any other HR person at
23  CSC during your entire 24-year tenure at the
24  company where that person conducted an
25  investigation and concluded that, yes,

31

1   discrimination did in fact take place?
2       A.  I don't know that.
3       Q.  During your entire tenure at CSC, were
4   you ever involved in any discussions or
5   conversations about the age demographics of CSC's
6   employees?
7       A.  Yes.
8           MR. WOOD: Object to the form.
9           THE WITNESS: Yes.
10  BY MR. MUNSHI:
11      Q.  In what context would you have
12  discussions or conversations about the age of the
13  workforce?
14          MR. WOOD: Object to the form.
15          THE WITNESS: Well, there were many
16  times that we would talk about it, depending on the
17  circumstance. We could be talking about the entry
18  of a new training class. We could be talking about
19  protecting our intellectual property.
20  BY MR. MUNSHI:
21      Q.  Any other context where the age of the
22  workforce would come up?
23          MR. WOOD: Object to the form. Vague.
24          THE WITNESS: I'm not sure what you
25  mean.

32

1   BY MR. MUNSHI:
2       Q.  Sure. Okay. So I started a couple of
3   questions ago asking you if you were ever in or
4   participated in any discussions or conversations
5   where the age of the workforce was discussed. You
6   said yes. You gave me two examples, the entry of a
7   training class and protecting IP. My next question
8   is simply, are there any other contexts that you
9   recall where you were having discussions or
10  conversations about the age of the workforce?
11          MR. WOOD: Object to the form.
12          THE WITNESS: Yes. There was one where
13  we talked about the encroaching age of our
14  retirement-eligible population and the fact that we
15  were concerned that we needed to protect -- this is
16  what I mean by intellectual property -- we needed
17  to protect what they had and make sure we were able
18  to make a suitable transition of their knowledge
19  and skills, if and when they retired.
20  BY MR. MUNSHI:
21      Q.  Was the word encroaching -- is that
22  what you said, the encroaching age of the
23  retirement population?
24      A.  I don't remember if I said that.
25  Maybe.

8 (Pages 29 to 32)

Debi Stafford

33

1     Q.   Were there discussions about the
2  workforce, that a substantial portion of the
3  workforce at CSC, maybe people who had this IP
4  knowledge, they were about to retire or of the age
5  of retirement?
6          MR. WOOD:  Object to the form.
7          THE WITNESS:  Not exactly.  We were
8  preparing our workforce, and it wasn't an eminent
9  thing as much as it was workforce planning and
10 preparation.
11 BY MR. MUNSHI:
12     Q.   And were you having these types of
13 conversations in the 2012 period?
14     A.   I don't recall that.
15     Q.   Well, did you have an understanding
16 that CSC did have an aging workforce in the 2012
17 period?
18         MR. WOOD:  Object to the form.  Vague.
19         THE WITNESS:  Yes.
20 BY MR. MUNSHI:
21     Q.   And did you ever learn or participate
22 in any conversations about any concerns that CSC
23 may have had about the aging workforce of the
24 company?
25         MR. WOOD:  Object to the form and

34

1  vague.
2          THE WITNESS:  That's what I just
3  answered a minute ago.  So we needed to make sure
4  that we were planning for those as they occurred.
5  BY MR. MUNSHI:
6      Q.   Were there any decisions made or any
7  goals that were set to be achieved?  What was the
8  resolution of those conversations?
9          MR. WOOD:  Object to the form.
10 Compound.
11         THE WITNESS:  There was never ever
12 planning that went on around those.  It was a
13 conversation.
14 BY MR. MUNSHI:
15     Q.   With whom were you having these
16 conversations?
17     A.   Generally, my leadership team.
18     Q.   And that included who?
19     A.   Jim Cook and his direct reports.
20     Q.   Who were his direct reports at that
21 time?
22     A.   Mark Roman, Ray August, Mary Jo Morris,
23 Eileen Sweeney.  There were a couple of others, but
24 I don't remember those.  Those were the business
25 leaders.

35

1      Q.   You mentioned conversations regarding
2  age in connection with the entry of a training
3  class.  What did you mean by that?
4          MR. WOOD:  Object to the form.  You can
5  answer.
6          THE WITNESS:  If we wanted to bring in
7  people like new entrants out of college, if we
8  wanted to do that.
9  BY MR. MUNSHI:
10     Q.   And how did age come about during those
11 conversations?
12         MR. WOOD:  Object to the form.
13         THE WITNESS:  We would just talk about
14 the same workforce planning that we were bringing
15 new people into the organization.  We'd have to
16 train them new skills, general conversations like
17 that.
18 BY MR. MUNSHI:
19     Q.   Were you part of any conversations
20 about making sure that the lower ranks, be more
21 junior employees, of CSC remained filled with
22 younger workers?
23         MR. WOOD:  Object --
24         THE WITNESS:  No.
25         MR. WOOD:  Object to the form.

36

1  Argumentative, vague, lack of foundation.
2          THE WITNESS:  No.
3  BY MR. MUNSHI:
4      Q.   Ever part of any conversations about
5  specifically bringing in younger employees into the
6  organization?
7          MR. WOOD:  Object to the form.
8          THE WITNESS:  No.
9  BY MR. MUNSHI:
10     Q.   Now, in your role over at CSC as the VP
11 of HR, would you hold telephone conferences with
12 operations managers?
13     A.   Yes.
14     Q.   Did you ever have any phone conferences
15 with Linda Liano?
16     A.   Yes.
17     Q.   Was that a common thing or no?
18         MR. WOOD:  Object to the form.
19         THE WITNESS:  She and I had several
20 conversations, probably several a week.
21 BY MR. MUNSHI:
22     Q.   Just the two of you or group
23 conversations?
24     A.   It could be both, just the two of us,
25 and it could be group conversations.

9 (Pages 33 to 36)

Debi Stafford

37

1    Q.  And would you routinely have group
2 conversations with Ms. Liano and other senior
3 operations employees at CSC?
4    A.  I'm not real familiar with that
5 operations term.  It wasn't a commonly used title
6 for me.
7        MR. WOOD:  Object to the form then.
8 BY MR. MUNSHI:
9    Q.  What was your understanding of what
10 Ms. Liano's position at CSC was?
11    A.  She was in a unique position at CSC.
12 Not unique.  It's probably not well said.  But she
13 was in an unusual position.  There were not many
14 people, although some across the company, in an
15 operations role.  But that wasn't a widespread
16 role.  And when I talked to Linda, she would be the
17 only person that had that title, or if I talked to
18 Linda in a group.  I never talked to a group of
19 operations people -- operations managers.
20    Q.  Did you know what her exact title was
21 at CSC?
22    A.  I probably did back then.  I don't now.
23    Q.  Are you familiar with the phrase the
24 business solutions and services group?
25    A.  Yes.

38

1    Q.  And what was that?
2    A.  That was owned by Jim Cook, and it was
3 the four business units that I mentioned a few
4 minutes ago.  They had the intellectual property
5 and the services part of our verticals.
6    Q.  Did you understand that Ms. Liano was
7 within the business solutions and services group?
8    A.  It's easier to call it BSS, but yes.
9    Q.  BSS?  Okay.  When you would have these
10 telephone conferences with Ms. Liano and any other
11 CSC's employees, would you have visual
12 representations and Power Points that would be
13 shown to folks over the phone call?
14    A.  Possibly.
15    Q.  In the year 2012, do you recall having
16 a phone conference where you presented data
17 regarding the age distribution curve at CSC?
18        MR. WOOD:  Object to the form and lack
19 of foundation.  You can answer.
20        THE WITNESS:  I do not.
21 BY MR. MUNSHI:
22    Q.  Do you recall at any point seeing a
23 visual representation of data on the ages and the
24 age distribution curve at CSC?
25        MR. WOOD:  Object to the form.  Lack of

39

1 foundation.  You can answer.
2        THE WITNESS:  Yes.
3 BY MR. MUNSHI:
4    Q.  What do you recall seeing, what types
5 of representations?
6    A.  Explain that a bit more.
7    Q.  Sure.  Have you ever seen any documents
8 that show data on the ages of CSC's workforce?
9        MR. WOOD:  Object to the form.  Vague.
10        THE WITNESS:  I have.
11 BY MR. MUNSHI:
12    Q.  Okay.  And what form do those documents
13 take?
14    A.  Usually Power Point presentations.
15    Q.  And do you recall seeing such a Power
16 Point presentation regarding the ages of employees
17 at CSC back in the 2012 period?
18        MR. WOOD:  Object to the form.
19        THE WITNESS:  I don't recall.
20 BY MR. MUNSHI:
21    Q.  Were you responsible for creating the
22 Power Point presentation?
23    A.  I could have been.
24    Q.  Do you recall specifically if you did
25 or did not create these Power Point presentations?

40

1    A.  Yes, I created some in the meeting that
2 I referred to a few minutes ago.
3    Q.  And remind me, what meeting are you
4 referring to?
5    A.  Well, as part of my job as HR vice
6 president, I was responsible for providing a number
7 of metrics.  In that tenure, a number of things
8 could have been provided in those Power Point
9 presentations.
10    Q.  And one of those metrics may have
11 included the ages of the various employees of CSC;
12 correct?
13        MR. WOOD:  Object to the form.  Lack of
14 foundation and vague.
15        THE WITNESS:  I don't recall that
16 specifically, no.
17 BY MR. MUNSHI:
18    Q.  Well, did you create any Power Point
19 presentations or other visual representations that
20 included a metric that included age?
21        MR. WOOD:  Object to the form.  Vague.
22        THE WITNESS:  Yes.
23 BY MR. MUNSHI:
24    Q.  And what would be the purpose of
25 creating that type of a Power Point presentation

10 (Pages 37 to 40)

Debi Stafford

41

1      with regard to age demographics?
2              MR. WOOD:  Object to the form.
3              THE WITNESS:  Well, it wasn't --
4              MR. WOOD:  Mischaracterizes the
5      witness' testimony.  You can answer.
6              THE WITNESS:  It wasn't solely about
7      age.  It was about our workforce, as I described a
8      few minutes ago.  It's still the same answer.
9      BY MR. MUNSHI:
10         Q.   Okay.  And I don't mean to say that the
11     only thing that was on this document was a number
12     on age.  So age and other things that may have been
13     part of this over all presentation.
14         A.   Yes.
15             MR. WOOD:  Object to the form.
16     BY MR. MUNSHI:
17         Q.   I didn't ask a question yet.  Would
18     that presentation that you created that included
19     among other things age, would that have been shared
20     with Linda Liano?
21         A.   Not by me.
22         Q.   Ms. Liano testified in this action that
23     she was on a telephone conference in 2012 with you
24     where a document was shared with her via Power
25     Point that included age metrics.  Do you recall

42

1      that phone conversation?
2          A.   I do not.
3              MR. WOOD:  Object to the form.  Lack of
4      foundation.
5              THE WITNESS:  I do not.
6      BY MR. MUNSHI:
7          Q.   When you created these Power Point
8      presentations, were you given any specific
9      directive as to what to include in them?
10         A.   I was given a task to go off and get
11     some information, and there might be guidelines
12     that I was given in order to make sure that I was
13     providing what they were looking to -- the
14     information they were looking to examine.
15         Q.   And who assigned you that task?
16         A.   Usually Jim Cook or the team of the
17     presidents.
18         Q.   Were you given any sort of directive or
19     directions on why to include certain metrics or not
20     to include other metrics?
21             MR. WOOD:  Object to the form.  Vague.
22             THE WITNESS:  No.
23     BY MR. MUNSHI:
24         Q.   Do you recall presenting these
25     presentations, including age metrics, to Mark

43

1      Roman?
2              MR. WOOD:  Object to the form.
3              THE WITNESS:  Yes, he would have been
4      in those same meetings.
5      BY MR. MUNSHI:
6          Q.   And how often would those meetings take
7      place?  Are you talking about once a year, once a
8      week?
9          A.   Where we discussed these things?
10         Q.   Correct.
11         A.   There was no set amount of time how
12     often we did it.  It wasn't regular.
13         Q.   And do you recall any of these meetings
14     where these things are being discussed that took
15     place during the period of the restructuring or
16     reduction in force at CSC in the 2012 period?
17         A.   I don't.
18         Q.   Do you still have any of these Power
19     Point presentations that you created or saw?
20         A.   No.
21             MR. WOOD:  Object to the form.
22     BY MR. MUNSHI:
23         Q.   Would those be documents that were
24     saved on your work computer when you worked there?
25             MR. WOOD:  Object to the form.  Lack of

44

1      foundation.
2              THE WITNESS:  I didn't personally do
3      them.  I don't know the answer to that question.
4      BY MR. MUNSHI:
5          Q.   Well, there was some presentations that
6      you did personally do; correct?
7          A.   Not usually.  I usually had an
8      administrative assistant that did those.
9          Q.   Okay.  You did present those though;
10     correct?
11         A.   Yes, yes.
12         Q.   And the documents that you presented,
13     would those be saved on your computer that you
14     worked on when you worked at CSC?
15             MR. WOOD:  Object to the form.  Asked
16     and answered.
17             THE WITNESS:  I don't know.
18     BY MR. MUNSHI:
19         Q.   Typically were documents, such as
20     business plans like these at CSC, were they saved
21     on any sort of shared network drive?
22             MR. WOOD:  Object to form.
23             THE WITNESS:  I don't know that answer.
24     Not mine.
25     BY MR. MUNSHI:

NJL Court Reporting & Video
800-426-7965

Debi Stafford

45

1        Q.   Well, in your personal experience,
2    creating any sort of business-related document,
3    where would you save it?
4              MR. WOOD:  Object to the form.  Vague.
5              THE WITNESS:  My administrative
6    assistant had those documents.  I didn't prepare
7    them, and I didn't keep them.
8    BY MR. MUNSHI:
9        Q.   Who was your administrative assistant
10   back in the 2012 period?
11       A.   Gina Smith.
12       Q.   Do you know if she's still employed by
13   CSC?
14       A.   I do not.
15       Q.   Did you ever see any data metrics or
16   any presentation which showed that the majority of
17   CSC managers were aged 50 and older?
18             MR. WOOD:  Object to the form.
19             THE WITNESS:  Ask me again, please.
20   BY MR. MUNSHI:
21       Q.   Did you ever see any data metrics or
22   presentations that reflected managers of CSC
23   typically being aged 50 and older?
24             MR. WOOD:  Object to the form.
25             THE WITNESS:  Managers, no.

46

1    BY MR. MUNSHI:
2        Q.   Ever have a conversation with anybody
3    about management-level employees being of a certain
4    age, 50 and over?
5              MR. WOOD:  Object to the form.  Vague.
6              THE WITNESS:  We could have talked
7    about that during those meetings I talked about.
8    BY MR. MUNSHI:
9        Q.   And in connection with the
10   restructuring or reduction in force that took place
11   in 2012, did you have any conversations with
12   anybody about the aging workforce at CSC?
13             MR. WOOD:  Object to the form.
14             THE WITNESS:  No.
15   BY MR. MUNSHI:
16       Q.   Definitely, no?
17       A.   Definitively, no.
18       Q.   So you know for sure there were
19   conversations where age demographics came up; but,
20   definitively, none of them took place in the year
21   2012?
22             MR. WOOD:  Object to the form.  That
23   mischaracterizes the witness' testimony and her
24   testimony concerning the meeting and subject matter
25   in which any age issue was discussed.

47

1    BY MR. MUNSHI:
2        Q.   Can you tell me if that's correct or
3    incorrect?
4        A.   I don't remember the question.
5        Q.   Okay.  Can you tell me definitely
6    whether any conversation that took place that
7    brought up age demographics or age metrics did not
8    take place in 2012 as part of the reduction in
9    force?
10             MR. WOOD:  Object to the form.
11             THE WITNESS:  Not that I was part of.
12   BY MR. MUNSHI:
13       Q.   Do you know a former employee of CSC
14   named Terri Stanton?
15       A.   Yes.  Not well.
16       Q.   And who is she?
17       A.   She, if I recall right, worked in the
18   healthcare group out of our Houston office.
19       Q.   Do you recall if she had an operations
20   role or function at CSC?
21       A.   I don't.
22       Q.   Was she an individual who likewise you
23   would have telephone conversations with?
24       A.   Not often.  Not frequently.
25       Q.   But you did at some point?

48

1        A.   An occasional one, yes.
2        Q.   Do you recall presenting to Ms. Stanton
3    any document or presentation that showed age
4    metrics of CSC management employees?
5        A.   No.
6        Q.   I've made a couple of references to the
7    restructuring at CSC in 2012.  Was that internally
8    referenced as the reduction in force?
9              MR. WOOD:  Object to form.
10             THE WITNESS:  It was internally
11   referenced as our spans and layers or delayering
12   project.
13   BY MR. MUNSHI:
14       Q.   Was it ever referred to as a RIF,
15   R-I-F?
16             MR. WOOD:  Object to form.
17             THE WITNESS:  Not the entire project,
18   no.  A RIF was an outcome of the delayering
19   process.
20   BY MR. MUNSHI:
21       Q.   And during your tenure at CSC, had
22   there been any RIFs at CSC prior to 2012?
23       A.   Absolutely.
24       Q.   And in connection with the delayering
25   process in 2012, was there in fact a reduction of

Debi Stafford

49

1   the number of employees at CSC?
2      A.  Yes, there was.
3      Q.  When did you first learn there was
4   going to be a delayering process taking place?
5      A.  Probably in April of 2012.  Sometime
6   between April and May.
7      Q.  Who did you learn this from?
8      A.  I think it was Gus Siekierka, who was
9   the then CHRO of CSC.
10      Q.  What does that acronym stand for?
11      A.  Chief human resources officer.
12      Q.  Did you report directly to him during
13   that time period?
14      A.  At points, I did; and at other points,
15   I reported to the business leader.
16      Q.  And this delayering process at CSC, was
17   this simply a process to reduce the number of
18   employees of the company, or were there also going
19   to be new employees hired by the company?
20      MR. WOOD:  Object to form and lack of
21   foundation.
22      THE WITNESS:  Ask me again.
23   BY MR. MUNSHI:
24      Q.  In connection with the delayering
25   process in 2012, were there also going to be new

50

1   employees hired by the company?
2      MR. WOOD:  Object to the form.
3      THE WITNESS:  Potentially, there could
4   have been.
5   BY MR. MUNSHI:
6      Q.  Were there any new positions that were
7   created within the organizational structure as part
8   of the delayering process?
9      MR. WOOD:  Object to the form.
10      THE WITNESS:  I don't know that answer.
11   BY MR. MUNSHI:
12      Q.  Did you have any specific
13   responsibilities or duties in connection with the
14   delayering process at CSC in 2012?
15      A.  I led it for the BSS organization.
16      Q.  And by leading it, what do you mean?
17   Can you explain to me what your actual roles were?
18      A.  Yeah, I worked with the consulting
19   group that we had and worked on managing each step
20   of the delayering process by working with our group
21   presidents and then the next layers down.
22      Q.  The consulting group is Boston
23   Consulting Group; correct?
24      A.  That's correct.
25      Q.  And the managing level that you worked

51

1   with, who were those individuals?
2      MR. WOOD:  Object to the form.
3      THE WITNESS:  It depended on the layer
4   we were at.  But each layer would be either the L2
5   layers, the presidents, then we went down to
6   division presidents, then we went down to a group
7   of, generally speaking, vice presidents or
8   directors.  But it depended on the layer you were
9   at, we were working on.
10   BY MR. MUNSHI:
11      Q.  And did you work directly with Mark
12   Roman as one of the managers?
13      A.  I did.
14      Q.  Do you recall what his title was back
15   in the 2012 period?
16      MR. WOOD:  Object to the form.  Vague.
17      THE WITNESS:  He probably started the
18   year as a division president, and then through the
19   delayering process, he would have become a -- I
20   forget what the exact title was, but his title
21   probably changed.  I forget what it was.
22   BY MR. MUNSHI:
23      Q.  Did you have an understanding that,
24   prior to her termination, Ms. Liano reported
25   directly to Mr. Roman?

52

1      A.  Yes.
2      Q.  Just looking at Mr. Roman and his
3   business group, the individuals who reported to
4   Mr. Roman, what role did you play in connection
5   with the delayering process as it pertained to
6   Mr. Roman's group?
7      A.  I managed it for the entire group that
8   we had, and so I would have regular check-ins with
9   Mark and his team.
10      Q.  And when you say his team, what do you
11   mean by that?
12      A.  Well, he had to work with his next
13   level group as the process continued to meet the
14   objectives of the -- to meet the objectives of the
15   process.
16      Q.  Is his next level group, the phrase
17   that you just used, did that next level group
18   include Ms. Liano?
19      MR. WOOD:  Object to the form.
20      THE WITNESS:  It could have.
21   BY MR. MUNSHI:
22      Q.  Sorry.  I didn't hear you.
23      A.  It could have if you were at a
24   delayering point in the organization where they
25   were planning the next level.

Debi Stafford

53

1      Q.   Do you recall working with Ms. Liano in
2  any capacity with regard to the delayering process?
3         MR. WOOD:  Object to the form.  Vague.
4         THE WITNESS:  No.
5  BY MR. MUNSHI:
6      Q.   Were you given any directives from any
7  CSC employees or Boston Consulting Group on how to
8  facilitate this?
9      A.   Yes.
10     Q.   What directives were you given?
11        MR. WOOD:  Object to the form.
12        VIDEOGRAPHER:  We'll now go off the
13 record.  The time on the monitor is 2:52 p.m.
14        (A recess transpired.)
15        VIDEOGRAPHER:  We are now back on the
16 record.  The time on the monitor is 2:59 p.m.
17 BY MR. MUNSHI:
18     Q.   Ms. Stafford I was asking you questions
19 about your role with regard to the delayering
20 process and any directives or guidelines you may
21 have been given.  Were you in fact given any
22 directives or guidelines on how to facilitate this
23 delayering process?
24        MR. WOOD:  Object to the form.
25        THE WITNESS:  Yes, I was.

54

1  BY MR. MUNSHI:
2      Q.   And what were they?
3      A.   Well, I can't remember specifically
4  everything, but BCG had a very tight process, and
5  they took us through the process from the four-step
6  process that it was, and they were with us for
7  every one of those four steps for each layer that
8  we went.  But it was my responsibility to handle it
9  with our business leaders and to give them the
10 output.
11     Q.   Is the phrase business leader a title
12 that's given to any specific individuals, or is
13 that a generic term?
14     A.   It's just a term.
15     Q.   Was Mark Roman considered a business
16 leader?
17     A.   When I just described what I did, yes.
18     Q.   And did you provide Mr. Roman with any
19 directives or guidelines as to facilitating this
20 delayering process?
21        MR. WOOD:  Object to the form.  Vague.
22        THE WITNESS:  Part of my job was to
23 take each layer that we were in and to help the
24 leader above them to go through the process of
25 looking at what the organization should look like

55

1  as we achieved the objectives that the organization
2  had set for us.  So I --
3      Q.   And -- sorry.  Go ahead.
4      A.   So I would meet with those division
5  presidents, and we would discuss -- just like BCG
6  had discussed with me, I would discuss with them
7  what the various steps were.
8      Q.   And was one of those individuals who
9  you spoke with Mr. Roman?
10     A.   Yes.
11     Q.   Did you have discussions with Mr. Roman
12 about what his organization should look like after
13 the delayering process?
14        MR. WOOD:  Object to the form.
15        THE WITNESS:  After the complete
16 process?
17 BY MR. MUNSHI:
18     Q.   Or let me just take a step back and go
19 more broadly.  What did you communicate with
20 Mr. Roman in connection with this delayering
21 process?
22        MR. WOOD:  Object to the form.
23        THE WITNESS:  Well, we had multiple
24 conversations about it.  Each -- so we talked
25 conceptionally at first with instructions from the

56

1  president of the company, and then we talked about
2  each layer that we would ultimately go through.
3  BY MR. MUNSHI:
4      Q.   Approximately how many layers reported
5  to Mr. Roman?
6         MR. WOOD:  Object to the form.  Vague
7  as to time.
8         THE WITNESS:  I'm not absolutely
9  certain, but I don't think more than six.
10 BY MR. MUNSHI:
11     Q.   Okay.  Did you have any conversations
12 with Mr. Roman about how his organization should be
13 structured after the delayering process is
14 completed?
15     A.   Well, yes, I guess I had conversations
16 with him about that.
17     Q.   Did you work with Mr. Roman on creating
18 a plan for any organizational chart or hierarchy
19 that would exist after the completion of the
20 delayering process?
21        MR. WOOD:  Object to the form.  Vague.
22        THE WITNESS:  The entire process?
23 BY MR. MUNSHI:
24     Q.   Correct.
25     A.   No.

14 (Pages 53 to 56)

Debi Stafford

57

1      Q.  Did you work with Mr. Roman on creating
2  a proposal for what his organization will look like
3  through this delayering process?
4           MR. WOOD:  Object to the form.  Vague
5  as to time.
6           THE WITNESS:  Ask me that again.
7  BY MR. MUNSHI:
8      Q.  Sure.  So looking at the period in
9  2012, did you work with Mr. Roman on figuring out
10  what his organization was going to look like, let's
11  say, in 2013?
12           MR. WOOD:  Object to the form.  Vague.
13           THE WITNESS:  Yes.
14  BY MR. MUNSHI:
15      Q.  Okay.  And when you're having these
16  conversations with Mr. Roman, did you have any
17  conversations about specifically the individuals
18  who were reporting to Mr. Roman at that time in
19  2012?
20           MR. WOOD:  Object to the form.  Vague.
21           THE WITNESS:  Yes.
22  BY MR. MUNSHI:
23      Q.  Did you have any conversations with
24  Mr. Roman about Ms. Liano, who reported directly to
25  Mr. Roman?

58

1      A.  Yes.
2      Q.  And what do you recall about those
3  conversations?
4      A.  Well, first, you have to step back.
5  There was an entire process that occurred.  We
6  first had to design the organization.  Then it had
7  to be approved.  Then we had to staff the
8  organization.  So throughout the course of that,
9  depending on where we were in the process, we would
10  have had different conversations, either about the
11  organization --
12      Q.  Go ahead, sorry.
13      A.  Either about the organization or,
14  subsequently, about the approved organization.
15      Q.  Okay.  So let's start with the first
16  one, which is designing the organization.  Did you
17  have conversations with Mr. Roman about designing
18  the organization?
19      A.  I did.
20      Q.  And in your conversations with
21  Mr. Roman, did you ever discuss what role, if any,
22  Ms. Liano would play in this designed organization?
23      A.  In Mark's first pass at his
24  organization, Linda was on the organizational
25  chart.

59

1      Q.  Whose decision was that?
2      A.  Mark's.
3      Q.  And when you say first pass, what do
4  you mean by that?
5      A.  That pass then had to go to the
6  steering committee to be approved.
7      Q.  Who was on the steering committee?
8      A.  Mike Lawrie, our president; Joe Mason,
9  his chief of staff; and all of his direct reports,
10  his being Mike Lawrie.
11      Q.  Did that first pass that Mr. Roman
12  created in fact go to the steering committee?
13      A.  It did.
14      Q.  Did it go through you, or were you
15  copied on any correspondence where it was passed to
16  the steering committee?
17      A.  The president, Jim Cook, took it to the
18  steering committee.
19      Q.  Do you know in what way he took it?
20  E-mail, physically took it?
21      A.  I believe he physically carried in
22  Power Point presentations.
23      Q.  Did you see those Power Point
24  presentations?
25      A.  That he took in?

60

1      Q.  Correct.
2      A.  Yes.
3      Q.  And what was included in those Power
4  Point presentations?
5           MR. WOOD:  Object to the form.
6           THE WITNESS:  The organization that
7  Mark Roman was recommending that he keep.
8  BY MR. MUNSHI:
9      Q.  Did you have any discussions with
10  Mr. Roman about his first pass that included
11  specifically keeping Ms. Liano?
12      A.  We didn't talk specifically about
13  Linda.  He just had her on the org chart in her
14  same position.
15      Q.  Were you a member of the steering
16  committee?
17      A.  No.
18      Q.  Did you participate in any
19  conversations with the steering committee about
20  Mr. Romans's organizational charts?
21      A.  No.
22           MR. WOOD:  Object to the form.
23  BY MR. MUNSHI:
24      Q.  After it was presented to the steering
25  committee, what happened next?

15  (Pages 57 to 60)

Debi Stafford

61

1      A.  Jim Cook would bring it back to the
2   individual presidents.  They would discuss the
3   outcomes.
4      Q.  Did Mr. Cook have a conversation with
5   Mr. Roman about his what you called first pass?
6      A.  I don't know.  I'm assuming.
7      Q.  Are you aware of any e-mails that were
8   going back and forth between Mr. Roman and Mr. Cook
9   about Mr. Roman's org chart?
10     A.  No.
11     Q.  Did Mr. Cook then present Mr. Roman
12  with a revised chart?
13        MR. WOOD:  Object to the form.
14        THE WITNESS:  Did Mr. Cook present to
15  Mr. Roman a revised chart?  I don't know that
16  answer.
17  BY MR. MUNSHI:
18     Q.  Do you know what happened with
19  Mr. Roman's first pass, what happened to that
20  chart?
21        MR. WOOD:  Object to the form.
22        THE WITNESS:  It was significantly
23  changed.
24  BY MR. MUNSHI:
25     Q.  Did you play any role in any decisions

62

1   to change his first pass?
2         MR. WOOD:  Object to the form.
3         THE WITNESS:  No.
4   BY MR. MUNSHI:
5      Q.  How do you know that it was
6   significantly changed?
7      A.  Because Jim Cook told me.
8      Q.  What did he tell you?
9      A.  I'm sorry?
10     Q.  What did he tell you?
11     A.  Well, after each time they came back
12  from the steering committee meeting, he would call
13  his same group together, and he would discuss the
14  changes that were made to those charts.  So he told
15  me in passing what he told Mark Roman, and that is
16  his chart hadn't been approved as submitted and
17  showed him the changes.
18     Q.  Did Mr. Cook explain to you why there
19  were changes being made to Mark Roman's first pass?
20     A.  I don't remember.
21     Q.  Were you given any directives from BCG
22  or anybody within CSC about individuals who were
23  going to be affected by this delayering process or
24  were there any targeted roles?
25        MR. WOOD:  Object to the form, vague.

63

1         THE WITNESS:  Did you say targeted
2   individuals?
3   BY MR. MUNSHI:
4      Q.  Or roles, yes.
5         MR. WOOD:  Object to the form.  Vague.
6         THE WITNESS:  Roles, yes.  Targeted
7   individuals, no.
8   BY MR. MUNSHI:
9      Q.  Were there targeted roles?
10     A.  As we went through the process, there
11  were.
12     Q.  What were the targeted roles?
13     A.  Well, it depended on the organization
14  you were at and what layer you were at.  There were
15  multiple.
16     Q.  Were you ever given a general directive
17  that senior operations management positions were
18  going to be eliminated?
19        MR. WOOD:  Object to the form.
20        THE WITNESS:  It was an outcome of the
21  org chart, so yes.
22  BY MR. MUNSHI:
23     Q.  And did you understand that Ms. Liano
24  fell within that senior operations management role?
25     A.  I did.

64

1      Q.  Were there any other individuals at CSC
2   who fell within the senior operations management
3   role?
4      A.  Not in my group.
5      Q.  And when you say your group, can you
6   tell me what your group was?
7      A.  BSS.
8      Q.  And describe for me what BSS included.
9      A.  Jim Cook's organization, which included
10  the four industry verticals:  Manufacturing,
11  healthcare, financial services, and I forget the
12  name of the last one, but it was basically
13  telecommunications and retail.
14     Q.  Was that diversified industries?
15     A.  Yes, thank you.
16     Q.  Were there any individuals who had a
17  senior operations role within any of the other
18  verticals besides healthcare with Ms. Liano?
19     A.  No.
20        MR. WOOD:  Object to form.  Vague as to
21  time.
22  BY MR. MUNSHI:
23     Q.  We're talking about the 2012 period, if
24  that wasn't clear.
25     A.  (Witness moves head up and down.)

16 (Pages 61 to 64)

Debi Stafford

65

```
1            MR. WOOD:  Object to the form.  Still
2   vague.
3   BY MR. MUNSHI:
4       Q.  Did you understand that Terri Stanton,
5   who we mentioned earlier, had an operations role
6   within BSS?
7       A.  No.
8       Q.  One of the industries under Jim Cook
9   was financial services; correct?
10      A.  Yes.
11      Q.  Do you know an individual named Brian
12  Wallace?
13      A.  I do.
14      Q.  And what was Brian Wallace's role in
15  2012?
16          MR. WOOD:  Object to the form.  Vague
17  as to time.
18          THE WITNESS:  In early 2012, I believe
19  he was in charge of strategy for the financial
20  services group.  I don't believe he had a title in
21  the middle of 2012.  I don't remember what his
22  final title was.
23  BY MR. MUNSHI:
24      Q.  Putting aside his title, did his actual
25  role change in the year 2012?
```

66

```
1       A.  I don't believe so.
2       Q.  That strategy role that Mr. Wallace had
3   in 2012, was that an operations role?
4       A.  No, it was not.
5       Q.  What's the difference between an
6   operations role and what Mr. Wallace did in 2012?
7       A.  He was responsible for leading the
8   direction of the product, and I don't believe an
9   operations role has that responsibility.
10      Q.  Mr. Wallace was not let go by CSC;
11  correct?
12          MR. WOOD:  Object to the form.  Vague
13  as to time.
14          THE WITNESS:  I don't know that answer.
15  BY MR. MUNSHI:
16      Q.  In 2012.
17      A.  Oh, no.
18      Q.  Sorry, let me just redo that, because
19  that was a fair objection.  Mr. Wallace was not let
20  go by CSC in 2012; correct?
21      A.  No.
22      Q.  There was also the manufacturing
23  division reporting to Mr. Cook; correct?
24      A.  That's correct.
25      Q.  Do you know an individual named Chris
```

67

```
1   Weaver?
2       A.  I know of him.
3       Q.  Did Chris Weaver have an operations
4   role at CSC in 2012?
5       A.  I don't believe so, no.
6       Q.  Do you know what his role was?
7       A.  I don't.
8       Q.  He was not let go by CSC in 2012;
9   correct?
10      A.  I don't remember.
11      Q.  Do you know an individual named David
12  Jaggard, J-A-G-G-A-R-D?
13      A.  Again, I know of him.
14      Q.  Did he have an operations role at CSC?
15      A.  I don't believe so, no.
16      Q.  Do you know what his role was?
17      A.  I don't.
18      Q.  He was not let go by CSC in 2012;
19  correct?
20      A.  I don't believe so.
21      Q.  Do you know an individual named Nick
22  Northam?
23      A.  I just know the name.  I don't remember
24  anything about him.
25      Q.  Do you know if he had an operations
```

68

```
1   role at CSC in 2012?
2       A.  I don't.
3       Q.  Are you aware that he was not let go by
4   CSC in 2012?
5       A.  I'm not aware either way.
6       Q.  Was it your decision to terminate
7   Ms. Liano's employment?
8       A.  No.
9       Q.  Whose decision was it?
10          MR. WOOD:  Object to the form.
11          THE WITNESS:  I ultimately believe it
12  was Mike Lawrie's decision.
13  BY MR. MUNSHI:
14      Q.  And why do you believe that?
15      A.  Because the way the spans and the
16  layers process went, you could take people out of
17  their roles and consolidate that organization at
18  that level.  But there could be individuals that
19  you believed you could find a role for or would
20  have relevant skills somewhere else in the company
21  at the next layer when we got ready to do that
22  delayering work.  So they were moved to a holding
23  pattern, if you will, until they could -- until we
24  could get through that level to discuss.
25          That's where Linda -- that's what
```

17 (Pages 65 to 68)

Debi Stafford

---

**69**

1    happened with Linda.  Her role was eliminated, but
2    Mark moved her to this holding pattern until we
3    could get through the next layer.  Linda was put in
4    this along with many others.  We were led to
5    believe that we would go through the delayering at
6    the next level.  And about halfway through that
7    process, we were told, due to financial
8    constraints, that group in total should come out of
9    that holding pattern and should be terminated.
10   That decision came from Mike Lawrie and Joe Mason.
11        Q.   That holding pattern was referred to as
12   the talent pool; correct?
13        A.   That's correct.
14        REPORTER:  I'm sorry, as the what?
15        THE WITNESS:  Talent pool.
16   BY MR. MUNSHI:
17        Q.   Just focus -- we'll get to the talent
18   pool part of it next.  But, first, on the first
19   step of Ms. Liano's role actually being eliminated,
20   it's your understanding that that was Mike Lawrie's
21   decision to eliminate Linda Liano's role?
22        A.   It's my understanding that that's the
23   result of the steering committee meeting that day.
24        Q.   And you were not present for that
25   meeting; correct?

---

**70**

1        A.   No.
2        Q.   Did you ever have a conversation with
3    Mike Lawrie about eliminating Linda Liano's role?
4        A.   No.
5        Q.   Did you ever have a conversation with
6    Mark Roman about eliminating Linda Liano's role?
7        A.   Yes.
8        Q.   When did you have the first
9    conversation with Mr. Roman?
10       A.   It would have been during the month
11   that we were doing her layer.  I don't remember
12   exactly what month that was.
13       Q.   And what do you recall of that
14   conversation that you had with Mr. Roman?
15       A.   That that position had been eliminated,
16   and Linda would have to be taken out of that
17   position.
18       Q.   Was this before or after Mr. Roman's
19   first pass at his org chart?
20       A.   It would have been after.
21       Q.   Did Mr. Roman express to you that he
22   disagreed with taking Ms. Liano out of this
23   position?
24       A.   I don't believe he said it just like
25   that.

---

**71**

1        Q.   What do you recall him saying?
2        A.   Well, I don't recall the entire
3    conversation.  I know that he was disappointed that
4    his organization was structured in the way it was.
5    He had put up an organization that had quite a few
6    number of different roles, and it came back much
7    more -- much less diversified than he wanted, and
8    that was -- he was disappointed in that.
9        Q.   And what does diversified mean in that
10   context?
11       A.   Well, that he had probably eight or
12   nine boxes on the org chart.  It came back with
13   three.
14       Q.   Were -- you're aware there were other
15   individuals who reported directly to Mr. Roman in
16   mid 2012; correct?
17       A.   Yes, yes.
18       Q.   Were any of those individuals
19   terminated as part of the delayering process?
20       A.   I don't remember.
21       Q.   Were any of the other individuals who
22   reported to Mr. Roman in 2012, besides Ms. Liano,
23   placed in that talent pool?
24       A.   I don't remember.
25       Q.   Are you aware that Ms. Liano herself

---

**72**

1    had several individuals who reported directly to
2    her in 2012?
3        A.   No, I don't remember that.
4        Q.   Did you participate in that layer of
5    the delayering process under Ms. Liano?
6        A.   I led the process, yes.
7        Q.   Do you recall having any conversations
8    with Mr. Roman about that layer, the one that
9    reports to Ms. Liano?
10       A.   No.
11       Q.   Have you ever seen any documents that
12   states or reflects why Ms. Liano specifically was
13   chosen for this termination?
14       MR. WOOD:  Object to the form.  Lack of
15   foundation and vague.
16       THE WITNESS:  No.
17   BY MR. MUNSHI:
18       Q.   Have you ever seen any sort of
19   electronic mail or a memo to the file or a note
20   from anybody that specifically says why Ms. Liano
21   was terminated?
22       MR. WOOD:  Object to the form.
23       THE WITNESS:  No.
24   BY MR. MUNSHI:
25       Q.   Do you know if any such documents

---

18 (Pages 69 to 72)

Debi Stafford

73

```
1    exists?
2         A.  I don't.
3         MR. WOOD:  Object to the form.  Vague.
4         THE WITNESS:  I don't.
5    BY MR. MUNSHI:
6         Q.  As an HR professional, you would agree
7    with me that it would be best practices for HR for
8    such a document to exist?
9         A.  I do.
10        MR. WOOD:  Object to the form.  Vague,
11   lack of foundation, and argumentative.
12        THE WITNESS:  I absolutely do think
13   that.
14   BY MR. MUNSHI:
15        Q.  Okay.  Have you ever seen any document
16   that was created for any individual who was
17   terminated as part of this delayering process
18   stating why that individual was chosen?
19        MR. WOOD:  Object to the form.
20        THE WITNESS:  No.
21   BY MR. MUNSHI:
22        Q.  Do you know if any were created?
23        A.  I don't.
24        Q.  Did you ever communicate with Mr. Roman
25   over e-mail about the structure of his organization
```

74

```
1    as part of this delayering process?
2         MR. WOOD:  Object to the form.
3         THE WITNESS:  I don't remember.
4    BY MR. MUNSHI:
5         Q.  Did you ever communicate with Mr. Cook
6    about what this organization under Mr. Roman would
7    look like as part of the delayering process?
8         MR. WOOD:  Object to the form.  Asked
9    and answered.
10        THE WITNESS:  I don't remember.
11   BY MR. MUNSHI:
12        Q.  The result of the steering committee
13   meeting was that Ms. Liano was no longer on
14   Mr. Roman's organizational chart.  Do you have any
15   understanding of how they reached that conclusion?
16        MR. WOOD:  Object to the form.  Lack of
17   foundation.
18        THE WITNESS:  No.
19   BY MR. MUNSHI:
20        Q.  Do you have any idea what factors were
21   relied on by anybody at CSC to decide that
22   Ms. Liano was no longer going to be employed there?
23        MR. WOOD:  Object to the form.
24        THE WITNESS:  Say that again, please.
25   BY MR. MUNSHI:
```

75

```
1         Q.  Are you aware of any factors that were
2    relied upon with regard to Ms. Liano that led to
3    the conclusion that she was going to be fired by
4    the company?
5         MR. WOOD:  Object to the form.
6         THE WITNESS:  Yes.  She was --
7    BY MR. MUNSHI:
8         Q.  What factors were those?
9         A.  She was in the talent pool, and the
10   talent pool was to be eliminated.
11        Q.  Prior to the talent pool, are you aware
12   of any factors that were relied upon by CSC to
13   eliminate her position?
14        MR. WOOD:  Object to the form.
15   Argumentative.
16        THE WITNESS:  Her position?  Yes.
17   BY MR. MUNSHI:
18        Q.  And what factors are those?
19        A.  Well, those are the factors that Mark
20   put up a chart, it went to the steering committee,
21   was disapproved, and it came back.  She was -- her
22   position was no longer on that chart.  So Mark put
23   her in the talent pool.
24        Q.  Okay.  And in that initial period of
25   Mr. Roman putting her on an organizational chart
```

76

```
1    and then she's no longer on an organizational
2    chart, what factors did CSC rely upon to get to
3    that conclusion that she's no longer on the chart?
4         MR. WOOD:  Object to the form.
5         THE WITNESS:  I don't know.
6    BY MR. MUNSHI:
7         Q.  I'm sorry, did you say...
8         A.  I don't know.
9         Q.  Were there any other individuals within
10   human resources that had any role in this
11   delayering as it pertained to Mr. Roman's group?
12        MR. WOOD:  Object to the form.  Vague.
13        THE WITNESS:  No.
14   BY MR. MUNSHI:
15        Q.  Sitting here right now, Ms. Stafford,
16   do you have any understanding as to why Ms. Liano
17   was on the chart for Mr. Roman's group and then was
18   no longer was on that chart?  Do you know what
19   happened?
20        MR. WOOD:  Object to the form.
21        THE WITNESS:  I know Mark proposed an
22   organization that included keeping Linda in there.
23   And when the -- when that was not approved by the
24   steering committee and it came back with just three
25   boxes to be filled, that Mark valued Linda enough
```

19 (Pages 73 to 76)

Debi Stafford

77

1  to, instead of terminate her, put her in the talent
2  pool. Beyond that, Mike Lawrie and Joe Mason
3  decided that the talent pool was going to need to
4  be eliminated and not reallocated through the
5  organization. So despite our efforts, she had to
6  be terminated.
7  BY MR. MUNSHI:
8      Q.  Before we even get to the talent pool,
9  do you know what Mike Lawrie and Joe Mason and
10  whoever else was on the steering committee, what
11  factors they were relying upon or any criteria that
12  they were relying upon that resulted in Ms. Liano
13  no longer being on the organizational chart?
14          MR. WOOD:  Object to the form.
15          THE WITNESS:  No.
16  BY MR. MUNSHI:
17      Q.  Did you ever ask anybody?
18      A.  No.
19      Q.  Did you ever see any document, any
20  e-mail, any memo to the file, anything written down
21  that says why Ms. Liano is no longer on an
22  organizational chart?
23          MR. WOOD:  Object to the form. Lack of
24  foundation.
25          THE WITNESS:  No.

78

1  BY MR. MUNSHI:
2      Q.  And as an HR professional, do you agree
3  with me that it would be best practices of HR for
4  some sort of a document to exist that says why
5  she's no longer on the org charts?
6          MR. WOOD:  Object to the form.
7          THE WITNESS:  Yes, under normal
8  circumstances, I would absolutely agree with you.
9  BY MR. MUNSHI:
10      Q.  Is there anything about what's
11  happening here that's not normal?
12          MR. WOOD:  Object to the form. Vague.
13          THE WITNESS:  Extremely.
14  BY MR. MUNSHI:
15      Q.  What makes this situation so abnormal
16  as to not have to follow HR best practices?
17          MR. WOOD:  Object to form.
18          THE WITNESS:  We were working through
19  an organizational delayering process. We had a new
20  CEO that had come to the company, and he had stated
21  that we were going to decrease our spans and
22  layers, improve our managers' span of control, and
23  manage our financials. So as part of this process,
24  we looked at org charts, not people in the boxes on
25  the org charts. And then after those org charts

79

1  were functionally approved, then we came back and
2  we had to staff the department as it was approved.
3  So that's why it's different.
4  BY MR. MUNSHI:
5      Q.  That staffing step, Ms. Liano was never
6  even part of any conversations of staffing; right?
7  She never even got that far?
8          MR. WOOD:  Object to the form. Lack of
9  foundation, argumentative.
10          THE WITNESS:  She would never have been
11  part of a staffing step for her own role.
12  BY MR. MUNSHI:
13      Q.  Right. But she never even --
14      A.  Had she stayed, she would have been
15  part of a staffing conversation for the next layer
16  down.
17      Q.  So going back to my previous question,
18  what is abnormal about what was happening at CSC to
19  warrant not following HR best practices and writing
20  down somewhere why Ms. Liano's position was
21  eliminated?
22          MR. WOOD:  Object to the form. Lack of
23  foundation, argumentative, and vague.
24          THE WITNESS:  It was about the
25  position, not the person. And so the position was

80

1  eliminated. We tried to retain the person, and
2  that didn't survive. That effort didn't survive
3  that layer.
4  BY MR. MUNSHI:
5      Q.  Okay. So let's take Ms. Liano out of
6  it, and let's just talk about the position. Have
7  you ever seen any document, any e-mail, any note to
8  the file, any memorandum that states why a
9  particular position that Ms. Liano held was
10  eliminated as part of this delayering process?
11          MR. WOOD:  Object to the form.
12          THE WITNESS:  No.
13  BY MR. MUNSHI:
14      Q.  Are you aware any such document exists?
15      A.  No.
16      Q.  I believe you have a stack of documents
17  in front of you. And if you don't, we can grab all
18  of those.
19      A.  I don't.
20          REPORTER:  Hold on, hold on.
21          THE WITNESS:  I do.
22  BY MR. MUNSHI:
23      Q.  You'll see in this stack of documents,
24  all of them have a sticker in the lower right-hand
25  corner, an exhibit sticker. Do you see that?

Debi Stafford

81

1      A.  I do now, yes.
2      Q.  If you can find the document that has a
3  sticker that says Plaintiff's Exhibit 14, one four.
4      A.  Okay.
5      MR. WOOD:  May I see the document?
6  BY MR. MUNSHI:
7      Q.  And this should be Defendant's Answers
8  to Plaintiff's Interrogatories.  Do you see that up
9  top?
10      A.  I do.
11      Q.  Okay.  And you'll see on the first
12  page, it says Interrogatory Number 1, and it says:
13  Answer to Interrogatory Number 1.
14      Do you see that?
15      A.  Yes.
16      Q.  Okay.  Interrogatory Number 1 asks CSC
17  to state with specificity each and every
18  legitimate, nondiscriminatory reason as to why
19  defendant terminated plaintiff's employment and
20  describe the factual basis for this decision.
21      Do you see that?
22      A.  I do.
23      Q.  Going down to the bottom of page 1, the
24  last sentence, it says:  Their contribution --
25  referring to BCG -- included assistance redefining

82

1  roles and reporting relationships and, in turn,
2  identifying positions within the organization
3  (based on functional role, not any personal
4  factors) which could be eliminated or consolidated.
5      Do you see that?
6      A.  I do.
7      Q.  Describe for me -- let me start over.
8  Did you have any communications with any
9  representatives of BCG in connection with this
10  delayering process?
11      A.  I did.
12      Q.  What was the nature of your
13  communications with the BCG?
14      MR. WOOD:  Object to the form.  Vague.
15      THE WITNESS:  Well, they were
16  responsible for the process.  They were our
17  consultants for the process.  So I had people at
18  BCG that I worked with, different people depending
19  on what part of the organization I was working
20  with.
21  BY MR. MUNSHI:
22      Q.  Organization you were working with, do
23  you mean within CSC?
24      A.  Yes.
25      Q.  Okay.  Did you have any communications

83

1  with BCG about Mark Roman's organization?
2      A.  Yes, of course.
3      Q.  And what was the nature of your
4  communications, just looking at Mark Roman's
5  organization?
6      A.  Well, BCG provided us the documents
7  that we put in place.  They provided -- they
8  provided us with a practice that we should go
9  through to make sure that we were delayering it
10  according to what they wanted to.  We would talk
11  back and forth about the organization, and they
12  would help us -- force us, really, to define what
13  the organization was responsible for and help us
14  look at the spans of control and just lead us
15  generally through a process that would allow to us
16  then submit a recommended org chart.
17      Q.  So let's take a snapshot in time as the
18  date and time that you learned that the first pass
19  that Mr. Roman submitted on his organizational
20  chart then came back and there were only three
21  boxes in there, so that snapshot in time.
22      A.  Okay.
23      Q.  Did you have any conversations with BCG
24  prior to that snapshot in time about Mr. Roman's
25  organization?

84

1      A.  Not that I can recall.
2      Q.  After that snapshot in time, did you
3  have communications with BCG about Mr. Roman's
4  organization?
5      A.  Yes.
6      Q.  Do you know if Mr. Roman had any
7  communications with BCG prior to that snapshot in
8  time I just --
9      A.  I don't.
10      Q.  At any point did you have e-mail
11  communications with BCG as it pertained to
12  Mr. Roman's organization?
13      A.  I don't recall.
14      Q.  When you communicated with individuals
15  at BCG, would you do it over e-mail or over phone,
16  or how would you do it, or in person?
17      A.  Generally in person.
18      Q.  Would this be at Falls Church?
19      A.  Yes.
20      Q.  This interrogatory response that I just
21  read stated that there would be positions within
22  the organization based on functional role, not any
23  personal factors.
24      Do you see that, what I read before?
25      A.  I do.

Debi Stafford

85

1       Q.   Based on your understanding of how the
2   delayering process went at CSC, is this an accurate
3   statement?
4       A.   It is.
5       Q.   What was Ms. Liano's functional role?
6       A.   I don't recall her title.
7       Q.   Well, there is nothing in here about
8   title. We're talking about functional role. Do
9   you recall what her functional role was?
10      A.   I believe she was responsible for an
11  operations group. That is what I was trying to
12  recall.
13      Q.   Was Ms. Liano's position eliminated in
14  full, or was it consolidated with another position?
15      MR. WOOD:  Object to the form.
16      THE WITNESS:  I believe it was
17  eliminated in full.
18  BY MR. MUNSHI:
19      Q.   Did anybody take over Ms. Liano's job
20  duties?
21      A.   No.
22      Q.   Okay. Ms. Liano worked at CSC for
23  many, many years. Presumably she had work to do.
24  Did anybody do that work anymore? What happened to
25  it?

86

1       A.   Not any one person did that work. So
2   part of it was sent to a sales role. Part of it
3   was sent to a commission role. I'm sure she did
4   other things with the staff you tell me she has,
5   but I don't know what those were.
6       Q.   So do you know any individual at CSC
7   who was retained who then did any of the job duties
8   that Ms. Liano previously did?
9       A.   Who was retained in the same layer that
10  she was in?
11      Q.   Retained as part of the delayering
12  process.
13      MR. WOOD:  Object to the form.
14      THE WITNESS:  There is no way to draw a
15  complete conclusion on that. The delayering
16  process took months, and there were 13 layers that
17  we delayered. So where you started here and where
18  you ended up could take conversations and layers
19  over several months of conversation. So it's not
20  like you picked up one thing and just dropped it
21  somewhere else.
22  BY MR. MUNSHI:
23      Q.   Okay. My question is meant to be much
24  simpler than that. Prior to Ms. Liano's
25  termination, she had certain job duties and

87

1   responsibilities. Then her employment is
2   terminated. Who took over doing the work that
3   Ms. Liano was previously doing?
4       MR. WOOD:  Object to the form. Lack of
5   foundation.
6       THE WITNESS:  As I said just a moment
7   ago, I believe part of it went to the sales
8   organization. I think part of it went to the sales
9   commission piece that we were newly standing up and
10  consolidating. I think other parts of it must have
11  gone to other parts of the organization, but I
12  don't know who. I did not work with Mark and his
13  team to transition responsibilities.
14  BY MR. MUNSHI:
15      Q.   Did Ms. Liano's work performance as CSC
16  play any role in the decision to terminate her?
17      A.   Absolutely not.
18      Q.   If you turn to the second -- the next
19  page of P 14, it's the continuation of response to
20  Interrogatory Number 1. It says here: Plaintiff,
21  an at-will employee, was laid off as part of a
22  reduction in force instituted in connection with
23  the reorganization process. Prior to the
24  reorganization, plaintiff held the only operations
25  position in the global healthcare group reporting

88

1   to Mark Roman. The reorganization designed by BCG
2   changed Mr. Roman's role and placed each of his
3   direct reports (and the span of their reporting
4   employs) into other organizational areas, based on
5   functional role.
6       Based on your understanding, is that an
7   accurate statement?
8       MR. WOOD:  Objection to form. The
9   quotation should be: Prior direct reports.
10  BY MR. MUNSHI:
11      Q.   Okay.
12      A.   Well, first of all, BCG didn't design
13  it, so I wouldn't think that's accurate. BCG
14  didn't place any of his prior direct reports into
15  any other organizational efforts or areas. Those
16  were done by Mr. Roman in conjunction with others
17  in the organization.
18  BY MR. MUNSHI:
19      Q.   And in the organization, you mean CSC
20  employees --
21      A.   Yes.
22      Q.   -- correct? Where it says here, the
23  reorganization designed by BCG, is it your
24  understanding that that should be reorganization
25  designed by CSC?

22 (Pages 85 to 88)

Debi Stafford

89

1          MR. WOOD:  Object to the form.
2          THE WITNESS:  CSC was responsible for
3    implementing a design that BCG brought to us.  We
4    then took their best practice and delayered the
5    organization according to those terms.
6    BY MR. MUNSHI:
7          Q.  So ultimately who did the
8    reorganization, was it BCG or CSC making these
9    decisions?
10         MR. WOOD:  Objection to the form.
11   Vague.
12         THE WITNESS:  Making these decisions,
13   it was absolutely CSC.  BCG had no authority to do
14   that.
15   BY MR. MUNSHI:
16         Q.  Did BCG have any authority to decide
17   which positions were going to be eliminated by CSC?
18         A.  No.
19         MR. WOOD:  Object to the form.
20   BY MR. MUNSHI:
21         Q.  Did BCG have any authority to decide
22   what Mr. Roman's organization was going to look
23   like after the delayering process?
24         MR. WOOD:  Object to the form.
25         THE WITNESS:  Not to my understanding.

90

1    BY MR. MUNSHI:
2          Q.  The next sentence of Interrogatory
3    Number 2 states:  The operations role, however, did
4    not fit in the newly-structured business
5    organization, and the position was not included in
6    the new organizational design.
7          Do you see that?
8          A.  It's in Interrogatory Number 1;
9    correct?
10         Q.  Yes, it's the next sentence of where we
11   left off.  So it's the middle of that response.
12         A.  Yeah, I see it.
13         Q.  Page 2.
14         A.  I see it.  It's just Interrogatory
15   Number 1.
16         Q.  Correct.  So that response right there,
17   did BCG have any authority to decide what
18   operations role would or would not fit into the
19   newly-structured business organization?
20         MR. WOOD:  Object to the form.
21         THE WITNESS:  No.
22   BY MR. MUNSHI:
23         Q.  That was a CSC decision; is that
24   correct?
25         MR. WOOD:  Object to the form.

91

1          THE WITNESS:  Yes.
2    BY MR. MUNSHI:
3          Q.  Did BCG have any authority to decide
4    which roles or positions --
5          A.  I'm sorry.  You cut out.
6          REPORTER:  We couldn't hear you.
7    BY MR. MUNSHI:
8          Q.  Did BCG have any authority to decide
9    which positions were going to be retained as part
10   of this delayering process?
11         A.  No, sir.
12         MR. WOOD:  Object to the form.
13   BY MR. MUNSHI:
14         Q.  Were all of these decisions that we
15   just went through made by the CSC steering
16   committee?
17         MR. WOOD:  Object to the form.  Vague
18   as to the reference.
19         THE WITNESS:  As far as I know, yes.
20   BY MR. MUNSHI:
21         Q.  Did you have any e-mail communications
22   with Jim Cook about what Mr. Roman's organizational
23   structure was going to look like as part of this
24   delayering process?
25         A.  No.

92

1          Q.  Any e-mail communications with anybody
2    on the steering committee about Mr. Roman's
3    organization?
4          A.  No.
5          Q.  And the -- and you did have
6    communications with Mr. Roman obviously.  Did you
7    take any notes on your communications with
8    Mr. Roman about what his organization structure
9    would look like?
10         MR. WOOD:  Object to the form.
11         THE WITNESS:  I don't recall.
12   BY MR. MUNSHI:
13         Q.  Any e-mails with Mr. Roman that you
14   recall?
15         A.  No.
16         MR. WOOD:  Object to the form.  Vague.
17   BY MR. MUNSHI:
18         Q.  -- would look like?
19         A.  No.
20         REPORTER:  I'm sorry.  Could you repeat
21   that last question?
22   BY MR. MUNSHI:
23         Q.  Sure.  Any e-mail communications with
24   Mr. Roman about what his organizational structure
25   would look like?

23 (Pages 89 to 92)

Debi Stafford

93

1          MR. WOOD:  Object to the form.  Vague
2    as to time.
3          THE WITNESS:  Not that I recall.
4    BY MR. MUNSHI:
5          Q.   When you were working with Mr. Roman,
6    was that typically -- sorry.  When you were working
7    with Mr. Roman specifically about what his
8    organizational structure would look like, were
9    those in person or over the phone?
10         A.   Almost always over the phone.
11         Q.   Would anyone else participate in those
12   phone calls?
13         A.   Jim Cook could have.  I don't remember.
14         Q.   Anyone else you recall?
15         A.   No.
16         MR. WOOD:  Object to the form.
17         THE WITNESS:  No.
18   BY MR. MUNSHI:
19         Q.   So let's talk a little bit about the
20   talent pool that we referenced earlier.  Did you,
21   Ms. Stafford, play any role in the decision as to
22   placing Ms. Liano into that talent pool?
23         A.   I guess you could say I did.
24         Q.   And describe for me what role you would
25   play.

94

1          A.   Well, Mark felt that Linda was a
2    valuable contributor to his organization.  He was
3    disappointed that she -- her position has been
4    eliminated.  So he and I discussed the option of
5    outright termination or putting her in the talent
6    pool to see if there would be another role for her.
7          Q.   And once she was placed in that talent
8    pool, was anybody looking for a position for her?
9          MR. WOOD:  Object to the form.
10   BY MR. MUNSHI:
11         Q.   I'll ask a better question.
12   Essentially, how did it work?  Once she has been
13   designated to be in that talent pool, what's
14   happening next to her employment?
15         A.   Well, in most of the layers, what
16   happened was that talent pool sat basically off to
17   the side.  We finished the layer that we were
18   working on.  And then the week after we finished
19   that layer, which meant that we included all of the
20   terminations that went with that, those staffing
21   decisions, we started working on the next layer
22   down.
23         As we got to the staffing phase of the
24   next layer and that organization became more
25   apparent, it had been through all of the reviews,

95

1    et cetera, then it was up to myself and the leader
2    of the group to make sure that, just like we had in
3    earlier layers, that we had the right people in the
4    roles that we had.  So then under normal
5    circumstances, we could have made the decision to
6    take someone out of the talent pool and have them
7    replaced by someone else in the organization.
8          Q.   So with regard to Ms. Liano, the way
9    she's placed in that talent pool -- sorry, is there
10   feedback or --
11         MR. WOOD:  Yeah, it is somewhat
12   difficult.
13         THE WITNESS:  A little bit.
14         MR. WOOD:  And now we've got a fan on.
15         VIDEOGRAPHER:  It's this whole thing --
16   there it goes.  How is this now?
17         MUNSHI:  That's fine on my end.
18         THE WITNESS:  Okay here too.
19   BY MR. MUNSHI:
20         Q.   With regard to Ms. Liano specifically,
21   while she was placed in that talent pool, was there
22   anybody trying to find her another position
23   within --
24         MR. WOOD:  We're still getting
25   feedback, sorry.

96

1          MR. MUNSHI:  Yeah, so are we.
2          VIDEOGRAPHER:  You're cutting in and
3    out just a tad.
4          MUNSHI:  Should we go off for a minute
5    and try to fix this?
6          MR. WOOD:  Yeah, let's do that.
7          VIDEOGRAPHER:  All right.  Sure.  We'll
8    now go off the record.  This will also conclude
9    tape number 1 in our video deposition today.  The
10   time on the monitor is approximately 3:46 p.m.
11         (Off-the-record conference.)
12         VIDEOGRAPHER:  We are now back on the
13   record.  This is the beginning of tape number 2 in
14   our video deposition today.  The time on the
15   monitor is approximately 3:57 p.m.
16   BY MR. MUNSHI:
17         Q.   Ms. Stafford, before we took our break
18   just now, we were talking about the talent pool.
19   While Ms. Liano was placed in that talent pool, was
20   there anybody who was tasked with finding another
21   position for her?
22         A.   Not in the pool she was in.
23         Q.   Were there other pools where people
24   were tasked with finding positions?
25         A.   Not exactly.  Let me just explain it.

24 (Pages 93 to 96)

Debi Stafford

97

1    So remember I said a moment ago that the order was
2    we did the design, the design was approved, we came
3    back and staffed the design, either terminated some
4    and moved some to -- very few. The talent pool was
5    the exception to the rule, not the rule. The rule
6    was we terminated. So in Ms. Liano's case, Mark
7    wanted to find another role for her if he could.
8    So he postponed that decision basically by putting
9    her in the talent pool.
10        Had she stayed in the talent pool, when
11   we went through the next level of delayering, which
12   would have been the next level under her, then she
13   would have been considered for that, and there
14   would have been people looking to fill roles with
15   the best people. In Ms. Liano's case, she was
16   placed in the talent pool that didn't get that
17   opportunity.
18        In December we were told by the CEO of
19   the company that we needed the financial pickup
20   that we would get from that talent pool, so he
21   asked us to terminate the entire pool. Therefore,
22   nobody came out of -- very few people came out of
23   that pool to other roles.
24        Q. Okay. So when Ms. Liano was placed in
25   the talent pool, was there just one talent pool at

98

1    that time, or were there multiple talent pools?
2        A. Just one.
3        Q. Okay. So when was she -- if she was
4    terminated on December 12th, when was she placed
5    into the talent pool?
6        A. I don't remember the dates. It was
7    during the whole L -- let me think, one, two,
8    three -- L4 process.
9        Q. Okay. And since you were going layer
10   by layer, is it correct that her talent pool
11   contained all individuals at her layer and above?
12       A. That --
13           MR. WOOD: Object to the form.
14           THE WITNESS: -- should be correct,
15   yes. Should be correct.
16   BY MR. MUNSHI:
17       Q. Okay. So she's placed in this talent
18   pool. And while she is in there, at that point, no
19   one is tasked with trying to find her another
20   position; is that right?
21       A. No one specific person is tasked with
22   it, that's correct.
23       Q. And then at some point in December, the
24   entire talent pool is terminated; is that right?
25       A. That's correct, yes.

99

1        Q. So at some point, there is zero people
2    in the talent pool; right?
3        A. Yes.
4        Q. And then the next layer happens, and
5    the talent pool is then replenished?
6        A. I don't believe so. I think after that
7    experience, we -- and because of our financial --
8    because of our financials, I don't believe we ever
9    had another talent pool after that.
10       Q. Okay. So ultimately was everybody who
11   was placed in the talent pool, including Ms. Liano,
12   terminated?
13           MR. WOOD: Object to the form.
14           THE WITNESS: In the talent pool that
15   she was placed in -- ask your question again,
16   please.
17   BY MR. MUNSHI:
18       Q. Right. So just as you were about to
19   say, the talent pool that she was placed in, does
20   that mean that there are other talent pools that
21   existed that she was not placed in?
22       A. Well, just in other layers, like the
23   layers on top of hers.
24       Q. Okay. So just within her layer, the
25   talent pool of her layer, were all of those

100

1    individuals terminated?
2        A. Not all. You could have made a case
3    with justification that had to go up to the CEO
4    that a certain individual should be taken out of
5    that talent pool and given a role. And if an
6    organization won the ability to do that, they had
7    to replace that individual's salary by terminating
8    others in the organization, in their organization.
9        Q. Okay. Do you still have Plaintiff's
10   Exhibit 14 in front of you?
11       A. I do.
12       Q. And if you recall, we left off in the
13   middle of the response to Interrogatory Number 1.
14       A. Yes.
15       Q. So the next sentence where we left off
16   states: This effectively eliminated plaintiff's
17   position. Plaintiff was placed into a talent pool
18   for potential future consideration later in the
19   reorganization process. Subsequently, however, CSC
20   laid off the entire talent pool in order to achieve
21   cost take out goals.
22           So that is not a fully accurate
23   statement; right?
24           MR. WOOD: Objection to the form. Lack
25   of foundation and argumentative.

25 (Pages 97 to 100)

Debi Stafford

101

1       THE WITNESS: It's a fully accurate
2  statement, but not everybody that had been there at
3  the beginning ultimately was the one that came out.
4  We would have placed other people, as I described.
5  You could save one, if you will, with a
6  justification to the CEO, and then you would have
7  to replace them with others in the organization.
8  That was very much by exception, and I would
9  believe less than two handfuls of people were able
10 to do that, probably less than that.
11 BY MR. MUNSHI:
12      Q.  Was there any conversation with
13 Mr. Roman that you had where you talked about
14 making a justification or making a case for
15 Ms. Liano?
16      MR. WOOD:  Object to the form.
17      THE WITNESS:  I don't recall.
18 BY MR. MUNSHI:
19      Q.  Who ultimately made the decision to
20 eliminate the entire talent pool that Ms. Liano was
21 in?
22      A.  I believe it was the CEO and the chief
23 of staff.
24      Q.  So back to Lawrie and Mason?
25      A.  Yes, sir.

102

1       Q.  Were all individuals employed by CSC
2  who had senior operations functions terminated as
3  part of this delayering process?
4       MR. WOOD:  Object to the form.  Vague.
5       THE WITNESS:  I don't know that answer.
6  BY MR. MUNSHI:
7       Q.  Was there anybody else at CSC that
8  you're aware of who had similar roles and functions
9  as Ms. Liano?
10      A.  I don't know that answer.
11      Q.  Or a person who did what she did?
12      A.  I don't know that answer.
13      Q.  I believe you mentioned earlier that
14 your role as VP of HR was a global role; is that
15 right?
16      A.  Yes, correct.
17      Q.  And CSC had employees all over the
18 world; right?
19      A.  Yes.
20      Q.  Were individuals outside of North
21 America also affected by this delayering process?
22      A.  Yes.
23      Q.  And were individuals outside of North
24 America also -- were some individuals outside of
25 North America terminated as part of this delayering

103

1  process?
2       A.  Yes.
3       Q.  Were there any conversations that you
4  had with Mr. Roman about limiting his design to
5  only affect individuals who were placed in North
6  America?
7       MR. WOOD:  Object to the form.
8       THE WITNESS:  Say that again, please.
9  BY MR. MUNSHI:
10      Q.  Sure.  When you were having
11 conversations with Mr. Roman about his
12 organizational structure, were there any
13 conversations about treating North American
14 individuals differently than global individuals?
15      MR. WOOD:  Object to the form.  Vague.
16      THE WITNESS:  No.
17 BY MR. MUNSHI:
18      Q.  In other words, there were individuals
19 outside of North America who reported to Mr. Roman
20 who theoretically could have been impacted by this
21 delayering; correct?
22      A.  Well, I believe, at the time, Mr. Roman
23 had just North American responsibilities.
24      Q.  Are you aware of any individuals who
25 were located outside of North America who reported

104

1  directly or indirectly to Mr. Roman?
2       MR. WOOD:  Object to the form.  Vague
3  as to time.
4       THE WITNESS:  At any point in time?
5  BY MR. MUNSHI:
6       Q.  Let's talk about a snapshot of middle
7  of 2012.
8       MR. WOOD:  Object to the form.  Vague
9  as to time.
10      THE WITNESS:  I don't remember exact --
11 BY MR. MUNSHI:
12      Q.  Let me ask this question then.  At any
13 point in the 2012 period, did the individuals
14 reporting to Mr. Roman change?
15      A.  Yes.
16      Q.  Okay.  During the 2012 period, were
17 there any individuals who reported to Mr. Roman
18 directly or indirectly who were based outside of
19 North America?
20      A.  I believe so.
21      Q.  Were any of the individuals who
22 reported to Mr. Roman in the year 2012 who were
23 outside of North America affected by the delayering
24 process?
25      MR. WOOD:  Object to the form.  Vague.

26 (Pages 101 to 104)

Debi Stafford

105

1       THE WITNESS:  Outside of the U.S., but
2   reported directly to Mr. Roman affected by the
3   delayering process?
4   BY MR. MUNSHI:
5       Q.   Correct.
6       A.   Because of Mark Roman?
7       Q.   Just in Mark Roman's organizational
8   structure.
9       A.   Well, Mark Roman's structure changed to
10  where he didn't have global responsibilities; he
11  had North American responsibilities.  So those
12  folks outside of his organization wouldn't have
13  been -- those folks in Europe and the other places
14  that he previously had wouldn't have been his
15  direct reports anymore.
16      Q.   And when did that happen?
17      A.   With the -- I think the L3 layers, we
18  brought a new layer in to Jim Cook's organization
19  for healthcare, effectively moving everyone down a
20  layer.
21      Q.   And did that happen before Ms. Liano
22  was terminated or after?
23      A.   Before.
24      Q.   She was terminated December of 2012.
25  Can you give me a ball park as to when this took

106

1   place?
2       A.   Summer.
3       Q.   Of 2012?
4       A.   Yes, sir.
5       Q.   Okay.  Do you know if any other
6   individual who reported directly to Mr. Roman in
7   the summer of 2012 was likewise a part of this
8   delayering process besides Ms. Liano?
9       MR. WOOD:  Object to the form.
10      THE WITNESS:  I don't recall.
11  BY MR. MUNSHI:
12      Q.   As part of the overall delayering
13  process at CSC, were there any individuals who were
14  located outside of North America terminated?
15      A.   Yes.
16      Q.   Was there any adverse impact analysis
17  that was created at CSC?
18      MR. WOOD:  Object to the form.
19      THE WITNESS:  When?
20  BY MR. MUNSHI:
21      Q.   Are you familiar with what an adverse
22  impact analysis is?
23      A.   Yes.
24      MR. WOOD:  Object to the form.  Lack of
25  foundation.

107

1       MR. MUNSHI:  Well, she just said she
2   knows.
3   BY MR. MUNSHI:
4       Q.   Was there any adverse impact analysis
5   created in connection with the delayering process
6   that resulted in Ms. Liano's termination?
7       MR. WOOD:  Object to the form.
8       THE WITNESS:  I'm not aware of one.  HR
9   did not perform one.
10  BY MR. MUNSHI:
11      Q.   Do you know if anybody created one?
12      A.   I don't.
13      Q.   As an HR professional, within your
14  capacity as an HR person, do you believe that
15  that's a good idea for a company to create an
16  adverse impact analysis to see if there are a
17  disproportionate number of, let's say, older
18  workers affected by a reduction in force?
19      MR. WOOD:  Objection to form.  Vague,
20  lack of foundation.
21      THE WITNESS:  I believe it's a standard
22  best practice when you do any workforce reduction
23  to do an adverse impact analysis, yes.
24  BY MR. MUNSHI:
25      Q.   Okay.  And does that apply to this

108

1   situation as well?  Is it still standard for CSC --
2       A.   I'm not at CSC.  I don't know.
3       MR. WOOD:  Object to the form.  Vague.
4   BY MR. MUNSHI:
5       Q.   Take me back to 2012.
6       A.   I'm sorry.  Ask again.
7       Q.   Would it be standard HR best practices
8   for CSC to do an adverse impact analysis in the
9   year 2012 when they're doing a reduction in force?
10      MR. WOOD:  Object to the form.
11      THE WITNESS:  Not reductions in force
12  associated with the delayering process.
13  BY MR. MUNSHI:
14      Q.   Explain that to me.  What do you mean
15  by that?
16      A.   I mean that we didn't do, to my
17  knowledge, any adverse impact analysis in the
18  United States as part of the delayering process.
19  Had we done a --
20      Q.   Why not?
21      A.   The decision was made by Mike Lawrie.
22  I don't know why not.
23      Q.   The decision to not do an adverse
24  impact analysis was made by Mike Lawrie?
25      A.   Somebody made that above my pay grade.

27 (Pages 105 to 108)

Debi Stafford

109

1    Q.  Okay.  Would you consider that to not
2  be best practices in this situation to not do an
3  adverse impact analysis?
4    A.  Well, as I said a moment ago, as an HR
5  professional, I believe an adverse impact analysis
6  should be performed whenever you do a workforce
7  reduction.
8    Q.  In connection with this delayering
9  process that resulted in individuals losing their
10  jobs, was there ever any discussion about the
11  effect that this would have on the overall age of
12  the workforce at CSC?
13      MR. WOOD:  Object to the form.
14      THE WITNESS:  Not that I was a part of.
15  BY MR. MUNSHI:
16    Q.  You mentioned earlier various
17  presentations, Power Point presentations or
18  documents that were created where age was one
19  metric included.  After 2012, did you ever create
20  or see a similar document where age was a metric on
21  your presentation?
22      MR. WOOD:  Object to the form.
23      THE WITNESS:  It was a recurring part
24  of my metrics, yes.
25  BY MR. MUNSHI:

110

1    Q.  And prior to December of 2012, when you
2  did gather or present that data including age
3  metrics, was that for the entire CSC company or any
4  specific layer of CSC employee?
5      MR. WOOD:  Object to the form.
6      THE WITNESS:  It was for people in
7  the -- it was for people in BSS.
8  BY MR. MUNSHI:
9    Q.  Okay.  And that would include Mark
10  Roman and Linda Liano; correct?
11      MR. WOOD:  Object to the form.
12      THE WITNESS:  Yes.
13  BY MR. MUNSHI:
14    Q.  Do you recall the last time you created
15  or presented that type of data metrics prior to
16  December of 2012?
17    A.  I don't.
18    Q.  Do you think it would have been within
19  that year or that decade?
20      MR. WOOD:  Object to the form.  Vague
21  and compound.
22      THE WITNESS:  I believe it probably was
23  within that decade.
24  BY MR. MUNSHI:
25    Q.  And when you said it was recurring, how

111

1  often was it recurring?
2    A.  Probably every year or so.
3    Q.  As a result of any of the presentations
4  or documents that you gathered or presented where
5  age was a metric, were you ever given any sort of a
6  directive or a game plan as to what to do next with
7  that information?
8      MR. WOOD:  Object to the form.
9      THE WITNESS:  No.
10      MR. MUNSHI:  Okay.  Ms. Stafford, I
11  don't have any more questions for you this
12  afternoon.  Thank you for being here.
13      THE WITNESS:  Thank you.
14      MR. MUNSHI:  And Mr. Wood has the
15  opportunity to ask any questions of you.
16      EXAMINATION
17  BY MR. WOOD:
18    Q.  Ms. Stafford, you've been asked several
19  questions in the deposition today about
20  documentation, and counsel for Ms. Liano used the
21  term, quote, age as a metric, closed quote.  Do you
22  recall those questions?
23    A.  Yes.
24    Q.  And I believe you testified that any
25  such information would have been presented in a

112

1  meeting in which the topic of discussion included
2  protection of the company's intellectual property.
3  Is that right?
4    A.  That's correct.
5      MUNSHI:  Objection to form.  Go ahead.
6  BY MR. WOOD:
7    Q.  Was there any other context or subject
8  matter in which documentation concerning, quote,
9  age as a metric, closed quote, was presented or
10  discussed other than the context that you described
11  in terms of protection of intellectual property?
12    A.  Not that I produced, no.
13    Q.  And is there any other type of meeting
14  that you recall outside of that particular context
15  as you described it earlier in the deposition?
16    A.  No.
17    Q.  Do you know whether automation or
18  centralization were factors potentially involved in
19  eliminating a position such as an operations role
20  in an industry vertical?
21      MR. MUNSHI:  Objection to form.  Go
22  ahead.
23      THE WITNESS:  We actually had several
24  criteria for all of the roles.  Automation could
25  have been one.  Centralizing, we centralized human

Debi Stafford

---

113

1    resources at this time.  So centralization could be
2    one.  The financial results of an organization
3    could be another.  So all of those could have been
4    factors. .
5            MR. WOOD:  That's all I have.
6            EXAMINATION
7    BY MR. MUNSHI:
8        Q.  I just have a couple of follow-ups
9    there.  Ms. Stafford, with regard to age being a
10   metric of discussion with regard to IP issues, the
11   purpose of including age as a metric is that CSC
12   had to keep track of who is going to retire;
13   correct?
14           MR. WOOD:  Object to the form.
15           THE WITNESS:  Well, we couldn't predict
16   when people were going to retire.  But we certainly
17   could think that it was upcoming for some people.
18   So, yes, what we wanted to make sure that we could
19   do is have a good transition plan for those folks
20   if they announced that they were retiring, yes.
21   BY MR. MUNSHI:
22       Q.  And in your experience at CSC,
23   typically individuals who choose to retire tend to
24   be close to what I'll call retirement age, in the
25   60s of their life; correct?

---

114

1            MR. WOOD:  Object to the form.
2            THE WITNESS:  Or older.
3    BY MR. MUNSHI:
4        Q.  Or older; correct?
5        A.  Definitely.
6        Q.  And in those situations where there is
7    somebody in their 60s or older who may be on the
8    verge of retirement, CSC needs to ensure that that
9    knowledge base is transferred to somebody who is
10   still going to be at the company; right?
11           MR. WOOD:  Object to the form.
12           THE WITNESS:  Yes, that's true.
13   BY MR. MUNSHI:
14       Q.  And typically those individuals who
15   would be the recipients of that knowledge base
16   would be younger; correct?
17           MR. WOOD:  Object to form.  Lack of
18   foundation.
19           THE WITNESS:  Practically speaking,
20   yes.
21           MR. MUNSHI:  Okay.  That's all I have.
22   Thank you.
23           THE WITNESS:  Thank you.
24           MR. WOOD:  That's all I have.  Thank
25   you.

---

115

1            VIDEOGRAPHER:  This concludes the video
2    deposition of Debi Stafford.  The time on the
3    monitor is approximately 4:19 p.m., and we are now
4    off the record.
5            (The witness, after having been advised
6    of her right to read and sign this transcript, does
7    not waive that right.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

116

1            SIGNATURE OF DEPONENT
2    DEPONENT:  DEBI STAFFORD
     DEPOSITION DATE:  SEPTEMBER 19, 2017
3    REPORTER:  JANICE N. SHEPHERD
     CASE CAPTION:  LINDA LIANO vs. COMPUTER SCIENCES
4    CORPORATION
5
     (Please return both Signature of Deponent pages)
6
         I, the undersigned, DEBI STAFFORD, do hereby
7    certify that I have read the foregoing deposition
     and find it to be a true and accurate transcription
8    of my testimony, with the following corrections, if
     any:
9    PAGE LINE        CHANGE            REASON
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Debi Stafford

117

1       SIGNATURE OF DEPONENT (CONTINUED)
2   DEPOSITION DATE:  SEPTEMBER 18, 2017
    REPORTER:  JANICE N. SHEPHERD
3   CASE CAPTION:  LINDA LIANO vs. COMPUTER SCIENCES
    CORPORATION
4
5   PAGE  LINE     CHANGE          REASON
6
7
8
9
10
11
12  _____
        DEBI STAFFORD          Date
13      I, Janice N. Shepherd, Notary Public for the
    State of South Carolina at Large, do hereby certify
14  that the deponent was advised of his or her right
    to read and sign said deposition both verbally and
15  in writing.  If the deponent fails to execute and
    return foregoing Signature of Deponent pages within
16  the thirty (30) days allowed pursuant to the Rules
    of Civil Procedure, the original transcript may be
17  filed with the court.
18
19
20
21
22
23  _____
        Janice N. Shepherd, RPR, CSR
        My Commission expires
24      October 10, 2024
25

118

1           CERTIFICATE OF REPORTER
2
3           I, Janice N. Shepherd, Registered
4   Professional Reporter and Notary Public for the
5   State of South Carolina at Large, do hereby certify
6   that the foregoing transcript is a true, accurate,
7   and complete record.
8           I further certify that I am neither
9   related to nor counsel for any party to the cause
10  pending or interested in the events thereof.
11          Witness my hand, I have hereunto
12  affixed my official seal this 26th day of
13  September, 2017, at Charleston, Charleston County,
14  South Carolina.
15
16
17
18
19
20
21
22
23  _____
        Janice N. Shepherd, RPR, CSR
24      My Commission expires
        October 10, 2024
25

119

1               I N D E X
2
3                   Page    Line
4   DEBI STAFFORD              4      4
5   EXAMINATION               4      9
6   BY MR. MUNSHI
7   EXAMINATION             111     16
8   BY MR. WOOD
9   EXAMINATION             113      6
10  BY MR. MUNSHI
11  SIGNATURE OF DEPONENT    116      1
12  CERTIFICATE OF REPORTER  118      1
13
14
15      REQUESTED INFORMATION INDEX
16
17      (No Information Requested)
18
19
20
21          E X H I B I T S
22
23      (No Exhibits Proffered)
24
25

| **A** | | | | |
|---|---|---|---|---|
| **ability** 100:6 | 38:24 40:20 | **answer** 6:2 9:1 | 100:25 | **B** 119:21 |
| **able** 32:17 101:9 | 41:1,7,12,12 | 12:4 21:22 | **aside** 15:21 | **babies** 17:15 |
| **abnormal** 78:15 | 41:19,25 42:25 | 24:9,16 29:14 | 65:24 | **back** 11:22 13:3 |
| 79:18 | 46:4,19,25 | 35:5 38:19 | **asked** 11:25 | 16:24 18:8 |
| **absolutely** 23:20 | 47:7,7 48:3 | 39:1 41:5,8 | 19:14 44:15 | 19:24 20:13 |
| 25:3 48:23 | 109:11,18,20 | 44:3,23 50:10 | 74:8 97:21 | 37:22 39:17 |
| 56:8 73:12 | 110:2 111:5,21 | 61:16 66:14 | 111:18 | 45:10 51:14 |
| 78:8 87:17 | 112:9 113:9,11 | 81:13 102:5,10 | **asking** 5:3,16 | 53:15 55:18 |
| 89:13 | 113:24 | 102:12 | 27:3 32:3 | 58:4 61:1,8 |
| **accurate** 85:2 | **aged** 45:17,23 | **answered** 34:3 | 53:18 | 62:11 71:6,12 |
| 88:7,13 100:22 | **ages** 38:23 39:8 | 44:16 74:9 | **asks** 81:16 | 75:21 76:24 |
| 101:1 116:7 | 39:16 40:11 | **answering** 5:19 | **assigned** 42:15 | 79:1,17 83:11 |
| 118:6 | **aging** 33:16,23 | 12:2 | **assistance** 81:25 | 83:20 96:12 |
| **achieve** 100:20 | 46:12 | **answers** 5:4,24 | **assistant** 44:8 | 97:3 101:24 |
| **achieved** 34:7 | **ago** 4:24 6:20 | 81:7 | 45:6,9 | 108:5 |
| 55:1 | 15:15 32:3 | **anybody** 15:6,23 | **associate** 26:18 | **background** |
| **acquired** 17:20 | 34:3 38:4 40:2 | 46:2,12 62:22 | **associated** | 11:6 13:1 17:9 |
| 17:22 | 41:8 87:7 97:1 | 72:20 74:21 | 108:12 | 19:25 |
| **acronym** 49:10 | 109:4 | 77:17 85:19,24 | **associates** 1:13 | **ball** 105:25 |
| **Act** 22:17,21 | **agree** 22:8 24:3 | 92:1 94:8 | 3:9 26:4 | **base** 114:9,15 |
| **action** 7:7,13,18 | 25:9 26:6,11 | 95:22 96:20 | **assuming** 61:6 | **based** 20:22 82:3 |
| 9:18 15:14,17 | 73:6 78:2,8 | 102:7 107:11 | **at-will** 87:21 | 84:22 85:1 |
| 41:22 | **ahead** 6:6 16:17 | **anymore** 85:24 | **attorney** 4:14 | 88:4,6 104:18 |
| **actions** 10:2 | 55:3 58:12 | 105:15 | 15:19 | **basic** 5:1 |
| **actual** 6:2 50:17 | 112:5,22 | **apparent** 94:25 | **ATTORNEYS** | **basically** 5:3 |
| 65:24 | **air** 11:8,10,11 | **APPEARANC...** | 2:2,7 | 7:19 64:12 |
| **administrative** | **AL** 2:10 | 2:1 | **August** 16:4,23 | 94:16 97:8 |
| 44:8 45:5,9 | **allow** 83:15 | **apply** 107:25 | 16:24 34:22 | **basis** 81:20 |
| **adverse** 106:16 | **allowed** 117:16 | **approved** 58:7 | **Austin** 20:24 | **BCG** 54:4 55:5 |
| 106:21 107:4 | **America** 102:21 | 58:14 59:6 | **authority** 89:13 | 62:21 81:25 |
| 107:16,23 | 102:24,25 | 62:16 76:23 | 89:16,21 90:17 | 82:9,13,18 |
| 108:8,17,23 | 103:6,19,25 | 79:1,2 97:2 | 91:3,8 | 83:1,6,23 84:3 |
| 109:3,5 | 104:19,23 | **approximately** | **automation** | 84:7,11,15 |
| **advised** 115:5 | 106:14 | 3:3 11:20 19:2 | 112:17,24 | 88:1,12,13,23 |
| 117:14 | **American** | 28:17 29:12 | **aware** 5:12 9:17 | 89:3,8,13,16 |
| **affect** 103:5 | 103:13,23 | 56:4 96:10,15 | 9:21 10:1,9 | 89:21 90:17 |
| **affixed** 118:12 | 105:11 | 115:3 | 27:23 30:17,22 | 91:3,8 |
| **afternoon** 3:1 | **amount** 43:11 | **April** 49:5,6 | 61:7 68:3,5 | **beginning** 96:13 |
| 4:11 111:12 | **analysis** 106:16 | **area** 13:8 | 71:14,25 75:1 | 101:3 |
| **age** 22:17 23:18 | 106:22 107:4 | **areas** 88:4,15 | 75:11 80:14 | **behalf** 3:17 |
| 23:22 31:5,12 | 107:16,23 | **argumentative** | 102:8 103:24 | **belief** 24:11 |
| 31:21 32:5,10 | 108:8,17,24 | 24:23 25:16,21 | 107:8 | **believe** 3:19 12:2 |
| 32:13,22 33:4 | 109:3,5 | 26:10 30:8 | **AWR's** 3:6 | 14:19 59:21 |
| 35:2,10 38:17 | **announced** | 36:1 73:11 | | 65:18,20 66:1 |
| | 113:20 | 75:15 79:9,23 | **B** | 66:8 67:5,15 |

67:20 68:11,14
69:5 70:24
80:16 85:10,16
87:7 99:6,8
101:9,22
102:13 103:22
104:20 107:14
107:21 109:5
110:22 111:24
**believed** 68:19
**Benefit** 19:7,9
**Benefitfocus**
17:3
**best** 5:14,18 73:7
78:3,16 79:19
89:4 97:15
107:22 108:7
109:2
**better** 5:7 18:11
94:11
**Beyond** 77:2
**bias** 24:13
**biases** 24:5,21
26:6
**Birmingham**
2:10
**birth** 17:6
**bit** 39:6 93:19
95:13
**boss** 16:18,22
**Boston** 50:22
53:7
**bottom** 81:23
**boxes** 71:12
76:25 78:24
83:21
**break** 6:4 96:17
**Brian** 65:11,14
**bring** 7:18 35:6
61:1
**bringing** 35:14
36:5
**broadly** 55:19
**brought** 4:17
9:18,22 10:2

10:10 15:14,17
16:14 47:7
89:3 105:18
**BSS** 38:8,9
50:15 64:7,8
65:6 110:7
**business** 13:18
14:21,25 15:6
25:23 34:24
37:24 38:3,7
44:20 49:15
52:3 54:9,11
54:15 90:4,19
**business-related**
45:2
**businesses** 26:2

**C**

**call** 15:18 22:12
38:8,13 62:12
113:24
**called** 17:21 61:5
**calls** 93:12
**capacity** 20:1
22:15,19 28:15
53:2 107:14
**CAPTION**
116:3 117:3
**Carolina** 3:7
17:4 117:13
118:5,14
**carried** 59:21
**case** 3:13 7:3
8:11,14,16
9:13 97:6,15
100:2 101:14
116:3 117:3
**cases** 10:7
**cause** 118:9
**centralization**
112:18 113:1
**centralized**
112:25
**Centralizing**
112:25

**CEO** 78:20
97:18 100:3
101:6,22
**certain** 21:11
22:24 24:6
42:19 46:3
56:9 86:25
100:4
**certainly** 5:8
26:1 113:16
**CERTIFICATE**
118:1 119:12
**certificates**
20:10
**certifications**
20:11
**certify** 116:7
117:13 118:5,8
**cetera** 95:1
**challenging** 7:19
**change** 18:14
62:1 65:25
104:14 116:9
117:5
**changed** 51:21
61:23 62:6
88:2 105:9
**changes** 62:14
62:17,19
**characteristic**
23:13
**charge** 65:19
**Charleston** 1:14
3:7 17:3
118:13,13
**chart** 14:16
56:18 58:25
60:13 61:9,12
61:15,20 62:16
63:21 70:19
71:12 74:14
75:20,22,25
76:2,3,17,18
77:13,22 83:16
83:20

**charts** 11:2 12:6
12:16,20,23
13:6,7,11,14
13:21 14:12
15:10 60:20
62:14 78:5,24
78:25,25
**chase** 18:6
**check-ins** 52:8
**chief** 49:11 59:9
101:22
**choose** 113:23
**chosen** 72:13
73:18
**Chris** 66:25 67:3
**CHRO** 18:22
49:9
**Church** 21:1
84:18
**circumstance**
31:17
**circumstances**
78:8 95:5
**civil** 22:6,21
117:16
**claim** 29:9
**claimed** 9:24
10:3
**claims** 10:10
**class** 31:18 32:7
35:3
**classes** 22:2,5
**clean** 5:15,25
**clear** 64:24
**Clint** 2:15 3:7
**close** 113:24
**closed** 111:21
112:9
**co-workers** 16:6
**colleague** 3:19
**college** 35:7
**com** 18:7
**come** 5:15,25
24:21 27:3
31:22 35:10

69:8 78:20
**comes** 6:15
**commission** 86:3
87:9 117:23
118:24
**committee** 59:6
59:7,12,16,18
60:16,19,25
62:12 69:23
74:12 75:20
76:24 77:10
91:16 92:2
**common** 36:17
**commonly** 37:5
**communicate**
55:19 73:24
74:5
**communicated**
15:23 16:10,13
16:19 84:14
**communication**
16:5
**communications**
82:8,13,25
83:4 84:3,7,11
91:21 92:1,6,7
92:23
**commuting**
20:25
**company** 10:21
10:22 17:21
20:2 26:18,21
27:1,2,7,12
28:9 30:24
33:24 37:14
49:18,19 50:1
56:1 68:20
75:4 78:20
97:19 107:15
110:3 114:10
**company's**
112:2
**compensation**
20:18
**complained** 30:4

**complaint** 25:7
28:10,14 29:16
**complaints** 9:21
9:22 21:12,13
29:2 30:13
**complete** 12:3
55:15 86:15
118:7
**completed** 56:14
**completion**
56:19
**compound** 34:10
110:21
**computer** 1:6
2:7 3:13,18
43:24 44:13
116:3 117:3
**concept** 22:24
23:13
**conceptionally**
55:25
**concern** 26:23
**concerned** 32:15
**concerning**
46:24 112:8
**concerns** 26:24
33:22
**conclude** 96:8
**concluded** 30:5
30:25
**concludes** 115:1
**conclusion** 29:18
30:19 74:15
75:3 76:3
86:15
**conditioner** 11:8
11:10,11
**conduct** 21:23
29:1,8,13
**conducted** 29:23
30:24
**conducting**
29:15 30:12
**conference** 6:11
6:12 38:16

41:23 96:11
**conferences**
36:11,14 38:10
**conjunction**
88:16
**connection** 6:25
9:13 10:21,22
13:24 14:3
19:17 35:2
46:9 48:24
49:24 50:13
52:4 55:20
82:9 87:22
107:5 109:8
**consider** 109:1
**consideration**
100:18
**considered**
54:15 97:13
**Console** 2:3 4:14
**consolidate**
68:17
**consolidated**
82:4 85:14
**consolidating**
87:10
**constraints** 69:8
**consultants**
82:17
**consulting** 19:9
50:18,22,23
53:7
**contained** 98:11
**context** 31:11,21
71:10 112:7,10
112:14
**contexts** 32:8
**continuation**
87:19
**continued** 52:13
117:1
**continuously**
18:2
**Continuum**
17:21,22,24

**contribution**
81:24
**contributor** 94:2
**control** 78:22
83:14
**conversation**
34:13 42:1
46:2 47:6 61:4
70:2,5,9,14
71:3 79:15
86:19 101:12
**conversations**
15:22 31:5,12
32:4,10 33:13
33:22 34:8,16
35:1,11,16,19
36:4,20,23,25
37:2 46:11,19
47:23 55:24
56:11,15 57:16
57:17,23 58:3
58:10,17,20
60:19 72:7
79:6 83:23
86:18 103:3,11
103:13
**Cook** 34:19 38:2
42:16 59:17
61:1,4,8,11,14
62:7,18 65:8
66:23 74:5
91:22 93:13
**Cook's** 64:9
105:18
**copied** 59:15
**corner** 80:25
**Corporation** 1:6
2:7 3:13,19
116:4 117:3
**correct** 3:22
6:21 10:15
22:10 30:6
40:12 43:10
44:6,10 47:2
50:23,24 56:24

60:1 65:9
66:11,20,23,24
67:9,19 69:12
69:13,25 71:16
88:22 90:9,16
90:24 98:10,14
98:15,22,25
102:16 103:21
105:5 110:10
112:4 113:13
113:25 114:4
114:16
**corrections**
116:8
**correspondence**
59:15
**cost** 100:21
**counsel** 1:15 2:1
3:5,14 10:18
15:22 111:20
118:9
**count** 28:19
**counter** 26:6,14
**County** 118:13
**couple** 5:12 32:2
34:23 48:6
113:8
**course** 58:8 83:2
**courses** 22:1
**court** 1:1 4:2 5:9
10:2 117:17
**covered** 12:10
**create** 12:20
13:10 39:25
40:18 107:15
109:19
**created** 5:11
12:24 13:21,24
14:5 40:1
41:18 42:7
43:19 50:7
59:12 73:16,22
106:17 107:5
107:11 109:18
110:14

**creating** 14:2
39:21 40:25
45:2 56:17
57:1
**creation** 13:19
**criteria** 77:11
112:24
**CSC** 4:17 6:22
7:1,12,16 8:23
8:24 9:15,22
9:24 10:4,11
12:11,13 13:25
15:14,19,22
16:1,3,6,7,8,18
16:25 17:19,20
17:22 18:2,11
18:12,15,17,20
19:3,5,11,17
19:19 20:13,23
20:25 21:6
24:5,12 25:1,4
25:11 27:19,24
28:3,10 29:1
29:23 30:4,11
30:23 31:3
33:3,16,22
35:21 36:10
37:3,10,11,21
38:17,24 39:17
40:11 43:16
44:14,20 45:13
45:17,22 46:12
47:13,20 48:4
48:7,21,22
49:1,9,16
50:14 53:7
62:22 64:1
66:10,20 67:4
67:8,14,18
68:1,4 74:21
75:12 76:2
79:18 81:16
82:23 85:2,22
86:6 87:15
88:19,25 89:2

89:8,13,17
90:23 91:15
100:19 102:1,7
102:17 106:13
106:17 108:1,2
108:8 109:12
110:3,4 113:11
113:22 114:8
**CSC's** 10:17
31:5 38:11
39:8
**CSR** 117:23
118:23
**current** 16:22
**currently** 16:1
17:2 20:4
**curve** 38:17,24
**cut** 91:5
**cutting** 96:2

**D**

**D** 119:1
**Daniel** 2:9 3:18
3:22
**data** 38:16,23
39:8 45:15,21
110:2,15
**date** 1:10 3:2
17:5 83:18
116:2 117:2,12
**dates** 98:6
**David** 67:11
**day** 69:23
118:12
**days** 117:16
**Debi** 1:9 3:4 4:4
115:2 116:2,6
117:12 119:4
**decade** 110:19
110:23
**December** 97:18
98:4,23 105:24
110:1,16
**decide** 74:21
89:16,21 90:17

91:3,8
**decided** 77:3
**decision** 7:25 8:9
59:1 68:6,9,12
69:10,21 81:20
87:16 90:23
93:21 95:5
97:8 101:19
108:21,23
**decisions** 34:6
61:25 89:9,12
91:14 94:21
**decrease** 78:21
**defendant** 1:7
2:7 7:13 81:19
**Defendant's**
81:7
**define** 83:12
**definitely** 46:16
47:5 114:5
**definitively**
46:17,20
**degree** 17:10,13
**degrees** 17:16,17
**delayered** 86:17
89:4
**delayering** 48:11
48:18,24 49:4
49:16,24 50:8
50:14,20 51:19
52:5,24 53:2
53:19,23 54:20
55:13,20 56:13
56:20 57:3
62:23 68:22
69:5 71:19
72:5 73:17
74:1,7 76:11
78:19 80:10
82:10 83:9
85:2 86:11,15
89:23 91:10,24
97:11 102:3,21
102:25 103:21
104:23 105:3

106:8,12 107:5
108:12,18
109:8
**demographics**
31:5 41:1
46:19 47:7
**department** 79:2
**depended** 51:3,8
63:13
**depending** 14:25
31:16 58:9
82:18
**deponent** 116:1
116:2,5 117:1
117:14,15,15
119:11
**deposed** 6:20
8:23 9:12
**deposition** 1:9
3:4,12 4:1,18
4:20 6:25 9:19
10:14,24 12:2
15:11 16:19
96:9,14 111:19
112:15 115:2
116:2,7 117:2
117:14
**depositions** 3:11
**describe** 12:8
64:8 81:20
82:7 93:24
**described** 41:7
54:17 101:4
112:10,15
**design** 58:6
88:12 89:3
90:6 97:2,2,3
103:4
**designated**
94:13
**designed** 58:22
88:1,23,25
**designing** 58:16
58:17
**despite** 77:5

**details** 16:20
**dialed** 3:20
**difference** 66:5
**different** 13:20
14:24 21:11
58:10 71:6
79:3 82:18
**differently**
103:14
**difficult** 95:12
**difficulty** 11:5
**direct** 34:19,20
59:9 88:3,9,14
105:15
**direction** 66:8
**directions** 42:19
**directive** 42:9,18
63:16 111:6
**directives** 53:6
53:10,20,22
54:19 62:21
**directly** 18:21
49:12 51:11,25
57:24 71:15
72:1 104:1,18
105:2 106:6
**directors** 51:8
**disagreed** 70:22
**disappointed**
71:3,8 94:3
**disapproved**
75:21
**discriminated**
9:24 10:3,11
25:6 27:24
29:10 30:5
**discrimination**
21:13 22:3,17
23:1,5,6,18,23
23:23 25:2,13
27:18 28:10
29:16,19,25
30:13,20 31:1
**discuss** 55:5,6
58:21 61:2

62:13 68:24
**discussed** 32:5
43:9,14 46:25
55:6 94:4
112:10
**discussion**
109:10 112:1
113:10
**discussions** 31:4
31:12 32:4,9
33:1 55:11
60:9
**disproportion...**
107:17
**dispute** 7:4
**distribution**
38:17,24
**DISTRICT** 1:1
1:1
**diversified** 64:14
71:7,9
**division** 51:6,18
55:4 66:23
**document** 41:11
41:24 45:2
48:3 73:8,15
77:19 78:4
80:7,14 81:2,5
109:20
**documentation**
111:20 112:8
**documents**
10:23 11:1
12:1,12,12
15:9 39:7,12
43:23 44:12,19
45:6 72:11,25
80:16,23 83:6
109:18 111:4
**doing** 17:23
30:18 70:11
87:2,3 108:9
**Donna** 18:24,24
**dot** 18:6
**draw** 86:14

drive 1:13 3:6
44:21
dropped 86:20
due 69:7
duly 4:5
duties 20:14
21:5,20 28:24
29:17 50:13
85:20 86:7,25

**E**

E 119:1,21
e-mail 59:20
73:25 77:20
80:7 84:10,15
91:21 92:1,23
e-mails 61:7
92:13
earlier 65:5
93:20 95:3
102:13 109:16
112:15
early 65:18
easier 38:8
EASTERN 1:1
education 17:8
EEO 21:7,12,20
effect 109:11
effectively
100:16 105:19
effort 80:2
efforts 77:5
88:15
eight 71:11
Eileen 34:23
either 51:4 58:10
58:13 68:5
97:3
elaborate 16:15
electronic 72:19
eliminate 69:21
75:13 101:20
eliminated 63:18
69:1,19 70:15
75:10 77:4

79:21 80:1,10
82:4 85:13,17
89:17 94:4
100:16
eliminating 70:3
70:6 112:19
eminent 33:8
employed 6:22
8:3 12:13 16:7
45:12 74:22
102:1
employee 7:4,16
25:14 27:24
29:9 47:13
87:21 110:4
employees 21:11
26:7 31:6
35:21 36:5
37:3 38:11
39:16 40:11
46:3 48:4 49:1
49:18,19 50:1
53:7 88:20
102:17
employment 8:1
8:9,23 10:1
20:18 21:8
22:6,17 68:7
81:19 87:1
94:14
employment-r...
7:23 9:13
employs 88:4
encouraged 25:6
encroaching
32:13,21,22
ended 86:18
ensure 114:8
entire 30:23 31:3
48:17 52:7
56:22 58:5
71:2 97:21
98:24 100:20
101:20 110:3
entrants 35:7

entry 31:17 32:6
35:2
Equal 21:8
Essentially
94:12
estimated 29:24
et 95:1
Europe 105:13
events 118:10
everybody 99:10
101:2
exact 37:20
51:20 104:10
exactly 9:5 33:7
70:12 96:25
EXAMINATI...
4:9 111:16
113:6 119:5,7
119:9
examine 42:14
examined 4:5
examples 32:6
exception 97:5
101:8
execute 117:15
exhibit 25:13
80:25 81:3
100:10
Exhibits 119:23
exist 23:6,22,24
25:11,19 26:2
26:5,13 29:19
56:19 73:8
78:4
existed 30:20
99:21
exists 73:1 80:14
experience 45:1
99:7 113:22
expires 117:23
118:24
explain 21:9,9
39:6 50:17
62:18 96:25
108:14

express 70:21
Extremely 78:13

**F**

F 2:9
facilitate 53:8,22
54:19
facilitating
54:19
fact 29:8,25 31:1
32:14 48:25
53:21 59:12
factors 74:20
75:1,8,12,18
75:19 76:2
77:11 82:4
84:23 112:18
113:4
factual 81:20
fails 117:15
fair 66:19
fairly 15:5 18:23
fall 21:14
Falls 21:1 84:18
familiar 3:10
22:16,20,24
23:12 37:4,23
106:21
fan 95:14
far 79:7 91:19
Farms 1:13 3:6
fdw@kullman...
2:11
February 19:10
federal 22:25
23:4,17
feedback 95:10
95:25
feels 25:5
fell 63:24 64:2
felt 29:10 30:4
94:1
Fifteen 19:4
figuring 57:9
file 72:19 77:20
80:8

filed 8:12,12
9:15 117:17
fill 97:14
filled 35:21
76:25
final 65:22
financial 64:11
65:9,19 69:7
97:19 99:7
113:2
financials 78:23
99:8
find 68:19 81:2
95:22 97:7
98:19 116:7
finding 96:20,24
fine 95:17
finished 94:17
94:18
fired 75:3
FIRM 2:8
first 4:5 12:22
15:13 18:12
19:25 49:3
55:25 58:4,6
58:15,23 59:3
59:11 60:10
61:5,19 62:1
62:19 69:18,18
70:8,19 81:11
83:18 88:12
fit 90:4,18
fix 11:14 96:5
Floor 2:4
focus 19:8,9
69:17
folks 30:11
38:13 105:12
105:13 113:19
follow 78:16
follow-ups 113:8
following 79:19
116:8
follows 4:6
forbidden 26:14

**force** 13:25 14:3
  14:6,8 43:16
  46:10 47:9
  48:8 83:12
  87:22 107:18
  108:9,11
**foregoing** 116:7
  117:15 118:6
**forget** 51:20,21
  64:11
**form** 8:25 14:9
  14:18 15:4
  21:16,21 23:8
  23:25 24:7,14
  24:22 25:13,15
  25:20 26:9,16
  27:8,13,20,25
  28:11 29:5
  30:7,14 31:8
  31:14,23 32:11
  33:6,18,25
  34:9 35:4,12
  35:25 36:7,18
  37:7 38:18,25
  39:9,12,18
  40:13,21 41:2
  41:15 42:3,21
  43:2,21,25
  44:15,22 45:4
  45:18,24 46:5
  46:13,22 47:10
  48:9,16 49:20
  50:2,9 51:2,16
  52:19 53:3,11
  53:24 54:21
  55:14,22 56:6
  56:21 57:4,12
  57:20 60:5,22
  61:13,21 62:2
  62:25 63:5,19
  64:20 65:1,16
  66:12 68:10
  72:14,22 73:3
  73:10,19 74:2
  74:8,16,23

75:5,14 76:4
  76:12,20 77:14
  77:23 78:6,12
  78:17 79:8,22
  80:11 82:14
  85:15 86:13
  87:4 88:8 89:1
  89:10,19,24
  90:20,25 91:12
  91:17 92:10,16
  93:1,16 94:9
  98:13 99:13
  100:24 101:16
  102:4 103:7,15
  104:2,8,25
  106:9,18,24
  107:7,19 108:3
  108:10 109:13
  109:22 110:5
  110:11,20
  111:8 112:5,21
  113:14 114:1
  114:11,17
**former** 7:16 16:6
  47:13
**forth** 61:8 83:11
**forward** 26:25
  27:3
**found** 29:25
**foundation** 23:9
  24:8,15,23
  25:16 36:1
  38:19 39:1
  40:14 42:4
  44:1 49:21
  72:15 73:11
  74:17 77:24
  79:9,23 87:5
  100:25 106:25
  107:20 114:18
**four** 4:24 6:20
  38:3 54:7
  64:10 81:3
**four-step** 54:5
**frequently** 47:24

**front** 80:17
  100:10
**full** 85:14,17
**fully** 100:22
  101:1
**function** 47:20
**functional** 82:3
  84:22 85:5,8,9
  88:5
**functionally**
  79:1
**functions** 102:2
  102:8
**further** 118:8
**future** 100:18

### G

**game** 111:6
**gather** 110:2
**gathered** 111:4
**gender** 23:19
**general** 20:14,16
  20:18 35:16
  63:16
**generally** 34:17
  51:7 83:15
  84:17
**generic** 54:13
**getting** 95:24
**Gina** 45:11
**give** 5:4 6:9
  11:16 54:9
  105:25
**given** 19:16 42:8
  42:10,12,18
  53:6,10,21,21
  54:12 62:21
  63:16 100:5
  111:5
**global** 19:1
  20:16 87:25
  102:14 103:14
  105:10
**go** 5:1 6:6 8:16
  11:17,19,22

16:17 18:6
  42:10 53:12
  54:24 55:3,18
  56:2 58:12
  59:5,12,14
  66:10,20 67:8
  67:18 68:3
  69:5 83:8 96:4
  96:8 100:3
  112:5,21
**goals** 34:7
  100:21
**goes** 95:16
**going** 5:3,4,15
  5:17,25 13:3
  19:24 25:11
  49:4,18,25
  57:10 61:8
  62:23 63:18
  74:22 75:3
  77:3 78:21
  79:17 81:23
  89:17,22 91:9
  91:23 98:9
  113:12,16
  114:10
**good** 3:1 4:11,13
  4:13 25:22
  26:2 107:15
  113:19
**grab** 80:17
**grade** 108:25
**graduate** 17:16
**ground** 5:1
**group** 20:16
  36:22,25 37:1
  37:18,18,24
  38:7 47:18
  50:19,20,22,23
  51:6 52:3,6,7
  52:13,16,17
  53:7 62:13
  64:4,5,6 65:20
  69:8 76:11,17
  85:11 87:25

95:2
**guess** 56:15
  93:23
**guidelines** 42:11
  53:20,22 54:19
**Gus** 49:8
**guys** 11:18

### H

**H** 119:21
**half** 15:15
**halfway** 69:6
**hand** 118:11
**handfuls** 101:9
**handle** 54:8
**happen** 28:18
  105:16,21
**happened** 60:25
  61:18,19 69:1
  76:19 85:24
  94:16
**happening** 78:11
  79:18 94:14
**happens** 99:4
**head** 5:24,24
  28:7 64:25
**healthcare** 47:18
  64:11,18 87:25
  105:19
**hear** 11:15 12:3
  52:22 91:6
**heard** 23:14
**held** 80:9 87:24
**help** 54:23 83:12
  83:13
**hereunto** 118:11
**Hi** 3:16
**hidden** 24:21
**hierarchy** 56:18
**high** 17:9
**hired** 49:19 50:1
**hold** 36:11 80:20
  80:20
**holding** 68:22
  69:2,9,11

**Houston** 47:18
**HR** 13:17 14:21
  18:18,22,22
  20:7,11,14,17
  21:10,11 22:13
  22:15,19,23
  23:3,12,21
  24:3,19 25:9
  27:6 28:8,15
  28:25,25 30:11
  30:22 36:11
  40:5 73:6,7
  78:2,3,16
  79:19 102:14
  107:8,13,14
  108:7 109:4
**human** 17:25
  18:13,23 20:1
  20:4 22:9
  49:11 76:10
  112:25

**I**
**idea** 74:20
  107:15
**identifying** 82:2
**III** 2:12
**impact** 106:16
  106:22 107:4
  107:16,23
  108:8,17,24
  109:3,5
**impacted** 103:20
**implementing**
  89:3
**important** 6:10
**improve** 78:22
**include** 42:9,19
  42:20 52:18
  110:9
**included** 34:18
  40:11,20,20
  41:18,25 60:3
  60:10 64:8,9
  76:22 81:25

90:5 94:19
  109:19 112:1
**including** 42:25
  99:11 110:2
  113:11
**incorrect** 47:3
**INDEX** 2:25
  119:15
**indirectly** 104:1
  104:18
**individual** 7:15
  9:18,23 10:3
  15:2 24:12
  25:5 30:4
  47:22 61:2
  65:11 66:25
  67:11,21 73:16
  73:18 86:6
  100:4 106:6
**individual's**
  100:7
**individuals**
  10:10 14:23
  16:11,14 18:25
  22:25 24:6
  30:17 51:1
  52:3 54:12
  55:8 57:17
  62:22 63:2,7
  64:1,16 68:18
  71:15,18,21
  72:1 76:9
  84:14 98:11
  100:1 102:1,20
  102:23,24
  103:5,14,14,18
  103:24 104:13
  104:17,21
  106:13 109:9
  113:23 114:14
**industries** 20:16
  64:14 65:8
**industry** 64:10
  112:20
**information**

42:11,14 111:7
  111:25 119:15
  119:17
**initial** 75:24
**instituted** 87:22
**instructed** 26:24
**instruction** 6:9
**instructions**
  5:22 55:25
**insulate** 27:7,10
  27:15
**Insurance** 20:3
**intellectual**
  31:19 32:16
  38:4 112:2,11
**interested**
  118:10
**internal** 25:2
  28:10
**internally** 48:7
  48:10
**Interrogatories**
  81:8
**interrogatory**
  81:12,13,16
  84:20 87:20
  90:2,8,14
  100:13
**introduce** 3:15
**investigation**
  21:24 29:9,13
  30:25
**investigations**
  29:1,16,22
  30:13,18
**involuntary**
  19:24
**involved** 31:4
  112:18
**IP** 32:7 33:3
  113:10
**issue** 46:25
**issues** 20:18 21:7
  21:8,12,14,20
  21:24 113:10

**J**
**J-A-G-G-A-R-D**
  67:12
**Jaggard** 67:12
**Janice** 1:16
  116:3 117:2,13
  117:23 118:3
  118:23
**Jersey** 3:9
**Jim** 34:19 38:2
  42:16 59:17
  61:1 62:7 64:9
  65:8 91:22
  93:13 105:18
**Jo** 34:22
**job** 18:14 19:22
  20:14 21:5,19
  27:6,16 28:24
  29:17 40:5
  54:22 85:19
  86:7,25
**jobs** 109:10
**Joe** 3:20 15:18
  15:19 59:8
  69:10 77:2,9
**join** 17:19
**JOSEPH** 2:12
**Jr** 1:12 3:9
**jrw@kullmanl...**
  2:14
**judge** 6:13
**junior** 35:21
**jurisdiction**
  21:15
**jury** 6:13
**justification**
  100:3 101:6,14

**K**
**keep** 45:7 60:7
  113:12
**keeping** 60:11
  76:22
**kind** 17:23
**know** 5:7,17 6:5

8:5,11,16,19
  13:10 27:9
  30:21 31:2
  37:20 44:3,17
  44:23 45:12
  46:18 47:13
  50:10 59:19
  61:6,15,18
  62:5 65:11
  66:14,25 67:2
  67:6,11,13,16
  67:21,23,25
  71:3 72:25
  73:22 76:5,8
  76:18,21 77:9
  84:6 86:5,6
  87:12 91:19
  102:5,10,12
  106:5 107:11
  108:2,22
  112:17
**knowledge** 32:18
  33:4 108:17
  114:9,15
**knows** 107:2
**KULLMAN** 2:8

**L**
**L** 98:7
**L-E-S-C-H**
  18:24
**L2** 51:4
**L3** 105:17
**L4** 98:8
**LA** 2:13
**lack** 23:8 24:7
  24:14,22 25:15
  36:1 38:18,25
  40:13 42:3
  43:25 49:20
  72:14 73:11
  74:16 77:23
  79:8,22 87:4
  100:24 106:24
  107:20 114:17

**laid** 87:21
100:20
**large** 15:6
117:13 118:5
**law** 2:3 4:15
22:6,6
**Lawrie** 59:8,10
69:10 70:3
77:2,9 101:24
108:21,24
**Lawrie's** 68:12
69:20
**laws** 22:25 23:5
23:17,22
**lawsuit** 8:12
9:22 15:24
16:14
**lawsuits** 10:2
**layer** 51:3,4,8
54:7,23 56:2
63:14 68:21
69:3 70:11
72:4,8 79:15
80:3 86:9
94:17,19,21,24
98:9,10,11
99:4,24,25
105:18,20
110:4
**layers** 12:11
48:11 50:21
51:5 56:4
68:16 78:22
86:16,18 94:15
95:3 99:22,23
105:17
**lead** 83:14
**leader** 20:15
49:15 54:11,16
54:24 95:1
**leaders** 34:25
54:9
**leadership** 34:17
**leading** 50:16
66:7

**learn** 15:13,16
33:21 49:3,7
**learned** 83:18
**leave** 16:3 19:5
**leaving** 19:17
**led** 50:15 69:4
72:6 75:2
**left** 16:4 18:17
18:20 19:3
90:11 100:12
100:15
**legal** 2:15 3:8,10
**legitimate** 81:18
**Lesch** 18:24
**let's** 11:17 57:10
58:15 80:5,6
83:17 93:19
96:6 104:6
107:17
**level** 50:25 52:13
52:16,17,25
68:18,24 69:6
97:11,12
**liability** 27:7
**Liano** 1:3 2:2
3:12,17 4:16
15:13 16:11
21:2 36:15
37:2 38:6,10
41:20,22 51:24
52:18 53:1
57:24 58:22
60:11 63:23
64:18 70:22
71:22,25 72:5
72:9,12,20
74:13,22 75:2
76:16 77:12,21
79:5 80:5,9
85:22 86:8
87:3 93:22
95:8,20 96:19
97:24 99:11
101:15,20
102:9 105:21

106:8 110:10
111:20 116:3
117:3
**Liano's** 14:13
15:24 37:10
68:7 69:19,21
70:3,6 79:20
85:5,13,19
86:24 87:15
97:6,15 107:6
**licenses** 20:11
**life** 113:25
**likewise** 47:22
106:7
**limiting** 103:4
**Linda** 1:3 2:2
3:12,17 4:16
16:11 21:2
36:15 37:16,18
41:20 58:24
60:13 68:25
69:1,3,21 70:3
70:6,16 76:22
76:25 94:1
110:10 116:3
117:3
**line** 3:23 116:9
117:5 119:3
**little** 11:5 13:1
93:19 95:13
**lived** 20:24
**living** 20:25
**located** 103:25
106:14
**location** 1:12 3:6
**Locust** 2:4
**long** 6:5
**longer** 74:13,22
75:22 76:1,3
76:18 77:13,21
78:5
**look** 14:7 54:25
55:12 57:2,10
74:7 83:14
89:22 91:23

92:9,18,25
93:8
**looked** 78:24
**looking** 42:13,14
52:2 54:25
57:8 83:4 94:8
97:14
**losing** 109:9
**Lots** 21:10
**lower** 35:20
80:24

_____

**M**

**Madam** 4:2
**mail** 72:19
**majority** 45:16
**making** 20:20
35:20 89:8,12
101:14,14
**man** 7:9
**manage** 78:23
**managed** 52:7
**management**
48:4 63:17,24
64:2
**management-l...**
46:3
**manager** 25:12
**managers** 27:23
36:12 37:19
45:17,22,25
51:12
**managers'** 78:22
**managing** 50:19
50:25
**manufacturing**
64:10 66:22
**Mark** 34:22
42:25 51:11
52:9 54:15
60:7 62:15,19
69:2 70:6
75:19,22 76:21
76:25 83:1,4
87:12 88:1

94:1 97:6
105:6,7,9
110:9
**Mark's** 58:23
59:2
**Mary** 34:22
**Mason** 59:8
69:10 77:2,9
101:24
**matter** 3:12 4:16
7:1,23 8:19
46:24 112:8
**Mattiacci** 2:3
4:14
**mean** 20:19
27:10,15 31:25
32:16 35:3
41:10 50:16
52:11 59:4
71:9 82:23
88:19 99:20
108:14,16
**meaning** 21:12
**meant** 14:16
26:14 86:23
94:19
**meet** 52:13,14
55:4
**meeting** 40:1,3
46:24 62:12
69:23,25 74:13
112:1,13
**meetings** 43:4,6
43:13 46:7
**member** 20:7
60:15
**memo** 72:19
77:20
**memorandum**
80:8
**mentioned** 6:19
14:21 35:1
38:3 65:5
102:13 109:16
**met** 21:2

metric 40:20
109:19,20
111:5,21 112:9
113:10,11
metrics 40:7,10
41:25 42:19,20
42:25 45:15,21
47:7 48:4
109:24 110:3
110:15
mid 71:16
middle 65:21
90:11 100:13
104:6
Mike 59:8,10
68:12 69:10,20
70:3 77:2,9
108:21,24
mind 11:18
mine 44:24
minute 34:3
96:4
minutes 38:4
40:2 41:8
mischaracteri...
41:4 46:23
moment 11:14
11:17 87:6
97:1 109:4
monitor 3:3
11:19,23 53:13
53:16 96:10,15
115:3
month 70:10,12
months 18:6
86:16,19
Morris 34:22
moved 68:22
69:2 97:4
moves 28:7
64:25
moving 105:19
multiple 55:23
63:15 98:1
Munshi 2:4 3:16

3:16 4:7,10,14
9:3 11:4,13,24
13:1,5 14:11
14:20 15:8
21:18,25 23:11
24:2,10,17,25
25:18,24 26:12
26:19 27:11,14
27:22 28:2,13
29:7 30:10,16
31:10,20 32:1
32:20 33:11,20
34:5,14 35:9
35:18 36:3,9
36:21 37:8
38:21 39:3,11
39:20 40:17,23
41:9,16 42:6
42:23 43:5,22
44:4,18,25
45:8,20 46:1,8
46:15 47:1,12
48:13,20 49:23
50:5,11 51:10
51:22 52:21
53:5,17 54:1
55:17 56:3,10
56:23 57:7,14
57:22 60:8,23
61:17,24 62:4
63:3,8,22
64:22 65:3,23
66:15 68:13
69:16 72:17,24
73:5,14,21
74:4,11,19,25
75:7,17 76:6
76:14 77:7,16
78:1,9,14 79:4
79:12 80:4,13
80:22 81:6
82:21 85:18
86:22 87:14
88:10,18 89:6
89:15,20 90:1

90:22 91:2,7
91:13,20 92:12
92:17,22 93:4
93:18 94:10
95:17,19 96:1
96:4,16 98:16
99:17 101:11
101:18 102:6
103:9,17 104:5
104:11 105:4
106:11,20
107:1,3,10,24
108:4,13
109:15,25
110:8,13,24
111:10,14
112:5,21 113:7
113:21 114:3
114:13,21
119:6,10
munshi@cons...
2:6

_____

**N**

N 1:16 116:3
117:2,13,23
118:3,23 119:1
name 3:7 4:13
4:13 7:6 9:17
14:13,15 16:21
18:24 64:12
67:23
named 47:14
65:11 66:25
67:11,21
names 10:9,12
nature 7:3 13:22
82:12 83:3
nearly 28:3
need 77:3
needed 15:1
32:15,16 34:3
97:19
needs 114:8
neither 118:8

network 44:21
never 34:11
37:18 79:5,7
79:10,13
new 2:13 3:9
18:23 31:18
35:7,15,16
49:19,25 50:6
78:19 90:6
105:18
newly 87:9
newly-structu...
90:4,19
Nick 67:21
nine 71:12
noise 11:6 13:2
nondiscrimina...
81:18
normal 78:7,11
95:4
North 102:20,23
102:25 103:5
103:13,19,23
103:25 104:19
104:23 105:11
106:14
Northam 67:22
Notary 117:13
118:4
note 72:19 80:7
notes 92:7
notion 26:15
number 3:13
40:6,7 41:11
49:1,17 71:6
81:12,13,16
87:20 90:3,8
90:15 96:9,13
100:13 107:17

_____

**O**

oath 6:14,14
Object 8:25
14:18 15:4
21:16,21 23:8

23:25 24:7,14
24:22 25:15,20
26:9,16 27:8
27:13,20,25
28:11 29:3
30:7,14 31:8
31:14,23 32:11
33:6,18,25
34:9 35:4,12
35:23,25 36:7
36:18 37:7
38:18,25 39:9
39:18 40:13,21
41:2,15 42:3
42:21 43:2,21
43:25 44:15,22
45:4,18,24
46:5,13,22
47:10 48:9,16
49:20 50:2,9
51:2,16 52:19
53:3,11,24
54:21 55:14,22
56:6,21 57:4
57:12,20 60:5
60:22 61:13,21
62:2,25 63:5
63:19 64:20
65:1,16 66:12
68:10 72:14,22
73:3,10,19
74:2,8,16,23
75:5,14 76:4
76:12,20 77:14
77:23 78:6,12
78:17 79:8,22
80:11 82:14
85:15 86:13
87:4 89:1,19
89:24 90:20,25
91:12,17 92:10
92:16 93:1,16
94:9 98:13
99:13 101:16
102:4 103:7,15

104:2,8,25
106:9,18,24
107:7 108:3,10
109:13,22
110:5,11,20
111:8 113:14
114:1,11,17
**objection** 14:9
66:19 88:8
89:10 100:24
107:19 112:5
112:21
**objectives** 52:14
52:14 55:1
**obviously** 92:6
**occasional** 48:1
**occurred** 34:4
58:5
**October** 117:24
118:24
**Off-the-record**
96:11
**offended** 22:12
**offer** 18:11
**office** 47:18
**officer** 49:11
**offices** 3:6
**official** 118:12
**Oh** 11:13 66:17
**okay** 4:11,25 5:7
5:20,21 6:8,19
6:22 7:22 8:22
9:17 10:13
11:13 12:16
13:2 14:21
15:16,21 16:22
18:8 26:13
28:8 29:8 32:2
38:9 39:12
41:10 44:9
47:5 56:11
57:15 58:15
73:15 75:24
80:5 81:4,11
81:16 82:25

83:22 85:22
86:23 88:11
95:18 97:24
98:3,9,17
99:10,24 100:9
104:16 106:5
107:25 109:1
110:9 111:10
114:21
**older** 45:17,23
107:17 114:2,4
114:7
**once** 43:7,7 94:7
94:12
**ones** 12:17
**operations** 36:12
37:3,5,15,19
37:19 47:19
63:17,24 64:2
64:17 65:5
66:3,6,9 67:3
67:14,25 85:11
87:24 90:3,18
102:2 112:19
**opportunity**
21:8 97:17
111:15
**option** 94:4
**order** 16:20
42:12 97:1
100:20
**org** 11:2 12:6,16
12:20,22 13:6
13:6,10,14,21
60:13 61:9
63:21 70:19
71:12 78:5,24
78:25,25 83:16
**organization**
13:23 14:4,6
14:25 35:15
36:6 50:15
52:24 54:25
55:1,12 56:12
57:2,10 58:6,8

58:11,13,14,16
58:18,22,24
60:6 63:13
64:9 68:17
71:4,5 73:25
74:6 76:22
77:5 82:2,19
82:22 83:1,5
83:11,13,25
84:4,12,22
87:8,11 88:17
88:19 89:5,22
90:5,19 92:3,8
94:2,24 95:7
100:6,8,8
101:7 105:12
105:18 113:2
**organizational**
13:7 14:12,15
14:16 15:10
50:7 56:18
58:24 60:20
74:14 75:25
76:1 77:13,22
78:19 83:19
88:4,15 90:6
91:22 92:24
93:8 103:12
105:7
**organizations**
20:8
**original** 117:16
**Orleans** 2:13
**outcome** 48:18
63:20
**outcomes** 61:3
**output** 54:10
**outright** 94:5
**outside** 102:20
102:23,24
103:19,25
104:18,23
105:1,12
106:14 112:14
**overall** 106:12

109:11
**owned** 38:2

---

**P**

**P** 87:19
**p.m** 1:11 3:4
11:20,23 53:13
53:16 96:10,15
115:3
**PA** 2:5
**package** 19:16
**page** 81:12,23
87:19 90:13
116:9 117:5
119:3
**pages** 116:5
117:15
**park** 2:9 105:25
**part** 21:5 27:6
27:16 29:17
35:19 36:4
38:5 40:5
41:13 47:8,11
50:7 54:22
69:18 71:19
73:17 74:1,7
78:23 79:6,11
79:15 80:10
82:19 86:2,2
86:11 87:7,8
87:21 91:9,23
102:3,25 106:7
106:12 108:18
109:14,23
**participate**
33:21 60:18
72:4 93:11
**participated**
32:4
**particular** 26:7
26:14 80:9
112:14
**parties** 4:2
**partners** 13:18
14:22 15:6

**parts** 87:10,11
**party** 118:9
**pass** 58:23 59:3
59:5,11 60:10
61:5,19 62:1
62:19 70:19
83:18
**passed** 59:15
**passing** 62:15
**pattern** 68:23
69:2,9,11
**pay** 108:25
**penalties** 6:16
**pending** 6:6
118:10
**PENNSYLVA...**
1:1
**people** 14:24
19:2 21:10
24:4,20 27:3
33:3 35:7,15
37:14,19 68:16
78:24 82:17,18
95:3 96:23
97:14,15,22
99:1 101:4,9
110:6,7 113:16
113:17
**perform** 107:9
**performance**
87:15
**performed** 109:6
**period** 12:14
33:13,17 39:17
43:15,16 45:10
49:13 51:15
57:8 64:23
75:24 104:13
104:16
**perjury** 6:16
**person** 7:18 8:3
8:5 21:3 28:8
28:15,25 30:22
30:24 37:17
79:25 80:1

84:16,17 86:1
93:9 98:21
102:11 107:14
**person's** 8:1,9
27:6
**personal** 45:1
82:3 84:23
**personally** 8:5
10:20 44:2,6
**pertained** 21:7
21:20 52:5
76:11 84:11
**pertaining** 3:11
**phase** 94:23
**Philadelphia** 2:5
4:15
**phone** 2:12
36:14 38:13,16
42:1 84:15
93:9,10,12
**phrase** 23:14
37:23 52:16
54:11
**physically** 59:20
59:21
**picked** 86:20
**pickup** 97:19
**piece** 87:9
**place** 2:9 26:3
30:1 31:1 43:7
43:15 46:10,20
47:6,8 49:4
83:7 88:14
106:1
**placed** 71:23
88:2 94:7 95:9
95:21 96:19
97:16,24 98:4
98:17 99:11,15
99:19,21
100:17 101:4
103:5
**places** 105:13
**placing** 93:22
**plaintiff** 1:4,15

2:2 3:5,17 7:6
87:20,24
100:17
**plaintiff's** 81:3,8
81:19 100:9,16
**plan** 56:18 111:6
113:19
**planning** 20:18
20:19 33:9
34:4,12 35:14
52:25
**plans** 44:20
**play** 7:25 8:8
13:13,16 52:4
58:22 61:25
87:16 93:21,25
**please** 3:14 4:3
6:1 12:9 45:19
74:24 99:16
103:8 116:5
**point** 6:5 11:2
12:6,8 15:10
18:14 24:18
38:22 39:14,16
39:22,25 40:8
40:18,25 41:25
42:7 43:19
47:25 52:24
59:22,23 60:4
84:10 98:18,23
99:1 104:4,13
109:17
**points** 38:12
49:14,14
**policies** 25:1,2
25:10,19 26:3
26:5,13,20
**policy** 25:4
**pool** 69:12,15,18
71:23 75:9,10
75:11,23 77:2
77:3,8 93:20
93:22 94:6,8
94:13,16 95:6
95:9,21 96:18

96:19,22 97:4
97:9,10,16,20
97:21,23,25,25
98:5,10,18,24
99:2,5,9,11,14
99:19,25 100:5
100:17,20
101:20
**pools** 96:23 98:1
99:20
**population**
32:14,23
**portion** 33:2
**position** 18:12
37:10,11,13
60:14 70:15,17
70:23 75:13,16
75:22 79:20,25
79:25 80:6,9
85:13,14 87:25
90:5 94:3,8
95:22 96:21
98:20 100:17
112:19
**positions** 50:6
63:17 82:2
84:21 89:17
91:4,9 96:24
**Possibly** 38:14
**post** 17:9
**postponed** 97:8
**potential** 6:15
26:6 100:18
**potentially** 27:7
50:3 112:18
**Power** 11:2 12:6
12:8 15:10
38:12 39:14,15
39:22,25 40:8
40:18,25 41:24
42:7 43:18
59:22,23 60:3
109:17
**Poydras** 2:12
**Practically**

114:19
**practice** 25:23
83:8 89:4
107:22
**practices** 73:7
78:3,16 79:19
108:7 109:2
**preceding** 9:19
**predict** 113:15
**prejudice** 24:13
**prejudices** 24:5
24:21 26:7
**preparation**
10:24 12:1
13:14 33:10
**prepare** 45:6
**preparing** 33:8
**present** 2:15
3:14 6:13 44:9
61:11,14 69:24
110:2
**presentation**
39:16,22 40:25
41:13,18 45:16
48:3 109:21
**presentations**
11:3 12:6,8
15:10 39:14,25
40:9,19 42:8
42:25 43:19
44:5 45:22
59:22,24 60:4
109:17,17
111:3
**presented** 38:16
44:12 60:24
110:15 111:4
111:25 112:9
**presenting** 42:24
48:2
**president** 17:25
18:13 40:6
51:18 56:1
59:8,17
**presidents** 42:17

50:21 51:5,6,7
55:5 61:2
**Presumably**
85:23
**previous** 79:17
**previously** 12:17
86:8 87:3
105:14
**prior** 8:6,20 9:9
9:11 15:11
48:22 51:24
75:11 83:24
84:7 86:24
87:23 88:9,14
110:1,15
**privilege** 4:15
**probably** 5:2
15:15 28:23
36:20 37:12,22
49:5 51:17,21
71:11 101:10
110:22 111:2
**Procedure**
117:16
**proceed** 4:3,7
**process** 12:11
48:19,25 49:4
49:16,17,25
50:8,14,20
51:19 52:5,13
52:15 53:2,20
53:23 54:4,5,6
54:20,24 55:13
55:16,21 56:13
56:20,22 57:3
58:5,9 62:23
63:10 68:16
69:7 71:19
72:5,6 73:17
74:1,7 78:19
78:23 80:10
82:10,16,17
83:15 85:2
86:12,16 87:23
89:23 91:10,24

98:8 100:19
102:3,21 103:1
104:24 105:3
106:8,13 107:5
108:12,18
109:9
**produced**
112:12
**product** 66:8
**professional**
1:16 19:25
22:9,13,16,20
22:23 23:3,12
23:21 24:4,19
25:10 73:6
78:2 107:13
109:5 118:4
**Proffered** 119:23
**Progressive** 20:3
**project** 48:12,17
**projected** 20:21
**proper** 20:20
**property** 31:19
32:16 38:4
112:2,11
**proposal** 57:2
**proposed** 76:21
**protect** 22:25
23:5,17 26:3
26:18,20 27:1
27:12 32:15,17
**protected** 23:13
**protecting** 31:19
32:7
**protection** 112:2
112:11
**protects** 27:2
**provide** 54:18
**provided** 40:8
83:6,7,8
**providing** 40:6
42:13
**provisions** 3:10
**prudent** 25:23
**psychology**

17:11
**Public** 117:13
118:4
**purpose** 13:19
14:2 40:24
113:11
**purposes** 5:22
**pursuant** 117:16
**put** 23:15 26:3
69:3 71:5
75:20,22 77:1
83:7
**putting** 15:21
65:24 75:25
94:5 97:8

---
**Q**

**question** 5:5,7
5:17,19 6:6
32:7 41:17
44:3 47:4
79:17 86:23
92:21 94:11
99:15 104:12
**questions** 5:3,5
32:3 53:18
111:11,15,19
111:22
**quick** 11:17
**quite** 71:5
**quotation** 88:9
**quote** 111:21,21
112:8,9

---
**R**

**R** 2:12
**R-I-F** 48:15
**Rahul** 2:4 3:16
4:14
**raise** 25:6
**ranks** 35:20
**Ray** 16:23 34:22
**reach** 29:18
**reached** 74:15
**reaching** 30:19
**read** 84:21,24

115:6 116:7
117:14
**ready** 4:7 68:21
**real** 11:17 37:4
**reallocated** 77:4
**really** 83:12
**REAR** 2:25
**reason** 25:10
81:18 116:9
117:5
**reasons** 7:19
**recall** 7:8,9,21
8:4 9:5,8,20
15:3 18:24
32:9 33:14
38:15,22 39:4
39:15,19,24
40:15 41:25
42:24 43:13
47:17,19 48:2
51:14 53:1
58:2 70:13
71:1,2 72:7
84:1,13 85:6,9
85:12 92:11,14
93:3,14 100:12
101:17 106:10
110:14 111:22
112:14
**receive** 17:12
28:9,14
**received** 10:14
15:18 29:2
**recess** 11:21
53:14
**recipients**
114:15
**recognize** 22:2
**recommended**
83:16
**recommending**
60:7
**record** 3:2,15
11:17,19,23
53:13,16 96:8

96:13 115:4
118:7
**recurring**
109:23 110:25
111:1
**redefining** 81:25
**redo** 66:18
**reduce** 49:17
**reduction** 13:25
14:3,6,7 43:16
46:10 47:8
48:8,25 87:22
107:18,22
108:9 109:7
**reductions**
108:11
**reference** 91:18
**referenced** 48:8
48:11 93:20
**references** 48:6
**referred** 40:2
48:14 69:11
**referring** 40:4
81:25
**reflect** 13:22
14:4,5,16
**reflected** 13:7
45:22
**reflects** 72:12
**regard** 41:1 53:2
53:19 75:2
95:8,20 113:9
113:10
**regarding** 15:23
35:1 38:17
39:16
**Registered** 1:16
118:3
**regular** 43:12
52:8
**related** 118:9
**relationships**
82:1
**relevant** 68:20
**relied** 74:21 75:2

75:12
**rely** 76:2
**relying** 77:11,12
**remained** 35:21
**remember** 5:2
9:10 10:12
17:14 32:24
34:24 47:4
54:3 62:20
65:21 67:10,23
70:11 71:20,24
72:3 74:3,10
93:13 97:1
98:6 104:10
**remind** 40:3
**remote** 3:20
**reorganization**
87:23,24 88:1
88:23,24 89:8
100:19
**repeat** 5:6 92:20
**replace** 100:7
101:7
**replaced** 95:7
**replenished** 99:5
**report** 18:21,25
49:12
**reported** 1:16
19:2 49:15
51:24 52:3
56:4 57:24
71:15,22 72:1
103:19,25
104:17,22
105:2 106:6
**reporter** 1:17
4:2 5:9 69:14
80:20 91:6
92:20 116:3
117:2 118:1,4
119:12
**reporting** 20:15
57:18 66:23
82:1 87:25
88:3 104:14

**reports** 34:19,20
  59:9 72:9 88:3
  88:9,14 105:15
**representation**
  38:23
**representations**
  38:12 39:5
  40:19
**representative**
  8:24
**representatives**
  82:9
**represented**
  10:17
**representing** 3:8
  4:16
**Requested**
  119:15,17
**resign** 19:14
**resolution** 34:8
**resolve** 21:24
**resolved** 8:19
**resources** 18:1
  18:13,23 20:1
  20:5 22:9
  49:11 76:10
  113:1
**response** 84:20
  87:19 90:11,16
  100:13
**responsibilities**
  6:15 20:17
  21:6,7,19
  28:25 29:17
  50:13 87:1,13
  103:23 105:10
  105:11
**responsibility**
  54:8 66:9
**responsible**
  39:21 40:6
  66:7 82:16
  83:13 85:10
  89:2
**restructuring**

43:15 46:10
  48:7
**result** 5:12 69:23
  74:12 111:3
**resulted** 77:12
  107:6 109:9
**results** 113:2
**retail** 64:13
**retain** 10:20
  80:1
**retained** 86:7,9
  86:11 91:9
**retaliation** 21:13
**retire** 33:4
  113:12,16,23
**retired** 19:6
  32:19
**retirement** 19:11
  32:23 33:5
  113:24 114:8
**retirement-eli…**
  32:14
**retiring** 113:20
**return** 116:5
  117:15
**revenue** 20:21
**review** 10:23
**reviewed** 11:1
  12:1,5,9,17
  14:13 15:11
**reviews** 94:25
**revised** 61:12,15
**rich** 18:10
**riches** 18:7
**RIF** 48:14,18
**RIFs** 48:22
**right** 3:25 6:7,20
  13:8 19:3 26:8
  28:4 30:6
  47:17 76:15
  79:6,13 90:16
  95:3 96:7
  98:20,24 99:2
  99:18 100:23
  102:15,18

112:3 114:10
  115:6,7 117:14
**right-hand**
  80:24
**rights** 22:6,21
**Roberts** 1:12 3:9
**role** 7:25 8:8
  13:13,16 36:10
  37:15,16 47:20
  52:4 53:19
  58:21 61:25
  63:24 64:3,17
  65:5,14,25
  66:2,3,6,9 67:4
  67:6,14,16
  68:1,19 69:1
  69:19,21 70:3
  70:6 76:10
  79:11 82:3
  84:22 85:5,8,9
  86:2,3 87:16
  88:2,5 90:3,18
  93:21,24 94:6
  97:7 100:5
  102:14,14
  112:19
**roles** 50:17
  62:24 63:4,6,9
  63:12 68:17
  71:6 82:1 91:4
  95:4 97:14,23
  102:8 112:24
**Roman** 34:22
  43:1 51:12,25
  52:2,4 54:15
  54:18 55:9,11
  55:20 56:5,12
  56:17 57:1,9
  57:16,18,24,25
  58:17,21 59:11
  60:7,10 61:5,8
  61:11,15 62:15
  70:6,9,14,21
  71:15,22 72:8
  73:24 74:6

75:25 83:19
  84:6 88:1,16
  92:6,8,13,24
  93:5,7 101:13
  103:4,11,19,22
  104:1,14,17,22
  105:2,6 106:6
  110:10
**Roman's** 52:6
  61:9,19 62:19
  70:18 74:14
  76:11,17 83:1
  83:4,24 84:3
  84:12 88:2
  89:22 91:22
  92:2 105:7,9
**Romans's** 60:20
**room** 6:11,12
**routinely** 37:1
**RPR** 117:23
  118:23
**rule** 3:10,24 97:5
  97:5,5
**rules** 5:1 117:16

─────────
      **S**
─────────
**S** 119:21
**salary** 100:7
**sales** 86:2 87:7,8
**sat** 94:16
**save** 45:3 101:5
**saved** 43:24
  44:13,20
**saw** 13:6 43:19
**saying** 5:10 71:1
**says** 72:20 77:21
  78:4 81:3,12
  81:12,24 87:20
  88:22
**SC** 1:14
**school** 17:9
**Sciences** 1:6 2:7
  3:13,19 116:3
  117:3
**seal** 118:12

**second** 16:16
  87:18
**see** 11:14 12:22
  13:2,3 45:15
  45:21 59:23
  77:19 80:23,25
  81:5,8,11,14
  81:21 82:5
  84:24 90:7,12
  90:14 94:6
  107:16 109:20
**seeing** 38:22
  39:4,15
**seen** 12:13,18
  27:18 39:7
  72:11,18 73:15
  80:7
**seminars** 22:2,5
**senior** 37:2
  63:17,24 64:2
  64:17 102:2
**sent** 86:2,3
**sentence** 81:24
  90:2,10 100:15
**September** 1:10
  3:2 116:2
  117:2 118:13
**services** 37:24
  38:5,7 64:11
  65:9,20
**set** 34:7 43:11
  55:2
**seven** 1:13 3:6
  18:6
**severance** 19:16
**sex** 23:19,23
**shake** 5:24
**shared** 41:19,24
  44:21
**shares** 19:19
**Shepherd** 1:16
  116:3 117:2,13
  117:23 118:3
  118:23
**show** 39:8

Debi Stafford

**showed** 45:16 48:3 62:17
**shown** 3:25 38:13
**side** 94:17
**Siekierka** 49:8
**sign** 115:6 117:14
**Signature** 116:1 116:5 117:1,15 119:11
**significantly** 61:22 62:6
**similar** 5:22 102:8 109:20
**similarly** 30:12
**simpler** 86:24
**simply** 32:8 49:17
**single** 30:3
**sir** 15:12 91:11 101:25 106:4
**sitting** 5:9 76:15
**situation** 27:5 29:20 78:15 108:1 109:2
**situations** 24:20 25:12 26:1 114:6
**six** 56:9
**skills** 32:19 35:16 68:20
**Smith** 45:11
**snapshot** 83:17 83:21,24 84:2 84:7 104:6
**societies** 20:7
**solely** 41:6
**solutions** 37:24 38:7
**somebody** 7:15 26:22 108:25 114:7,9
**somebody's** 23:18,19

**somewhat** 95:11
**sorry** 11:4 15:20 52:22 55:3 58:12 62:9 66:18 69:14 76:7 91:5 92:20 93:6 95:9,25 108:6
**sort** 42:18 44:21 45:2 72:18 78:4 111:5
**sounds** 17:4
**South** 3:7 17:3 117:13 118:5 118:14
**span** 78:22 88:3
**spans** 12:10 48:11 68:15 78:21 83:14
**speaking** 51:7 114:19
**specific** 15:2 42:8 50:12 54:12 98:21 110:4
**specifically** 23:23 36:5 39:24 40:16 54:3 57:17 60:11,12 72:12 72:20 93:7 95:20
**specificity** 81:17
**spelled** 17:4
**spoke** 55:9
**stack** 80:16,23
**staff** 15:6,7 19:1 20:21 58:7 59:9 79:2 86:4 101:23
**staffed** 97:3
**staffing** 20:20 79:5,6,11,15 94:20,23
**Stafford** 1:9 3:5

4:4,11 6:10 11:25 17:5 53:18 76:15 93:21 96:17 111:10,18 113:9 115:2 116:2,6 117:12 119:4
**stand** 49:10
**standard** 107:21 108:1,7
**standing** 87:9
**Stanton** 47:14 48:2 65:4
**start** 19:7,25 58:15 82:7
**started** 19:9 32:2 51:17 86:17 94:21
**starting** 12:2
**state** 22:25 23:5 23:17 81:17 117:13 118:5
**stated** 7:19 78:20 84:21
**statement** 85:3 88:7 100:23 101:2
**states** 1:1 25:4 72:12 80:8 90:3 100:16 108:18
**stating** 73:18
**stayed** 79:14 97:10
**steering** 59:6,7 59:12,16,18 60:15,19,24 62:12 69:23 74:12 75:20 76:24 77:10 91:15 92:2
**step** 50:19 55:18 58:4 69:19 79:5,11

**steps** 54:7 55:7
**sticker** 80:24,25 81:3
**stock** 19:19
**story** 27:4
**strategy** 20:17 65:19 66:2
**Street** 2:4,12
**strike** 18:10
**structure** 13:7 14:17 50:7 73:25 91:23 92:8,24 93:8 103:12 105:8,9
**structured** 56:13 71:4
**subject** 46:24 112:7
**submit** 83:16
**submitted** 62:16 83:19
**subpoena** 10:14
**subsequently** 58:14 100:19
**substantial** 33:2
**suitable** 32:18
**Suite** 2:9
**summer** 106:2,7
**supervisor** 25:12
**sure** 5:13,23 10:1 17:16 20:20 21:10 26:22 28:23 31:24 32:2,17 34:3 35:20 39:7 42:12 46:18 57:8 83:9 86:3 92:23 95:2 96:7 103:10 113:18
**survive** 80:2,2
**swear** 4:3
**Sweeney** 34:23
**sworn** 4:5

## T

**T** 119:21
**tad** 96:3
**take** 6:4,13 11:14 18:10 26:24 31:1 39:13 43:6 47:8 54:23 55:18 68:16 80:5 83:17 85:19 86:18 92:7 95:6 100:21 108:5
**taken** 1:15 3:5 3:12 4:20 22:1 22:5 70:16 100:4
**talent** 69:12,15 69:17 71:21 75:9,10,11,23 77:1,3,8 93:20 93:22 94:5,7 94:13,16 95:6 95:9,21 96:18 96:19 97:4,9 97:10,16,20,25 97:25 98:1,5 98:10,17,24 99:2,5,9,11,14 99:19,20,25 100:5,17,20 101:20
**talk** 5:14 31:16 35:13 60:12 80:6 83:10 93:19 104:6
**talked** 32:13 37:16,17,18 46:6,7 55:24 56:1 101:13
**talking** 31:17,18 43:7 64:23 85:8 96:18
**tape** 96:9,13
**targeted** 62:24

63:1,6,9,12
**task** 42:10,15
**tasked** 30:12,18
    96:20,24 98:19
    98:21
**team** 34:17
    42:16 52:9,10
    87:13
**technical** 11:5
**telecommunic...**
    64:13
**telephone** 3:21
    36:11 38:10
    41:23 47:23
**tell** 6:14,16 27:4
    47:2,5 62:8,10
    64:6 86:4
**ten** 28:20
**tend** 113:23
**tenure** 9:23
    18:15 29:23
    30:23 31:3
    40:7 48:21
**term** 18:7 37:5
    54:13,14
    111:21
**terminate** 8:1,9
    68:6 77:1
    87:16 97:21
**terminated**
    19:21 69:9
    71:19 72:21
    73:17 77:6
    81:19 87:2
    97:3,6 98:4,24
    99:12 100:1
    102:2,25
    105:22,24
    106:14
**terminating**
    100:7
**termination** 7:5
    7:20 8:6 51:24
    72:13 86:25
    94:5 107:6

**terminations**
    94:20
**terms** 89:5
    112:11
**Terri** 47:14 65:4
**testified** 4:5 10:6
    41:22 111:24
**testify** 8:14
**testimony** 41:5
    46:23,24 116:8
**Texas** 17:10
    20:24
**thank** 64:15
    111:12,13
    114:22,23,24
**theoretically**
    103:20
**thereof** 118:10
**thing** 33:9 36:17
    41:11 86:20
    95:15
**things** 5:12 13:3
    21:11,14 40:7
    41:12,19 43:9
    43:14 86:4
**think** 3:20 17:20
    21:4 25:22
    26:2,17 27:2
    27:16 49:8
    56:9 73:12
    87:8,10 88:13
    98:7 99:6
    105:17 110:18
    113:17
**thirty** 117:16
**Thomas** 2:15 3:8
**three** 20:25
    71:13 76:24
    83:20 98:8
**tight** 54:4
**time** 1:11 3:3
    4:23 5:2,25 6:1
    6:6,23 9:6,8
    11:19,23 12:14
    12:24 15:1

30:3 34:21
    43:11 49:13
    53:13,16 56:7
    57:5,18 62:11
    64:21 65:17
    66:13 83:17,18
    83:21,24 84:2
    84:8 93:2
    96:10,14 98:1
    103:22 104:3,4
    104:9 110:14
    113:1 115:2
**times** 8:22 9:4
    28:17 29:12
    31:16
**title** 18:14 22:20
    37:5,17,20
    51:14,20,20
    54:11 65:20,22
    65:24 85:6,8
**today** 4:17 5:4
    10:13,18,24
    16:18,20,20
    96:9,14 111:19
**Today's** 3:2
**told** 9:9,12,19
    62:7,14,15
    69:7 97:18
**top** 81:9 99:23
**topic** 112:1
**total** 28:3 69:8
**track** 113:12
**train** 35:16
**trained** 24:19
**training** 31:18
    32:7 35:2
**transcript** 2:25
    5:11,15,23
    115:6 117:16
    118:6
**transcription**
    116:7
**transferred**
    114:9
**transition** 32:18

87:13 113:19
**transpired** 11:21
    53:14
**treated** 26:23
**treating** 103:13
**trial** 8:14,17,20
    10:6
**tried** 80:1
**true** 24:18 25:1
    114:12 116:7
    118:6
**truth** 6:14,16
**try** 5:7,16,18
    96:5
**trying** 85:11
    95:22 98:19
**turn** 82:1 87:18
**turned** 11:9,12
**Twenty-four**
    28:5,6
**two** 32:6 36:22
    36:24 98:7
    101:9
**type** 40:25
    110:15 112:13
**types** 21:14
    33:12 39:4
**typically** 44:19
    45:23 93:6
    113:23 114:14

**——— U ———**
**U.S** 105:1
**ultimately** 29:18
    30:5,19 56:2
    68:11 89:7
    99:10 101:3,19
**undergraduate**
    17:17
**undersigned**
    116:6
**understand** 4:18
    5:6 6:2,17 7:12
    7:22 23:16,22
    24:20 38:6

63:23 65:4
**understanding**
    23:4 33:15
    37:9 51:23
    69:20,22 74:15
    76:16 85:1
    88:6,24 89:25
**unique** 37:11,12
**United** 1:1
    108:18
**units** 14:25 38:3
**University** 2:9
    17:10
**unusual** 37:13
**upcoming**
    113:17
**usually** 39:14
    42:16 44:7,7

**——— V ———**
**vague** 30:14
    31:23 33:18
    34:1 36:1 39:9
    40:14,21 42:21
    45:4 46:5
    51:16 53:3
    54:21 56:6,21
    57:4,12,20
    62:25 63:5
    64:20 65:2,16
    66:12 72:15
    73:3,10 76:12
    78:12 79:23
    82:14 89:11
    91:17 92:16
    93:1 102:4
    103:15 104:2,8
    104:25 107:19
    108:3 110:20
**valuable** 94:2
**valued** 76:25
**various** 40:11
    55:7 109:16
**verbalize** 5:24
    6:1

Debi Stafford

**verbally** 117:14
**verge** 114:8
**versus** 3:13
**vertical** 112:20
**verticals** 38:5
  64:10,18
**vice** 17:25 18:13
  40:5 51:7
**video** 3:4 96:9
  96:14 115:1
**videographer**
  2:15 3:1,8,24
  4:8 11:10,16
  11:22 53:12,15
  95:15 96:2,7
  96:12 115:1
**videotape** 1:9
  3:11 4:1
**VII** 22:20
**Virginia** 21:1
**visual** 38:11,23
  40:19
**voluntarily** 16:4
**voluntary** 19:12
**VP** 18:18 20:14
  28:25 36:10
  102:14
**vs** 1:5 116:3
  117:3
**VTC** 2:4

**W**

**wait** 5:16,18
**waive** 115:7
**waived** 4:1
**walk** 17:8 18:5
**Wallace** 65:12
  66:2,6,10,19
**Wallace's** 65:14
**want** 5:6,23 6:4
**wanted** 35:6,8
  71:7 83:10
  97:7 113:18
**Ward** 2:12 3:20
  3:22 15:19

**warrant** 79:19
**wasn't** 33:8 37:5
  37:15 41:3,6
  43:12 64:24
**way** 13:2,20
  23:15 26:23
  59:19 68:5,15
  71:4 86:14
  95:8
**we'll** 11:18,22
  53:12 69:17
  96:7
**we're** 5:10 11:4
  64:23 85:8
  95:24
**we've** 95:14
**Weaver** 67:1,3
**week** 21:1 36:20
  43:8 94:18
**well-known** 26:2
**went** 21:15,22
  34:12 51:5,6
  54:8 63:10
  68:16 75:20
  85:2 87:7,8
  91:15 94:20
  97:11
**whatsoever** 8:8
**widespread**
  37:15
**William** 1:12 3:9
**witness** 3:25 4:1
  4:3 9:2 11:8,11
  14:10,19 15:5
  21:17,23 23:10
  24:1,9,16,24
  25:17,22 26:11
  26:17 27:9,21
  28:1,7,12 29:4
  29:6 30:9,15
  31:9,15,24
  32:12 33:7,19
  34:2,11 35:6
  35:13,24 36:2
  36:8,19 38:20

39:2,10,19
40:15,22 41:3
41:6 42:5,22
43:3 44:2,17
44:23 45:5,19
45:25 46:6,14
47:11 48:10,17
49:22 50:3,10
51:3,17 52:20
53:4,25 54:22
55:15,23 56:8
56:22 57:6,13
57:21 60:6
61:14,22 62:3
63:1,6,20
64:25 65:18
66:14 68:11
69:15 72:16,23
73:4,12,20
74:3,10,18,24
75:6,16 76:5
76:13,21 77:15
77:25 78:7,13
78:18 79:10,24
80:12,21 82:15
85:16 86:14
87:6 89:2,12
89:25 90:21
91:1,19 92:11
93:3,17 95:13
95:18 98:14
99:14 101:1,17
102:5 103:8,16
104:4,10 105:1
106:10,19
107:8,21
108:11 109:14
109:23 110:6
110:12,22
111:9,13
112:23 113:15
114:2,12,19,23
115:5 118:11
**witness'** 41:5
46:23

**woman** 7:10
**won** 100:6
**Wood** 2:9 3:18
  3:18 8:25 14:9
  14:18 15:4
  21:16,21 23:8
  23:25 24:7,14
  24:22 25:15,20
  26:9,16 27:8
  27:13,20,25
  28:11 29:3,5
  30:7,14 31:8
  31:14,23 32:11
  33:6,18,25
  34:9 35:4,12
  35:23,25 36:7
  36:18 37:7
  38:18,25 39:9
  39:18 40:13,21
  41:2,4,15 42:3
  42:21 43:2,21
  43:25 44:15,22
  45:4,18,24
  46:5,13,22
  47:10 48:9,16
  49:20 50:2,9
  51:2,16 52:19
  53:3,11,24
  54:21 55:14,22
  56:6,21 57:4
  57:12,20 60:5
  60:22 61:13,21
  62:2,25 63:5
  63:19 64:20
  65:1,16 66:12
  68:10 72:14,22
  73:3,10,19
  74:2,8,16,23
  75:5,14 76:4
  76:12,20 77:14
  77:23 78:6,12
  78:17 79:8,22
  80:11 81:5
  82:14 85:15
  86:13 87:4

88:8 89:1,10
89:19,24 90:20
90:25 91:12,17
92:10,16 93:1
93:16 94:9
95:11,14,24
96:6 98:13
99:13 100:24
101:16 102:4
103:7,15 104:2
104:8,25 106:9
106:18,24
107:7,19 108:3
108:10 109:13
109:22 110:5
110:11,20
111:8,14,17
112:6 113:5,14
114:1,11,17,24
119:8
**word** 32:11
**words** 18:17
  103:18
**work** 16:8,24
  17:2,23 18:2
  21:11 24:4,21
  43:24 51:11
  52:12 56:17
  57:1,9 68:22
  85:23,24 86:1
  87:2,12,15
  94:12
**worked** 14:22,24
  16:18,25 24:12
  28:3 43:24
  44:14,14 47:17
  50:18,19,25
  82:18 85:22
**workers** 35:22
  107:18
**workforce** 20:17
  20:19 31:13,22
  32:5,10 33:2,3
  33:8,9,16,23
  35:14 39:8

Debi Stafford

| | | | |
|---|---|---|---|
| 41:7 46:12 | **1** | 65:15,18,21,25 | **6** |
| 107:22 109:6 | **1** 81:12,13,16,23 | 66:3,6,16,20 | **6** 119:9 |
| 109:12 | 87:20 90:8,15 | 67:4,8,18 68:1 | **600** 2:9 |
| **working** 13:17 | 96:9 100:13 | 68:4 71:16,22 | **60s** 113:25 114:7 |
| 16:1 17:21 | 119:11,12 | 72:2 104:7,13 | |
| 19:7 20:1,4,23 | **1:58** 1:11 3:4 | 104:16,22 | **7** |
| 50:20 51:9 | **10** 117:24 | 105:24 106:3,7 | **7/6/55** 17:7 |
| 53:1 78:18 | 118:24 | 108:5,9 109:19 | **70163** 2:13 |
| 82:19,22 93:5 | **1100** 2:12 | 110:1,16 | |
| 93:6 94:18,21 | **111** 119:7 | **2013** 12:25 13:8 | **8** |
| **workplace** 22:3 | **113** 119:9 | 14:17 57:11 | **871-5858** 2:10 |
| 23:1,7,24 | **116** 119:11 | **2014** 16:4 18:3 | |
| **world** 102:18 | **118** 119:12 | 18:18,20 | **9** |
| **wouldn't** 88:13 | **12th** 98:4 | **2016** 19:10 | **9** 119:5 |
| 105:12,14 | **13** 86:16 | **2017** 1:10 3:3 | **9th** 2:4 |
| **writing** 79:19 | **14** 81:3 87:19 | 116:2 117:2 | |
| 117:15 | 100:10 | 118:13 | |
| **written** 77:20 | **1525** 2:4 | **2024** 117:24 | |
| **wrong** 27:4 | **16** 119:7 | 118:24 | |
| | **1600** 2:12 | **205** 2:10 | |
| **X** | **18** 117:2 | **215** 2:5 | |
| **X** 119:1,21 | **19** 1:10 116:2 | **234** 1:13 3:6 | |
| | **19102** 2:5 | **24** 28:9,18 | |
| **Y** | **1980** 20:3 | **24-year** 30:23 | |
| **Yeah** 11:11 | **1995** 17:20 18:3 | **26th** 118:12 | |
| 50:18 90:12 | **19th** 3:2 | | |
| 95:11 96:1,6 | | **3** | |
| **year** 14:17 15:15 | **2** | **3:46** 96:10 | |
| 17:12 18:7 | **2** 90:3,13 96:13 | **3:57** 96:15 | |
| 38:15 43:7 | **2:06** 11:20 | **30** 117:16 | |
| 46:20 51:18 | **2:07** 11:23 | **30(h)** 3:11 | |
| 65:25 104:22 | **2:16-CV-0108...** | **30(h)(3)** 3:25 | |
| 108:9 110:19 | 1:5 3:14 | **340** 2:9 | |
| 111:2 | **2:52** 53:13 | **35209** 2:10 | |
| **years** 4:24 6:20 | **2:59** 53:16 | | |
| 17:14 20:25 | **20** 28:4 | **4** | |
| 28:4,5,6,9,18 | **2012** 12:24 13:8 | **4** 119:4,4,5 | |
| 85:23 | 20:13 33:13,16 | **4:19** 115:3 | |
| **younger** 35:22 | 38:15 39:17 | | |
| 36:5 114:16 | 41:23 43:16 | **5** | |
| | 45:10 46:11,21 | **50** 28:22 29:24 | |
| **Z** | 47:8 48:7,22 | 45:17,23 46:4 | |
| **zero** 99:1 | 48:25 49:5,25 | **504** 2:13 | |
| | 50:14 51:15 | **524-4162** 2:13 | |
| **0** | 57:9,19 64:23 | **545-7676** 2:5 | |