IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LINDA LIANO, | : |
| Plaintiff, | : |
| v. | : CIVIL ACTION NO. 16-1080 |
| COMPUTER SCIENCES CORP., | : |
| Defendant. | : |

**PLAINTIFF LINDA LIANO'S OMNIBUS MOTION *IN LIMINE***

Plaintiff, Linda Liano, by and through her undersigned attorneys, moves this Honorable Court to enter an Order in the form attached hereto to exclude from trial any and all presentation of or references to the evidence identified below. In support of this Motion, Plaintiff relies upon the accompanying Memorandum of Law, which is incorporated herein by reference.

Respectfully submitted,

CONSOLE MATTIACCI LAW, LLC

*/s/ Stephen G. Console*

Stephen G. Console
Rahul Munshi
1525 Locust St., Ninth Floor
Philadelphia, PA 19102

Counsel for Plaintiff, Linda Liano

Date: February 16, 2018

I. **INTRODUCTION**

Plaintiff Linda Liano brings this employment discrimination action against her former employer, Defendant Computer Sciences Corporation ("CSC"). Defendant terminated Plaintiff's employment as Operations Director in December 2012. Her termination – at age fifty-nine (59) – came on the heels of Defendant's Vice President ("VP") of Human Resources ("HR") explicitly sharing with Plaintiff and her colleagues that Defendant had concerns with its aging population, especially its aging management workforce of which Plaintiff was a part. Plaintiff was the oldest individual reporting to her direct supervisor, Mark Roman, and was the only one (1) of his direct reports terminated. Over the two (2) previous years, Mr. Roman had showed his bias in favor of younger, male employees who he protected and retained while terminating female employees. Mr. Roman had also directly stated to Plaintiff that he wanted to bring in "younger" and "fresher" employees into Defendant. Although Plaintiff was terminated, a younger, male operations employee was retained and continues to work at Defendant in a role for which Plaintiff is qualified.

Plaintiff now seeks to preclude Defendant from presenting or referring to the evidence and/or facts identified below at trial in this matter, as the same are irrelevant or are substantially prejudicial to Plaintiff and misleading and confusing to the jury. Specifically, Plaintiff seeks the preclusion of the following evidence:

1. Any alleged performance issues of Plaintiff; and
2. Any personal information regarding Plaintiff's husband.

II. **LEGAL STANDARD**

Courts have inherent power to grant Motions *in Limine* to "manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1994). A Motion *in Limine* is "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is

actually offered." *Id.* at 40 n.2; *see also Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990) ("[A] motion *in limine* is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions."). "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, No. 09-3013, 2010 U.S. App. LEXIS 13827, *8 (3d Cir. July 7, 2010) (quoting *United States v. Abel*, 469 U.S. 45, 54 (1984)). Accordingly, evidence which is improper and inadmissible under the Federal Rules of Evidence is ripe for exclusion upon a Motion *in Limine*.

## II. ARGUMENT

### a. Any Alleged Performance Issues of Plaintiff

Defendant's witnesses have maintained that Plaintiff's performance played **no role** in the decision to terminate her employment. *See* Exhibit A - Deposition of Debi Stafford ("Stafford Dep") at 87:15-17; Deposition of Mark Roman ("Roman Dep.") at 112:18-20; and Deposition of Defendant ("30(b)(6) Dep.") at 41:12-18. To the extent that Defendant intends to offer evidence of any alleged performance issues of Plaintiff – which, by Defendant's own witnesses had **nothing** to do with why Plaintiff was terminated – such evidence should be precluded as irrelevant under Federal Rule of Evidence 401.

"In determining whether to admit evidence, a court must make the threshold determination that the proffered evidence is relevant." *N. Am. Roofing & Sheet Metal Co., Inc. v. Bldg. & Constr. Trades Council of Phila. and Vicinity*, 2005 U.S. Dist. LEXIS 241, *6 (E.D.Pa. Jan. 10, 2005). Federal Rule of Evidence 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 402 provides that "all relevant

evidence is admissible." Fed. R. Ev. 402; *see also Forrest v. Beloit Corp.*, 424 F.3d 344, 355 (3d Cir. 2005) (irrelevant evidence is inadmissible). Here, because any alleged performance issues of Plaintiff played **no** role in the adverse action taken against her by Defendant, any such evidence must be precluded from trial. Evidence of Plaintiff's alleged performance issues would not have any tendency to make any fact more or less probable in this matter because Defendant's stated reason for terminating Plaintiff's employment was unrelated to her job performance.

Further, even if the Court deems the evidence identified below as relevant in some form, the probative value of the same is substantially outweighed by the threat of unfair prejudice, confusing the issues, misleading the jury, and wasting this Court's time. *See* Fed. R. Evid. 403. Federal Rule of Evidence 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Rule 403 recognizes that a cost/benefit analysis must be employed to determine whether or not to admit the evidence." *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343 (3d Cir. 2002). "In balancing, 'the proper equation places on one side the maximum reasonable probative force for the offered evidence,' while 'the other side of the equation should include the likely prejudicial impact of the evidence." *Id.* at 1344 (quotation omitted). As such, "evidence may be excluded if its probative value is not worth the problems that its admission may cause." *Id.* at 1343. *See also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 1992) (describing Rule 403 standard).

Again, because any alleged issues with Plaintiff's performance admittedly had no influence over the decision to select Plaintiff for termination, the introduction of such evidence would unfairly prejudice Plaintiff and would mislead the jury. Allowing Defendant to present evidence

that Plaintiff was allegedly a poor performer could cause a jury to, improperly, determine that Plaintiff was a bad employee who deserved to be discriminated against; that someone with alleged performance issues cannot bring a legitimate claim for discrimination; or, that someone with alleged performance issues does not deserve to be compensated for discriminatory conduct to which she was subjected. As such, any testimony or documentation regarding Plaintiff's performance which casts a negative light on Plaintiff should be excluded from trial.

### b. Any Personal Information Regarding Plaintiff's Husband

At his deposition, Mr. Roman – Plaintiff's former supervisor – made unsolicited comments regarding Plaintiff's husband's alleged personal history. *See* Exhibit B - Roman Dep. at 109:4-8 ("I'd say we made concession for Linda when her husband was going through her (sic) drug and alcohol problem and was being sued by his business partner before he was convicted.").

First, there is no evidence in the record that supports Mr. Roman's allegations about Plaintiff's husband's personal situation, and undisputedly Plaintiff's husband's alleged situation had nothing to do with why Defendant terminated Plaintiff's employment. Consequently, such testimony must be precluded at trial.

Second, for fairly obvious reasons, such testimony should be precluded under Rule 403 as substantially and unfairly prejudicial. "Unfair prejudice as used in [Rule 403] means that the evidence is so inflammatory that it will blind the jury to the true, rational facts, and will inflame their passion and prejudices to the degree that they will be swayed by their emotions, rather than by a dispassionate evaluation of the evidence." *Dittrich v. Seeds*, 2005 U.S. Dist. LEXIS 22078, *43 (E.D.Pa. 2005). Any references to alleged drug or alcohol problems, or a conviction, of Plaintiff's husband are so far outside the bounds of this litigation that such testimony must be precluded.

### III. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that her Motion be granted and that Defendant be precluded from presenting or referring to the evidence identified herein at trial in this matter.

Respectfully submitted,

**CONSOLE MATTIACCI LAW, LLC**

_____
Stephen G. Console
Rahul Munshi
1525 Locust St., Ninth Floor
Philadelphia, PA 19102

Counsel for Plaintiff, Linda Liano

Date:   February 16, 2018

# EXHIBIT A

85

1  Q. Based on your understanding of how the
2  delayering process went at CSC, is this an accurate
3  statement?
4  A. It is.
5  Q. What was Ms. Liano's functional role?
6  A. I don't recall her title.
7  Q. Well, there is nothing in here about
8  title. We're talking about functional role. Do
9  you recall what her functional role was?
10 A. I believe she was responsible for an
11 operations group. That is what I was trying to
12 recall.
13 Q. Was Ms. Liano's position eliminated in
14 full, or was it consolidated with another position?
15     MR. WOOD: Object to the form.
16     THE WITNESS: I believe it was
17 eliminated in full.
18 BY MR. MUNSHI:
19 Q. Did anybody take over Ms. Liano's job
20 duties?
21 A. No.
22 Q. Okay. Ms. Liano worked at CSC for
23 many, many years. Presumably she had work to do.
24 Did anybody do that work anymore? What happened to
25 it?

86

1  A. Not any one person did that work. So
2  part of it was sent to a sales role. Part of it
3  was sent to a commission role. I'm sure she did
4  other things with the staff you tell me she has,
5  but I don't know what those were.
6  Q. So do you know any individual at CSC
7  who was retained who then did any of the job duties
8  that Ms. Liano previously did?
9  A. Who was retained in the same layer that
10 she was in?
11 Q. Retained as part of the delayering
12 process.
13     MR. WOOD: Object to the form.
14     THE WITNESS: There is no way to draw a
15 complete conclusion on that. The delayering
16 process took months, and there were 13 layers that
17 we delayered. So where you started here and where
18 you ended up could take conversations and layers
19 over several months of conversation. So it's not
20 like you picked up one thing and just dropped it
21 somewhere else.
22 BY MR. MUNSHI:
23 Q. Okay. My question is meant to be much
24 simpler than that. Prior to Ms. Liano's
25 termination, she had certain job duties and

87

1  responsibilities. Then her employment is
2  terminated. Who took over doing the work that
3  Ms. Liano was previously doing?
4      MR. WOOD: Object to the form. Lack of
5  foundation.
6      THE WITNESS: As I said just a moment
7  ago, I believe part of it went to the sales
8  organization. I think part of it went to the sales
9  commission piece that we were newly standing up and
10 consolidating. I think other parts of it must have
11 gone to other parts of the organization, but I
12 don't know who. I did not work with Mark and his
13 team to transition responsibilities.
14 BY MR. MUNSHI:
15 Q. Did Ms. Liano's work performance as CSC
16 play any role in the decision to terminate her?
17 A. Absolutely not.
18 Q. If you turn to the second -- the next
19 page of P 14, it's the continuation of response to
20 Interrogatory Number 1. It says here: Plaintiff,
21 an at-will employee, was laid off as part of a
22 reduction in force instituted in connection with
23 the reorganization process. Prior to the
24 reorganization, plaintiff held the only operations
25 position in the global healthcare group reporting

88

1  to Mark Roman. The reorganization designed by BCG
2  changed Mr. Roman's role and placed each of his
3  direct reports (and the span of their reporting
4  employs) into other organizational areas, based on
5  functional role.
6      Based on your understanding, is that an
7  accurate statement?
8      MR. WOOD: Objection to form. The
9  quotation should be: Prior direct reports.
10 BY MR. MUNSHI:
11 Q. Okay.
12 A. Well, first of all, BCG didn't design
13 it, so I wouldn't think that's accurate. BCG
14 didn't place any of his prior direct reports into
15 any other organizational efforts or areas. Those
16 were done by Mr. Roman in conjunction with others
17 in the organization.
18 BY MR. MUNSHI:
19 Q. And in the organization, you mean CSC
20 employees --
21 A. Yes.
22 Q. -- correct? Where it says here, the
23 reorganization designed by BCG, is it your
24 understanding that that should be reorganization
25 designed by CSC?

Mark Roman

**109**

1  Q  While working underneath you did you ever issue
2     her any sort of written warning or written
3     discipline?
4  A  No. I wouldn't say that. I'd say we made
5     concessions for Linda when her husband was
6     going through her drug and alcohol problem and
7     was being sued by his business partner before
8     he was convicted. So we would make concessions
9     for Linda to help with meetings where she would
10    dial in virtually or we would have a scheduled
11    call that I had something come up or she had
12    something come up. We had frequent
13    communications, not necessarily always
14    scheduled, but ad hoc.
15 Q  Would you agree with me in general that she
16    performed her duties in a satisfactory manner
17    while reporting to you?
18 A  Yes.
19 Q  If we could have a document handed to
20    Mr. Roman. This is Bates stamped D-61 to D-71,
21    please.
22             - - - - -
23        (Plaintiff's Exhibit No. 4 was marked.)
24             - - - - -
25 Q  Mr. Roman, in front of you is a document that I

**110**

1     believe has been marked Plaintiff's Exhibit 4
2     and I'll give you a moment to review it.
3  A  So quick question. Is there anything on the
4     first page? Are any of these boxes filled in?
5  Q  On the copy that was provided to me it's
6     probably looking just like you where it's a bit
7     shaded and hard to read.
8  A  Right.
9  Q  All I have is the same document. I think we're
10    looking at the same document in the same
11    format.
12 A  Okay.
13        MR. WOOD:       And yes, some
14    of those boxes that are shaded are filled in.
15        THE WITNESS:    Okay. Okay.
16 Q  Do you recognize -- oh, go ahead. I thought
17    you were done.
18 A  Okay.
19 Q  Mr. Roman, do you recognize this document?
20 A  Yes.
21 Q  And do you see this as Mrs. Liano's performance
22    evaluation for the period of April, 2010 to
23    March, 2011?
24 A  I'm assuming that that date is written on here
25    someplace, so I'll say yes.

**111**

1  Q  On the first page, on the front?
2  A  Yeah, this is --
3  Q  It says, "Start date and end date"? Tough to
4     read.
5  A  Yeah. Like I said, I'll believe you. This
6     copy is pretty unreadable.
7  Q  Do you recognize this document as an evaluation
8     that you completed for Miss Liano?
9  A  Yes.
10 Q  And reviewing what you were able to review
11    here, would you agree that this is a generally
12    positive review of her performance?
13 A  Yes.
14 Q  If you could turn to the page that's Bates
15    stamped D-70. 70.
16 A  Yes.
17 Q  And do you see in the middle of the page there
18    are three columns: Strengths, areas for
19    improvements and areas for development?
20 A  Yes.
21 Q  Middle column where it says, "Areas for
22    improvement," it says, "Do not complete this
23    column unless the individual has a performance
24    issue." Do you see that?
25 A  Yes, I do.

**112**

1  Q  And then there are no -- there is no more
2     content in that column, correct?
3  A  That's correct.
4  Q  So would you agree with me based on this
5     evaluation that there were no performance
6     issues set forth in this evaluation of
7     Miss Liano's performance?
8  A  That's correct. There were areas for -- areas
9     for development which she needed to improve,
10    but certainly not looking -- this being a
11    retrospective looking back. She did an
12    acceptable job, a good job for this period.
13 Q  Did you see anything in this evaluation that
14    would indicate that Miss Liano's job was in
15    jeopardy?
16 A  No, I would not see anything here that says her
17    job is in jeopardy.
18 Q  Did Miss Liano's work performance play any role
19    in the decision to terminate her employment?
20 A  No. I don't believe it did.
21 Q  There are two documents I'd like to show Mr.
22    Roman at the same time. One is the Complaint
23    in this action and the other one is the Answer
24    in this action. If we could put those two
25    together. Perhaps we can mark the Complaint as

```
                                                           41

 1    stage, right?
 2         A.         That's correct.
 3         Q.         So Linda Liano, what was done by the
 4    company with regard to her, was it ever a consideration,
 5    was her performance ever a consideration with regard to
 6    any decisions that were made regarding Linda Liano?
 7                    MR. WOOD:  Object to the form, vague,
 8    overbroad.
 9                    THE WITNESS:  So I just need you to
10    restate that; so was Linda Liano -- say it again.
11         BY MR. MUNSHI:
12         Q.         Did Ms. Liano's performance play any,
13    history of performance, performance evaluations or
14    anything else, did Ms. Liano's performance play any role
15    in CSC's decision to terminate her employment?
16                    MR. WOOD:  Object to the form.  You can
17    answer.
18                    THE WITNESS:  No.
19                    MR. MUNSHI:  This is a document that was
20    previously marked as Plaintiff's Exhibit 5.  Let's put a
21    sticker on it just so we have it on the record.  So let's
22    go ahead and mark this as Plaintiff's Exhibit 5.
23                    (Whereupon, the document referred to above
```

# EXHIBIT B

Mark Roman

**109**

1  Q  While working underneath you did you ever issue
2     her any sort of written warning or written
3     discipline?
4  A  No. I wouldn't say that. I'd say we made
5     concessions for Linda when her husband was
6     going through her drug and alcohol problem and
7     was being sued by his business partner before
8     he was convicted. So we would make concessions
9     for Linda to help with meetings where she would
10    dial in virtually or we would have a scheduled
11    call that I had something come up or she had
12    something come up. We had frequent
13    communications, not necessarily always
14    scheduled, but ad hoc.
15 Q  Would you agree with me in general that she
16    performed her duties in a satisfactory manner
17    while reporting to you?
18 A  Yes.
19 Q  If we could have a document handed to
20    Mr. Roman. This is Bates stamped D-61 to D-71,
21    please.
22              - - - - -
23    (Plaintiff's Exhibit No. 4 was marked.)
24              - - - - -
25 Q  Mr. Roman, in front of you is a document that I

**110**

1     believe has been marked Plaintiff's Exhibit 4
2     and I'll give you a moment to review it.
3  A  So quick question. Is there anything on the
4     first page? Are any of these boxes filled in?
5  Q  On the copy that was provided to me it's
6     probably looking just like you where it's a bit
7     shaded and hard to read.
8  A  Right.
9  Q  All I have is the same document. I think we're
10    looking at the same document in the same
11    format.
12 A  Okay.
13         MR. WOOD:         And yes, some
14    of those boxes that are shaded are filled in.
15         THE WITNESS:      Okay. Okay.
16 Q  Do you recognize -- oh, go ahead. I thought
17    you were done.
18 A  Okay.
19 Q  Mr. Roman, do you recognize this document?
20 A  Yes.
21 Q  And do you see this as Mrs. Liano's performance
22    evaluation for the period of April, 2010 to
23    March, 2011?
24 A  I'm assuming that that date is written on here
25    someplace, so I'll say yes.

**111**

1  Q  On the first page, on the front?
2  A  Yeah, this is --
3  Q  It says, "Start date and end date"? Tough to
4     read.
5  A  Yeah. Like I said, I'll believe you. This
6     copy is pretty unreadable.
7  Q  Do you recognize this document as an evaluation
8     that you completed for Miss Liano?
9  A  Yes.
10 Q  And reviewing what you were able to review
11    here, would you agree that this is a generally
12    positive review of her performance?
13 A  Yes.
14 Q  If you could turn to the page that's Bates
15    stamped D-70. 70.
16 A  Yes.
17 Q  And do you see in the middle of the page there
18    are three columns: Strengths, areas for
19    improvements and areas for development?
20 A  Yes.
21 Q  Middle column where it says, "Areas for
22    improvement," it says, "Do not complete this
23    column unless the individual has a performance
24    issue." Do you see that?
25 A  Yes, I do.

**112**

1  Q  And then there are no -- there is no more
2     content in that column, correct?
3  A  That's correct.
4  Q  So would you agree with me based on this
5     evaluation that there were no performance
6     issues set forth in this evaluation of
7     Miss Liano's performance?
8  A  That's correct. There were areas for -- areas
9     for development which she needed to improve,
10    but certainly not looking -- this being a
11    retrospective looking back. She did an
12    acceptable job, a good job for this period.
13 Q  Did you see anything in this evaluation that
14    would indicate that Miss Liano's job was in
15    jeopardy?
16 A  No, I would not see anything here that says her
17    job is in jeopardy.
18 Q  Did Miss Liano's work performance play any role
19    in the decision to terminate her employment?
20 A  No. I don't believe it did.
21 Q  There are two documents I'd like to show Mr.
22    Roman at the same time. One is the Complaint
23    in this action and the other one is the Answer
24    in this action. If we could put those two
25    together. Perhaps we can mark the Complaint as